SYLVIA CHIU (Bar No. 269844)
sylvia.chiu@dentons.com
CONNOR M. SCOTT (Bar No. 321714)
connor.scott@dentons.com
DENTONS US LLP
601 South Figueroa Street, Suite 2500
Los Angeles, California  90017-5704
Telephone:  (213) 623-9300
Facsimile:   (213) 623-9924

SHARI L. KLEVENS (*Pro Hac Vice Applicant*)
shari.klevens@dentons.com
CRAIG M. GIOMETTI (*Pro Hac Vice Applicant*)
craig.giometti@dentons.com
DENTONS US LLP
1900 K Street, N.W.
Washington, DC  20006
Telephone: (202) 496-7500
Facsimile: (202) 496-7756

Attorneys for Plaintiff
**Aspen Specialty Insurance Company**

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| ASPEN SPECIALTY INSURANCE COMPANY,<br><br>                    Plaintiff,<br><br>          v.<br><br>MILLER BARONDESS, LLP; LOUIS R. MILLER; JAMES GOLDMAN; ALEXANDER FRID; and JASON TOKORO,<br><br>                    Defendants. | Case No.  2:21-CV-04208<br><br>**COMPLAINT FOR DECLARATORY RELIEF AND REIMBURSEMENT** |

**INTRODUCTION**

1.     This action concerns insurance coverage for an underlying malicious prosecution action previously pending before this Court, styled *P6 LA MF Holdings SPE, LLC v. NMS Capital Partners I, LLC et al.*, Case No. 2:19-cv-1150 (the "AEW Action"), under a lawyers professional liability insurance policy issued by Aspen Specialty Insurance Company ("Aspen") to Miller Barondess, LLP ("Miller Barondess").

2.     The complaint in the underlying AEW Action contained a single claim for malicious prosecution against Miller Barondess, Louis R. Miller, James Goldman, Alexander Frid, and Jason Tokoro (collectively, the "Miller Barondess Parties"). Aspen provided the Miller Barondess Parties with a defense in the AEW Action under a reservation of rights and paid a settlement on their behalf to resolve the AEW Action subject to its reservation of rights, which included the right to seek reimbursement for all amounts paid by Aspen for uncovered claims pursuant to the Aspen Policy and California law.

3.     For several reasons, including the application of California Insurance Code § 533, the AEW Action does not fall within the scope of coverage provided by the Aspen Policy.

4.     Aspen thus seeks a declaration regarding its rights and obligations under the Aspen Policy in connection with the AEW Action and seeks reimbursement for amounts Aspen paid in the defense and settlement of the AEW Action.

**JURISDICTION AND VENUE**

5.     This is a civil action between citizens of different states and the amount in controversy exceeds $75,000, exclusive of costs and interest.  This Court has diversity jurisdiction under 28 U.S.C. § 1332.  Additionally, this Court has jurisdiction for providing declaratory relief under 28 U.S.C. § 2201.

6.      Venue is proper in the United States District Court for the Central District of California pursuant to 28 U.S.C. § 1391 because Defendants reside in this judicial district and a substantial portion of the events giving rise to this complaint occurred in this judicial district.

7.      An actual controversy exists regarding the rights, duties, and obligations of the parties regarding insurance coverage for Miller Barondess in connection with the AEW Action under the lawyers professional liability insurance policy issued by Aspen to Miller Barondess.

## THE PARTIES

8.      Plaintiff Aspen is a corporation organized and existing under the laws of the State of North Dakota with its principal place of business in New York, New York. Aspen is therefore a citizen of North Dakota and New York.

9.      Defendant Miller Barondess is a California limited liability partnership. Upon information and belief, all Partners at Miller Barondess are domiciled in California and are therefore citizens of California.  Therefore, Miller Barondess is a citizen of California.

10.      Defendant Louis R. Miller is an individual domiciled in California, and is therefore a citizen of California.  This action is brought against Louis R. Miller individually and in his capacity as a Partner at Miller Barondess.

11.      Defendant James Goldman is an individual domiciled in California, and is therefore a citizen of California.  This action is brought against James Goldman individually and in his capacity as a Partner at Miller Barondess.

12.      Defendant Alexander Frid is an individual domiciled in California, and is therefore a citizen of California.  This action is brought against Alexander Frid individually and in his capacity as a Partner at Miller Barondess.

13.     Defendant Jason Tokoro is an individual domiciled in California, and is therefore a citizen of California.  This action is brought against Jason Tokoro individually and in his capacity as a Partner at Miller Barondess.

## THE ASPEN POLICY

14.     Aspen issued Lawyers Professional Liability Insurance policy no. LR004CQ18 to Miller Barondess for the policy period of May 22, 2018 to May 22, 2019 (the "Aspen Policy").  The Aspen Policy has limits of liability of $5 million per claim and $5 million in the aggregate, subject to a $250,000 per Claim deductible and a $500,000 aggregate deductible.  The Aspen Policy's limits and the deductibles are subject to Damages and Claims Expenses.  A true and correct copy of the Aspen Policy is attached hereto as Exhibit A.

## THE AEW ACTION

15.     On February 14, 2019, P6 LA MF Holdings SPE, LLC ("AEW") initiated the AEW Action by filing its Complaint for Malicious Prosecution against the Miller Barondess Parties, among others, arising from their prosecution of an underlying lawsuit referred to as the *Lincoln Studios* Litigation.  A true and correct copy of the Complaint, without exhibits, is attached hereto as Exhibit B (the "AEW Complaint").

### The *Lincoln Studios* Litigation

16.     The *Lincoln Studios* Litigation (*Lincoln Studios, LLC, et al. v. DLA, et al.*, case no. BC551551 in the Superior Court of California, County of Los Angeles) was commenced on July 15, 2014.  The Miller Barondess Parties represented NMS Capital Partners I, LLC ("NMS") in the *Lincoln Studios* Litigation.

17.     The *Lincoln Studios* Litigation concerned a joint venture agreement ("JVA") between AEW and NMS to acquire and develop residential and mixed use buildings in West Los Angeles. Ex. B, AEW Complaint, ¶ 4.   At issue in the *Lincoln Studios* Litigation was a "buy/sell provision" in the JVA that allowed either party, at an agreed upon time, to buy the other party's interest or to sell its own interest at a

particular stated price.  *Id.*, ¶ 39.  According to AEW, NMS (with the Miller Barondess Parties as its counsel) asserted in the *Lincoln Studios* Litigation that a 5-year buy/sell provision in the JVA was a "typo" and that the parties had instead agreed to a 3-year buy/sell provision.  *Id.*, ¶ 61.  NMS allegedly relied upon a forged "Version 2" of the JVA that included the 3-year buy/sell provision.  *Id.*, ¶¶ 55, 61.

18.     In addition to forging "Version 2" of the JVA (among other documents), NMS also allegedly engaged in "widespread document and device manipulation, destruction and suppression, all with the aid of [the Miller Barondess Parties]," for the purpose of concealing the fact that it had forged documents.  *Id.*, ¶ 74.

19.     On January 29, 2016, AEW filed its "Motion for Terminating and Other Sanctions Against Plaintiffs for Spoliation of Evidence" in the *Lincoln Studios* Litigation against all plaintiffs and their counsel of record, including the Miller Barondess Parties (the "Motion for Sanctions").  The Motion for Sanctions contained allegations regarding NMS's forgery and destruction of evidence, and the Miller Barondess Parties' knowledge of the same, that would later form the basis for the malicious prosecution claim asserted in the AEW Action.  A true and correct copy of the Motion for Sanctions, without exhibits, is attached hereto as Exhibit C.

20.     For example, in the Motion for Sanctions, AEW specifically asserted that the Miller Barondess Parties were "either painfully aware of this massive and coordinated spoliation, forgery and perjury because they did the work that any reasonable attorney would have performed that would have caused such a discovery, or they willfully blinded themselves by failing to do the work required."  The relief sought by AEW included a demand for monetary sanctions against the plaintiffs in the *Lincoln Studios* Litigation and their counsel (*i.e.*, the Miller Barondess Parties) in the form of attorneys' fees, expert fees, and costs incurred by AEW.

21.     On November 22, 2016, the trial court in the *Lincoln Studios* Litigation issued a "Terminating Sanctions Order" based on findings that NMS had engaged in

forgery, perjury, and the destruction of evidence.  Ex. B, AEW Complaint, ¶ 103.  The court subsequently entered judgment against NMS on its affirmative claims and entered a default judgment against NMS and in favor of AEW on AEW's cross-complaint.  *Id.*, ¶¶ 104, 105.  Those judgments were affirmed on appeal.  *Id.*, ¶ 106.

### Related Litigation

22.    In addition to the *Lincoln Studios* Litigation, AEW and NMS (or related parties) were involved in various other related lawsuits in which the Miller Barondess Parties were also involved as counsel.  On June 3, 2016, in one such lawsuit (*P6 LA MF Holdings I LLC, et al. v. NMS Properties, Inc.*, Case No. BC584878, Superior Court of California, Los Angeles County), AEW filed a motion for case terminating sanctions ("the *P6* Motion for Sanctions") that, similar to the motion filed in the *Lincoln Studios* Litigation, sought monetary sanctions against the Miller Barondess Parties and asserted that they "must be held jointly and severally liable for these sanctions given their inability and/or unwillingness to explain their knowledge and involvement in this conduct, all of which took place on their watch."  A true and correct copy of the *P6* Motion for Sanctions, without exhibits, is attached hereto as Exhibit D.

### The AEW Complaint

23.    The AEW Complaint contained a single claim for malicious prosecution against the Miller Barondess Parties premised on the Miller Barondess Parties' alleged conduct in filing and pursuing the *Lincoln Studios* Litigation.  For example, the AEW Complaint alleged that "[i]n initiating and continuing to prosecute the *Lincoln Studios* Litigation, [the Miller Barondess Parties] acted with oppression, fraud, and malice, including, but not limited to, acting with intent to cause injury to Plaintiff, and engaging in a systematic concealment of the truth in order to advance NMS' baseless claims against Plaintiff."  Ex. B, AEW Complaint, ¶ 135.  The AEW Complaint also alleged that, in order to maintain the allegedly malicious and frivolous lawsuit against

1   AEW, the Miller Barondess Parties "knowingly submitted to the trial court even more

2   forgeries, and perjury, and oversaw one of the most far-reaching and brazen acts of

3   evidence spoliation that any court has ever seen." *Id.*, ¶ 1.

4       24.    The AEW Complaint sought relief against the Miller Barondess Parties in

5   the form of special damages, general damages, punitive damages "to penalize

6   Defendants for their intentional and malicious misconduct," pre-judgment interest, and

7   costs. *Id.*, p. 58.

8                          **Notice of the AEW Action to Aspen**

9       25.    By letter dated February 20, 2019, Miller Barondess provided notice of

10  the AEW Action to Aspen.  On March 28, 2019, Aspen sent correspondence to the

11  Miller Barondess Parties in which it reserved its rights under the Aspen Policy and,

12  subject to that reservation of rights, agreed to provide the Miller Barondess Parties

13  with a defense with the defense counsel chosen by the Miller Barondess Parties.

14      26.    Subject to its reservation of rights, Aspen paid all Claims Expenses (as

15  defined by the Aspen Policy) incurred by the Miller Barondess Parties in connection

16  with the AEW Action in excess of the Aspen Policy's deductible, which totaled an

17  amount exceeding $75,000.

18                         **The Settlement of the AEW Action**

19      27.    By Order dated September 4, 2019, this Court denied the Miller

20  Barondess Parties' special motion pursuant to Cal. Civ. P. Code ¶ 425.16 to strike the

21  AEW complaint as a prohibited strategic lawsuit against public participation

22  ("SLAPP").  *See P6 LA MF Holdings SPE, LLC v. NMS Capital Partners I, LLC*, No.

23  2:19-cv-01150-AB (AFMx), 2019 WL 8135416 (C.D. Cal. Sept. 4, 2019).  This Court

24  found that, viewing the evidence in the light most favorable to AEW, the elements of a

25  malicious prosecution claim (*i.e.*, lack of probable cause and malice) were sufficiently

26  pled.  *See id.*  This Court further noted that it "struggle[d] to see how [the Miller

27  Barondess Parties] could have failed to see the futility of their lawsuit.  The

28

spontaneous origin of a new version of the JVA, never before discussed, and the evidence contrary (including contemporary emails regarding the Agreement) should have signaled that the documents underlying the litigation may have been doctored." *Id.* at *7, fn. 4.

28.     The Miller Barondess Parties appealed this Court's September 4, 2019 Order to the U.S. Circuit Court of Appeals for the Ninth Circuit.  While that appeal was pending, on March 9, 2020, the Miller Barondess Parties sent correspondence to Aspen in which they demanded that Aspen immediately settle the AEW Action for an amount that AEW had indicated it would be willing to accept to resolve the matter. The Miller Barondess Parties advised that they viewed the sum sought by AEW as a reasonable amount in light of their potential exposure in connection with the malicious prosecution claim asserted by AEW, particularly following this Court's September 4, 2019 Order denying the Miller Barondess Parties' anti-SLAPP motion.

29.     On March 16, 2020, Aspen sent correspondence in which it responded to the Miller Barondess Parties' March 9, 2020 correspondence.  Aspen advised that it was evaluating an appropriate settlement strategy under the circumstances and sought to confer with the Miller Barondess Parties and defense counsel in that regard.

30.     Also on March 16, 2020, Aspen sent correspondence to the Miller Barondess Parties in which it supplemented the reservation of rights contained in Aspen's March 28, 2019 letter.   Aspen advised the Miller Barondess Parties that Aspen had no indemnification obligation in connection with the AEW Action because, among other reasons, Section 533 of the California Insurance Code prohibits an insurer from indemnifying a claim for malicious prosecution, and given that the sole claim included in the action was for malicious prosecution, which necessarily requires proof of willful acts within the scope of Section 533, the damages sought and to be settled were solely for uncovered claims.  Accordingly, Aspen advised that any agreement to pay policy proceeds towards a settlement of the AEW Action would be subject to

Aspen's right to reimbursement set forth in *Blue Ridge Ins. Co. v. Jacobsen*, 25 Cal.4th 489 (2001).

31.     In subsequent correspondence sent on March 23, 2020 and on March 25, 2020, Aspen confirmed that the Miller Barondess Parties consented to any settlement of the AEW Action that could be reached with AEW and funded by Aspen.  Aspen also again advised the Miller Barondess Parties that, because malicious prosecution claims necessarily required proof of intentional conduct, any amounts paid by Aspen to settle the AEW Action could not be covered under the Aspen Policy under California law, and thus Aspen reserved its right to seek full reimbursement of any settlement payment as set forth in *Blue Ridge*.  With knowledge of that position, the Miller Barondess Parties continued to demand that Aspen fund a settlement of the AEW Action.

32.     On April 3, 2020, a settlement agreement was executed in order to resolve the AEW Action.  Aspen agreed to pay the settlement amount on behalf of the Miller Barondess Parties to resolve the claims asserted against them in the AEW Action.  A true and correct copy of the settlement agreement is attached hereto as Exhibit E.[1]  As Aspen advised the Miller Barondess Parties in its prior correspondence, Aspen's agreement to fund the settlement was subject to a complete reservation of rights, including its right to seek reimbursement of amounts paid to settle claims that were not covered under the Aspen Policy.

33.     Pursuant to its reservation of rights, Aspen funded the settlement of the AEW Action, in a confidential amount exceeding $75,000.

---

[1]  Although Aspen takes no position on the confidentiality of the Settlement Agreement, Aspen is aware that the agreement contains a confidentiality provision.  Thus, Aspen moves herewith for a temporary order sealing the Settlement Agreement until such time that Defendants appear in this action and can, if they so choose, move this Court to state on their own behalf whether they believe the Settlement Agreement should continue to be sealed.

## FIRST CAUSE OF ACTION

### (Declarative Relief Under the Aspen Policy)

### (California Insurance Code § 533)

34.     Aspen hereby re-alleges and incorporates by reference all preceding paragraphs above, in their entirety, as though fully set forth herein.

35.     Section 533 of the California Insurance Code ("Section 533") is read into all insurance policies and provides, in relevant part, that "[a]n insurer is not liable for a loss caused by the wilful act of the insured…."

36.     The sole claim against the Miller Barondess Parties asserted in the AEW Complaint was for malicious prosecution based on the alleged willful acts of the Miller Barondess Parties in connection with the *Lincoln Studios* Litigation.

37.     Under California law, a claim for malicious prosecution necessarily requires proof of willful acts within the scope of Section 533.

38.     Accordingly, pursuant to Section 533, Aspen had no obligation to indemnify the Miller Barondess Parties in connection with the AEW Action.

39.     Aspen is therefore entitled to a declaration that it had no duty to indemnify the Miller Barondess Parties for the settlement of the AEW Action.

## SECOND CAUSE OF ACTION

### (Declarative Relief Under the Aspen Policy)

### (Intentional Acts Exclusion)

40.     Aspen hereby re-alleges and incorporates by reference all preceding paragraphs above, in their entirety, as though fully set forth herein.

41.     Section IV of  the Aspen Policy contains the following exclusion (the "Intentional Acts Exclusion"):

The Policy does not apply to any **Claim**:

1.     Alleging intentional wrongdoing, fraud, dishonesty, or malicious **Wrongful Acts** by an **Insured**, if such conduct is established as a matter of fact in a civil, arbitration, criminal or other proceeding, or is admitted

-10-

to by the **Insured**. The Insurer shall continue to defend the Insured against whom the allegations are made if these allegations arise out of **Wrongful Acts** otherwise covered under this Policy, but that **Insured** shall reimburse the Insurer for all **Claims Expenses** if such conduct is established as a matter of fact in a civil, arbitration, criminal or other proceeding, or is admitted to by the **Insured**.

This exclusion does not apply to an **Insured** who did not personally commit or personally participate in any of the conduct described in this exclusion.

42.     The sole claim against the Miller Barondess Parties asserted in the AEW Complaint filed in the AEW Complaint was for malicious prosecution based on the alleged intentional and malicious acts of the Miller Barondess Parties in connection with the *Lincoln Studios* Litigation.

43.     Under California law, a claim for malicious prosecution necessarily requires proof of intentional or malicious acts within the scope of the Intentional Acts Exclusion.

44.      Accordingly, pursuant to the Intentional Acts Exclusion, Aspen had no obligation to indemnify the Miller Barondess Parties in connection with the AEW Action.

45.     Aspen is therefore entitled to a declaration that it had no duty to indemnify the Miller Barondess Parties for the settlement of the AEW Action.

### THIRD CAUSE OF ACTION

### (Declaratory Relief Under the Aspen Policy)

### (Prior Knowledge Provision)

46.     Aspen hereby re-alleges and incorporates by reference all preceding paragraphs above, in their entirety, as though fully set forth herein.

47.     The Aspen Policy contains the following Insuring Agreement, in relevant part:

The Insurer shall pay on behalf of the **Insured** all sums in excess of the Deductible amount and up to the Limits of Liability stated in the

Declarations which the **Insured** shall become legally obligated to pay as **Damages** and shall pay **Claims Expenses** resulting from a **Claim** first made against an **Insured** during the **Policy Period** or **Extended Reporting Period**, if applicable, as a result of a **Wrongful Act** by an **Insured** or an entity for whom an **Insured** is legally liable, provided that:

. . .

C. Prior to the **Knowledge Date** no **Insured** knew or should have known of such **Wrongful Act** or could have reasonably expected that such **Wrongful Act** might give rise to a **Claim**; …

48.    The Aspen Policy specifies a Knowledge Date of May 22, 2016.

49.    The Motion for Sanctions was filed prior to the May 22, 2016 Knowledge Date and concerned the same alleged acts of the Miller Barondess Parties as those at issue in the AEW Action.  Indeed, in the Motion for Sanctions, AEW sought sanctions against the Miller Barondess Parties due to their alleged knowledge of, or participation in, the spoliation, forgery and perjury at issue in the AEW Action.

50.    Accordingly, prior to the May 22, 2016 Knowledge Date, an Insured knew or could have reasonably expected that any Wrongful Act alleged in the AEW Action might give rise to a Claim.

51.    As a result, the AEW Action does not come within the Insuring Agreement of the Aspen Policy.

52.    Aspen is therefore entitled to a declaration that it had no duty to defend or to indemnify the Miller Barondess Parties under the Aspen Policy in connection with the AEW Action due to the application of the prior knowledge provision of the Aspen Policy.

## **FOURTH CAUSE OF ACTION**
### **(Declaratory Relief Under the Aspen Policy)**
### **(Claim First Made During the Policy Period)**

53.    Aspen hereby re-alleges and incorporates by reference all preceding paragraphs above, in their entirety, as though fully set forth herein.

54.     The Insuring Agreement of the Aspen Policy applies, in relevant part, to a "**Claim** first made against an **Insured** during the **Policy Period** or **Extended Reporting Period**, if applicable…."

55.     The Policy Period of the Aspen Policy is May 22, 2018 to May 22, 2019.

56.     The Aspen Policy defines the term "**Claim**" as "a demand for money or services received by an **Insured** alleging a **Wrongful Act**, including service of suit, a request that an **Insured** waive a legal right or sign an agreement to toll a statute of limitations, or a demand for arbitration."

57.     The Aspen Policy defines the term "**Wrongful Act**" as "any actual or alleged negligent act, error or omission or **Personal Injury**, arising out of the rendering of or the failure to render **Professional Legal Services**."

58.     Prior to the May 22, 2018 inception date of the Aspen Policy, an Insured received both the Motion for Sanctions in the *Lincoln Studios* Litigation (which was filed on January 29, 2016) and the *P6* Motion for Sanctions (which was filed on June 3, 2016). Both motions for sanctions concerned the same alleged acts of the Miller Barondess Parties as those at issue in the AEW Action. Indeed, in each motion, AEW sought sanctions against the Miller Barondess Parties due to their alleged knowledge of, or participation in, the spoliation, forgery and perjury at issue in the AEW Action.

59.     The Motion for Sanctions and the *P6* Motion for Sanctions each also sought money in the form of monetary sanctions against the Miller Barondess Parties.

60.     The Motion for Sanctions and the *P6* Motion for Sanctions thus constituted the same Claim as the Claim later asserted in the AEW Action. As a result, the AEW Action is not a Claim "first made" during the Policy Period of the Aspen Policy, as required by the Insuring Agreement of the Aspen Policy.

61.     Aspen is therefore entitled to a declaration that it had no duty to defend or to indemnify the Miller Barondess Parties under the Aspen Policy in connection with

the AEW Action because the AEW Action was not a Claim first made during the Policy Period of the Aspen Policy.

## FIFTH CAUSE OF ACTION
### (Reimbursement of Amounts Paid in Funding the Settlement of the AEW Action)

62.     Aspen hereby re-alleges and incorporates by reference all preceding paragraphs above, in their entirety, as though fully set forth herein.

63.     Aspen's agreement to fund the settlement of the AEW Action was subject to a reservation of rights to seek reimbursement of that payment, as set forth in *Blue Ridge Ins. Co. v. Jacobsen*, 25 Cal.4th 489 (2001).

64.     Aspen had no duty to indemnify the Miller Barondess Parties in connection with the AEW Action.

65.     Aspen is therefore entitled to reimbursement from the Miller Barondess Parties of the entire amount of the confidential settlement amount that Aspen advanced to resolve the AEW Action.

## SIXTH CAUSE OF ACTION
### (Reimbursement of Amounts Paid in Defense of the Miller Barondess Parties in the AEW Action)

66.     Aspen hereby re-alleges and incorporates by reference all preceding paragraphs above, in their entirety, as though fully set forth herein.

67.     In reserving its rights under the Aspen Policy, Aspen reserved its right to seek reimbursement of all amounts paid by Aspen for the defense of the Miller Barondess Parties in the AEW Action.

68.     Subject to its reservation of rights, Aspen paid for the defense of the Miller Barondess Parties in the AEW Action.

69.     Aspen had no duty to defend the Miller Barondess Parties with respect to the AEW Action as those costs were incurred for the defense of an uncovered claim.

70.     Under California law, including as set forth in *Buss v. Superior Court*, 16 Cal. 4th 35 (1997) and *Scottsdale Ins. Co. v. MW Transportation*, 36 Cal. 4th 643

(2005), Aspen is entitled to recover from the Miller Barondess Parties the amount it expended for the defense of the Miller Barondess Parties in the AEW Action.

## SEVENTH CAUSE OF ACTION

### (Unjust Enrichment)

71.    Aspen hereby re-alleges and incorporates by reference all preceding paragraphs above, in their entirety, as though fully set forth herein.

72.    Aspen conferred a substantial benefit upon the Miller Barondess Parties by funding the defense and settlement of the AEW Action, amounts to which the Miller Barondess Parties were not entitled to under the Aspen Policy and California law.

73.    The Miller Barondess Parties were unjustly enriched by Aspen's payment of the substantial amounts for the defense and settlement of the AEW Action. Accordingly, it would be inequitable and unjust for the Miller Barondess Parties to continue to retain the amounts paid by Aspen, and benefits received from Aspen.

74.    Aspen seeks an award of all the benefits that have been conferred upon the Miller Barondess Parties and by which the Miller Barondess Parties were unjustly enriched by the amounts paid by Aspen to defend and settle the AEW Action in an amount to be proven at trial.

## RELIEF REQUESTED

WHEREFORE, Aspen requests the following relief:

A.    As for the First Cause of Action, a declaration that Aspen had no duty to indemnify the Miller Barondess Parties under the Aspen Policy in connection with the AEW Action;

B.    As for the Second Cause of Action, a declaration that Aspen had no duty to indemnify the Miller Barondess Parties under the Aspen Policy in connection with the AEW Action;

1    C.    As for the Third Cause of Action, a declaration that Aspen had no duty to
2  defend or duty to indemnify the Miller Barondess Parties under the Aspen Policy in
3  connection with the AEW Action;

4    D.    As for the Fourth Cause of Action, a declaration that Aspen had no duty
5  to defend or duty to indemnify the Miller Barondess Parties under the Aspen Policy in
6  connection with the AEW Action;

7    E.    As for the Fifth Cause of Action, for reimbursement of all amounts paid
8  by Aspen in funding the settlement between AEW and the Miller Barondess Parties in
9  the AEW Action, which was not covered under the Aspen Policy and applicable law;

10    F.    As for the Sixth Cause of Action, for reimbursement of all amounts paid
11  by Aspen in the defense of the Miller Barondess Parties in the AEW Action, which
12  was not covered under the Aspen Policy and applicable law;

13    G.    As for the Seventh Cause of Action, disgorgement and restitution of the
14  amounts by which the Miller Barondess Parties were unjustly enriched;

15    H.    For pre-judgment and post-judgment interest;

16    I.    For costs of suit incurred herein; and

17    J.    For such other and further relief as the Court may deem just and proper.

18  Dated:  May 20, 2021                    DENTONS US LLP
19
20                                          By: */s/ Sylvia Chiu*
21                                          Shari L. Klevens
                                            Sylvia Chiu
22                                          Craig M. Giometti
                                            Connor M. Scott
23
24                                          Attorneys for Plaintiff
25                                          Aspen Specialty Insurance Company
26
27
28

-16-

# Exhibit A

**Aspen Specialty Insurance Solutions**
**135 Main Street, Suite 1950**
**San Francisco, CA   94105**



May 18, 2018

Kelley Milks
Ahern Insurance Brokerage, Inc.
9655 Granite Ridge Drive
Suite 500
San Diego, CA  92123

Named Insured:       Miller Barondess, LLP
Policy Number:       LR004CQ18
Effective Date:       05/22/2018

Dear Kelley,

We are pleased to provide you with the following Lawyers Professional Liability Insurance
policy on behalf of Miller Barondess, LLP.

Thank you for choosing Aspen Specialty Insurance Solutions, please contact me if you have
any questions at bryan.nogaki@aspen-insurance.com or at 415-800-0011.

Sincerely,

Bryan Nogaki
Senior Vice President

Enclosure(s)

EXHIBIT A - PAGE 18

Aspen Specialty Insurance Solutions LLC
135 Main Street, San Francisco, CA 94105
License No. 0F82064

**Policy Number: LR004CQ18**
**Renewal Of:  LR004CQ17**


ASPEN

# LAWYERS PROFESSIONAL LIABILITY INSURANCE DECLARATIONS

THIS IS A CLAIMS-MADE AND REPORTED POLICY.  SUBJECT TO ITS TERMS AND CONDITIONS, THIS POLICY ONLY COVERS **CLAIMS** FIRST MADE AGAINST THE **INSURED** AND REPORTED TO THE INSURER DURING THE **POLICY PERIOD**, OR DURING THE **EXTENDED REPORTING PERIOD**, IF APPLICABLE.  **CLAIMS EXPENSES** ARE INCLUDED IN, AND WILL REDUCE, THE LIMITS OF LIABILITY.  PLEASE READ THE ENTIRE POLICY CAREFULLY.

WORDS THAT APPEAR IN BOLD PRINT, OTHER THAN THE CAPTION TITLES, HAVE SPECIAL MEANINGS AND ARE DEFINED SEPARATELY.  WHENEVER A SINGULAR FORM OF A WORD IS USED, THE SAME WILL INCLUDE THE PLURAL WHEN REQUIRED BY CONTEXT.

**Insurer:** Aspen Specialty Insurance Company
590 Madison Avenue, 7th Floor
New York, NY   10022

**Item 1.   Named Insured and Address:**
Miller Barondess, LLP
1999 Avenue of the Stars
Suite 1000
Los Angeles, CA 90067

**Item 2.   Policy Period:**
From:   05/22/2018
To:      05/22/2019
(12:01 AM Standard Time at the address of the Named Insured stated above.)

**Item 3.   Limits Of Liability:**
$5,000,000 Each **Claim** (including **Damages** and **Claims Expenses**)
$5,000,000 Aggregate (for all **Claims** including **Damages** and **Claims Expenses**)

**Item 4.   Deductible:**
$250,000 Each **Claim** (subject to **Damages** and **Claims Expenses**)
$500,000 Aggregate (for all **Claims** subject to **Damages** and **Claims Expenses**)
$ 25,000 Thereafter (for all **Claims** subject to **Damages** and **Claims Expenses**)

**Item 5.       Premium** ████████

Surcharges (if applicable) $0.00

**Item 6.   Retroactive Date**
05/22/2006

**Item 7. Knowledge Date**
05/22/2016

**Item 8.   Prior/Pending Litigation Date**
N/A

**Item 9. Producer Name and Address**
Ahern Insurance Brokerage, LLC
9655 Granite Ridge Drive
Suite 500
San Diego, CA 92123

**Item 10.   Forms and Endorsements Attached at Inception**
See Schedule of Forms and Endorsements

Aspen Specialty Insurance Solutions LLC
135 Main Street, San Francisco, CA 94105
License No. 0F82064

**Item 11.   Notice of Claim**

In the event of a **Claim**, notice to the Insurer shall be sent via express mail or electronic mail to:

Express Mail Address:

c/o Aspen Specialty Insurance Company
Professional Liability Claims Department
590 Madison Avenue, 7th Floor
New York, NY   10022
Electronic Mail Address: professionalliabilityclaims@aspen-insurance.com

This Declarations page, together with the Application for this Policy, the attached Policy form and all Endorsements thereto, shall constitute the contract between the Insurer and the **Insured**.  The Policy is valid only if signed below by a duly authorized representative of the Insurer.

In witness whereof, the Insurer has caused this Policy to be signed below by a duly authorized representative of the Insurer.

Issued on: 05/18/2018

_____
Authorized Representative

EXHIBIT A - PAGE 20

# SCHEDULE OF FORMS AND ENDORSEMENTS

| **FORM NUMBER** | **FORM NAME** |
|---|---|
| ASPLP002 0910 | Lawyers Professional Liability Insurance Declarations |
| ASPLP001 0617 | Lawyers Professional Liability Insurance Policy |
| ASPCO098 0213 | Signature Page |
| APNOFAC0001 0410 | OFAC |
| ASPLP015 0311 | Mutual Choice of Defense Counsel Endorsement |
| ASPCO002 0715 | General Service of Suit Notice |
| SNCA 0314 | California Surplus Lines Notice |



# LAWYERS PROFESSIONAL LIABILITY INSURANCE POLICY

THIS IS A CLAIMS-MADE AND REPORTED POLICY.  SUBJECT TO ITS TERMS AND CONDITIONS, THIS POLICY ONLY COVERS **CLAIMS** FIRST MADE AGAINST THE **INSURED** AND REPORTED TO THE INSURER DURING THE **POLICY PERIOD**, OR DURING THE **EXTENDED REPORTING PERIOD**, IF APPLICABLE.  **CLAIMS EXPENSES** ARE INCLUDED IN, AND WILL REDUCE, THE LIMITS OF LIABILITY.  PLEASE READ THE ENTIRE POLICY CAREFULLY.

WORDS THAT APPEAR IN BOLD PRINT, OTHER THAN THE CAPTION TITLES, HAVE SPECIAL MEANINGS AND ARE DEFINED SEPARATELY.  WHENEVER A SINGULAR FORM OF A WORD IS USED, THE SAME WILL INCLUDE THE PLURAL WHEN REQUIRED BY CONTEXT.

In consideration of the payment of the premium and in reliance upon the statements made in the Application, which is made a part hereof and deemed attached hereto, and subject to the Declarations and all terms of this insurance policy, the Insurer and the **Insureds** agree as follows:

## I.   INSURING AGREEMENTS

The Insurer shall pay on behalf of the **Insured** all sums in excess of the Deductible amount and up to the Limits of Liability stated in the Declarations which the **Insured** shall become legally obligated to pay as **Damages** and shall pay **Claims Expenses** resulting from a **Claim** first made against an **Insured** during the **Policy Period** or **Extended Reporting Period**, if applicable, as a result of a **Wrongful Act** by an **Insured** or an entity for whom an **Insured** is legally liable, provided that:

**A.**  Each **Wrongful Act** was committed on or after the **Retroactive Date** and before the end of the **Policy Period**;

**B.**  No **Insured** gave notice to any prior Insurer of such **Wrongful Act**; and

**C.**  Prior to the **Knowledge Date** no **Insured** knew or should have known of such **Wrongful Act** or could have reasonably expected that such **Wrongful Act** might give rise to a **Claim;** and

**D.**  The **Insured** reported the **Claim** in writing to the Insurer as soon as practicable, but in no event later than sixty (60) days after expiration or termination of this Policy, or during the **Extended Reporting Period**, if applicable.

## II.   EXTENSIONS OF COVERAGE

### A.   Crisis Management – Public Relations Extension

If there is any publication in a daily newspaper of general circulation or a radio, internet or television news report, during the **Policy Period**, containing statements regarding any **Insured** that is reasonably likely to harm the professional reputation of the **Insured ,** the first said publication shall be deemed to be a "Crisis**"** for purposes of this provision**.**  In the event of a Crisis**,** the Insurer may reimburse the Named Insured the reasonable costs incurred to prevent or repair such harm during the time period commencing ninety (90) days prior to, and in anticipation of the first publication, to 90 days after the first publication, regardless of whether a **Claim** is ever made against an **Insured** arising from such Crisis.  Reimbursable costs under this provision are those reasonable and necessary fees and expenses incurred by the Named Insured**,** with the prior written consent of the Insurer**,** for a **Public Relations Firm** to provide **Public Relations Services** for the benefit of the Named Insured in connection with a Crisis.  Such services include reasonable and necessary publishing, printing, advertising, mailing of materials, or travel by an **Insured** or the **Public Relations Firm** in connection with a Crisis**.**  The maximum amount payable by the Insurer pursuant to this provision is $25,000 for each **Policy Period** regardless of the number of publications, Crises, or **Insureds** subject to the unfavorable publication as

stated above.  Any payment made by the Insurer under this Extension shall not be subject to the Deductible obligation or the Limits of Liability.

Public **Relations Firm** means a firm providing services directed at creating and maintaining a positive public image of their clients.  **Public Relations Services** includes advice, creation and distribution of news releases, media placements, articles in general publications, advertisements, and/or providing assistance and training to **Insureds** in dealing with media inquiries and publicity related to the Crisis.

**B.   Defense Extension To Non-Covered Claims**

If the **Insurer** determines that an **Insured** is entitled to a defense of any portion of a **Claim,** the Insurer will defend the entire **Claim** including both covered and non-covered portions of the **Claim** subject to the termination of the duty to defend as stated in sub- section C of section V titled Defense, Investigation, Consent to Settle.  The costs of defending both the covered and non-covered portion of the **Claim** shall be deemed **Claims Expenses**.

**C.   Disciplinary Proceedings Extension**

If a **Disciplinary Proceeding** is commenced against an **Insured** during the **Policy Period**, the Insurer will reimburse the **Insured** against whom the **Disciplinary Proceeding** was commenced the reasonable attorney's fees and costs incurred in responding to such **Disciplinary Proceeding**.  The maximum amount payable by the Insurer pursuant to this Extension shall be $25,000 for each **Policy Period** regardless of the number of **Disciplinary Proceedings** or the number of **Insureds** against whom **Disciplinary Proceedings** are commenced.  Any payment made by the Insurer under this Extension shall not be subject to the Deductible or the Limits of Liability. The Insurer shall not pay any judgment, award or settlement pursuant to this Extension.

**D.   E-Discovery Error and Educational Instruction Coverage Extension**

If a **Claim** is made against an **Insured,** during the **Policy Period,** relating to electronic discovery, the Insurer may provide e-discovery educational instruction to the Named Insured directly or through a vendor of the Insurer's choice.  The maximum amount payable by the Insurer pursuant to this Extension shall be $25,000 for each **Policy Period** regardless of the number of e-discovery **Claims** or the number of **Insureds** against whom said **Claims** are commenced.  Any payment made by the Insurer under this Extension shall not be subject to the Deductible r the Limits of Liability.  The Insurer shall not pay any judgment, award or settlement pursuant to this Extension.

**E.   Privacy Breach and Remediation Coverage Extension**

If a **Claim** is made against an **Insured,** during the **Policy Period,** for violation of a right of privacy or any **Privacy Regulation** as a result of a breach of the **Insured**'s network security, the mismanagement of computer hardware or software, or the loss, theft or unauthorized disclosure or dissemination of **Personal Information**, the Insurer will pay for all services authorized in advance writing by the **Insurer**, up to a maximum of $25,000 for each **Policy Period**, on behalf of any **Insured** to investigate, remediate, develop or improve the **Insured**'s network security systems to address any network security issues raised by such **Claim** or for costs of notification required by law for any inadvertent disclosure or breach of security as described herein.  Any payment made by the Insurer under this Extension shall not be subject to the Deductible or the Limits of Liability.

**F.   Reimbursement of Expenses Coverage Extension**

If an **Insured** is requested by the Insurer to attend hearings, depositions and trials, to which that **Insured** would not otherwise be obligated to attend, relative to the defense of a **Claim**, the Insurer shall reimburse that **Insured's** actual loss of earnings and reasonable expenses due to such attendance up to $500 per day.  The maximum amount payable by the **Insurer** pursuant to this extension shall be $10,000 for each **Policy Period**.  Any payment made by the Insurer under this Extension shall not be subject to the Deductible or the Limits of Liability.

**G.   Subpoena Compliance Coverage Extension**

If an **Insured** is issued a subpoena, during the **Policy Period**, to produce any evidence in connection with a transaction or litigation in which no **Insured** was retained to perform **Professional Legal Services**, the Insurer shall pay attorneys' fees and other reasonable expenses associated with compliance with the subpoena.  The maximum amount payable by the Insurer pursuant to this extension shall be $10,000 per subpoena and $25,000 in the aggregate for each **Policy Period**, regardless of the number of subpoenas or the number of **Insureds** subject to subpoenas.  Any payment made by the Insurer under this Extension shall not be subject to the Deductible nor reduce the Limits of Liability.

If the subpoena is issued in connection with a transaction or litigation in which an **Insured** was retained to perform **Professional Services**, any **Insured** may report it to the Insurer as a potential **Claim** pursuant to section **V. B. Notice of Potential Claims**.

**H.   Supplementary Payment Coverage Extension**

The Insurer will also pay all costs taxed against an **Insured** in any litigation arising from a covered **Claim** and all interest on the full amount of any judgment that accrues after entry of the judgment and before the Insurer has paid, offered to pay, or deposited in court the part of the judgment that is within the applicable coverage and Limits of Liability.  Any payment made by the Insurer under this Extension shall not apply to the Deductible and shall not reduce the Limits of Liability.

The Insurer shall not be obligated to provide any additional coverage or benefit under section **II. EXTENSIONS OF COVERAGE**, after the aggregate limit of the Insurer's liability has been exhausted by payment of **Damages** and/or **Claim Expenses.**

## III.  DEFINITIONS

**Claim** means a demand for money or services received by an **Insured** alleging a **Wrongful Act**, including service of suit, a request that an **Insured** waive a legal right or sign an agreement to toll a statute of limitations, or a demand for arbitration.

**Claims Expenses** means reasonable and necessary fees, costs and expenses incurred by the Insurer, or by the **Insured** with the prior written consent of the Insurer consisting of fees, costs and expenses resulting from the investigation, adjustment, defense and appeal of a **Claim**, including the cost of appeal bonds; however, the Insurer shall not be obligated to apply for or furnish appeal bonds.  **Claims Expenses** do not include salary charges, wages or expenses of partners, principals, officers, directors, members or employees of the **Insured**.  **Claim Expenses** shall be part of, and not in addition to, the Limits of Liability specified in the Declarations.

**Damages** means any compensatory monetary judgment or settlement negotiated with the prior approval of the Insurer.  **Damages** shall not include: any disgorgement, return, withdrawal, restitution or reduction of any sums which are or were in the possession or control of any **Insured**, or any amounts credited to any **Insured's** account, or fees paid to or charged by any **Insured**; fines, sanctions, taxes or penalties; awards deemed uninsurable pursuant to any applicable law; punitive or exemplary damages; treble damages or any other damages resulting from the multiplication of compensatory damages assessed directly against an **Insured** or for which any **Insured** is held liable for any reason; equitable relief, or fees, costs or expenses
incurred by an **Insured** to comply with any such equitable relief.  Damages shall not include costs for credit monitoring in the event of any disclosure of **Personal Information**.

**Disciplinary Proceeding** means any proceeding by a regulatory or disciplinary official, board or agency to investigate charges of professional misconduct in the performance of **Professional Legal Services**.

**Extended Reporting Period** means the optional extension of coverage following the cancellation or non-renewal of the policy to report to the Insurer any **Claim** which arises from a **Wrongful Act** committed prior to such cancellation or non-renewal and on or after the **Retroactive Date**.

**Immediate Family** means the spouse, children, siblings, or parents of any **Insured**, and any trust or estate of which any of them or any **Insured** is a beneficiary.

**Insured** means:

1.   The Named Insured referenced in the Declarations or any **Predecessor**;

2.  any attorney or professional corporation  but only as respects **Professional Legal Services** rendered on behalf of the Named Insured or any **Predecessor**;

3.  All non-lawyer employees or independent contractors but only with respect to liability arising from and in the course of their services on behalf of the Named Insured or any **Predecessor**;

4.  The estate, heirs, executors, administrators, assigns and legal representatives of each **Insured** in the event of said **Insured**'s death, incapacity, insolvency or bankruptcy, but only to the extent that said **Insured** would otherwise be provided coverage under this Policy.

5.  the lawful spouse or domestic partner of any individual which qualifies as an **Insured**, above, for a **Claim** but only to the extent that the **Insured** would otherwise be provided coverage under this policy because of spousal or domestic partner status, and not out ofany alleged independent **Wrongful Acts**, of such individual;

**Interrelated Wrongful Acts** means **Wrongful Acts** that are causally or logically related and include all **Wrongful Acts** that have as a common nexus any fact, circumstance, situation, or event, or which are the same, related or continuous acts, regardless of whether the **Claim** or **Claims** alleging such acts involve the same or different Claimants, **Insureds** or legal causes of action.  **Interrelated Wrongful Acts** shall be deemed to have occurred only on the date that the earliest of such acts commenced.

**Knowledge Date** means the effective date of the first Lawyers Professional Liability Policy issued by this Insurer to the Named Insured and continuously renewed and maintained in effect to the inception of this **Policy Period**.

**Mediation** means a non-binding process in which a neutral panel or individual assists the parties in reaching settlement.  To be considered **Mediation** under this Policy, the process must be a kind set forth in the Commercial Mediation Rules of the American Arbitration Association.  The Insurer, however, at its sole option, may recognize any **Mediation** process or forum presented for approval.

**Other Organization** means any corporation, partnership, association, trust, individual, or fund, (including a pension, welfare, profit sharing, mutual or investment fund or trust) or any other business enterprise or charitable organization of any kind or nature, other than an **Insured**.

**Personal Information** means an individual's identity with any one or more of the following: social security number; medical or healthcare data, or other protected health information; drivers license number or state identification number; account number, credit card number or debit card number in combination with any required security code, access code or password that would permit access to that individual's financial account; or other nonpublic **Personal Information** as defined in a **Privacy Regulation**.

**Personal Injury** means false arrest, detention or imprisonment; malicious prosecution; the publication or utterance of a libel or slander or other defamatory or disparaging material; invasion, infringement or interference with rights of privacy or publicity; wrongful entry or eviction; invasion of the right of private occupancy; or violation of a right of privacy or publicity or a **Privacy Regulation** as a result of a breach of the **Insured**'s network security, the mismanagement of computer hardware or software, or the loss, theft or unauthorized disclosure or dissemination of **Personal Information**.

**Policy Period** means the period referenced in the Declarations or any shorter period that may occur as a result of a cancellation of this Policy.

**Predecessor** means any individual or entity identified in the Application that, prior to the inception of this **Policy Period**, the Named Insured became the successor in interest to greater than 50% of the identified predecessor's financial assets and liabilities.

**Privacy Regulation** means any statute or regulation associated with the control and use of personally identifiable financial, medical or other sensitive information; including identity theft and privacy protection legislation that requires commercial entities that collect **Personal Information** to post privacy policies, adopt specific privacy controls, or notify individuals in the event that **Personal Information** has actually or potentially been compromised.

**Professional Legal Services** means:

1.  services and activities performed by an **Insured** for others for a fee; or

2. activities as a member of a bar association, ethics, peer review, formal accreditation board or similar professional boards or committees; or

3. the publication or presentation of research papers or similar materials by an **Insured** but only if the fees, royalties, or other income generated from such work are not greater than ten thousand dollars ($10,000) during the **Policy Period**; or

4. Legal services performed on a pro bono basis approved in writing in advance by the **Named Insured** or any **Predecessor**.

**Retroactive Date** means the date referenced in the Declarations. This Policy shall not apply to any **Claims** resulting from any **Wrongful Acts** or **Interrelated Wrongful Acts** committed prior to this date.

**Totally and Permanently Disabled** means that the **Insured** has become so disabled as to be wholly unable to provide any **Professional Legal Services** in the **Insured's** capacity as a lawyer provided that such disability has existed continuously for not less than six (6) months; and is expected to be continuous and permanent. **Totally and Permanently Disabled** shall not include any condition which:

1. is a result of war or acts of war, whether or not declared;

2. occurred during active service in the armed forces of any country; or

3. results from:

   a. intentionally self-inflicted injuries;

   b. attempted suicide, whether or not sane; or the abuse or misuse of addictive chemical compounds, drugs or alcohol.

**Wrongful Act** means any actual or alleged negligent act, error or omission or **Personal Injury**, arising out of the rendering of or the failure to render **Professional Legal Services**.

## IV. EXCLUSIONS

This Policy does not apply to any **Claim**:

1. Alleging intentional wrongdoing, fraud, dishonesty, or malicious **Wrongful Acts** by an **Insured**, if such conduct is established as a matter of fact in a civil, arbitration, criminal or other proceeding, or is admitted to by the **Insured.** The Insurer shall continue to defend the **Insured** against whom the allegations are made if these allegations arise out of **Wrongful Acts** otherwise covered under this Policy, but that **Insured** shall reimburse the Insurer for all **Claims Expenses** if such conduct is established as a matter of fact in a civil, arbitration, criminal or other proceeding, or is admitted to by the **Insured**.

   This exclusion does not apply to an **Insured** who did not personally commit or personally participate in any of the conduct described in this exclusion.

2. Based upon, arising out of, directly or indirectly, or in any way involving any **Claim** by any **Insured** against any **Insured** unless said **Claim** is based solely and entirely upon an attorney client relationship between said **Insureds**.

3. Based upon, arising out of, directly or indirectly, or in any way involving, any **Insured's** activities as an officer, director, manager or employee of any **Other Organization**.

4. Based upon, arising out of, directly or indirectly, or in any way involving **Professional Legal Services** provided by an **Insured** to any **Other Organization** if any **Insured** collectively and/or members of the **Insured's Immediate Family** own 30% or more of the **Other Organization**;

5. Based upon, arising out of, directly or indirectly, or in any way involving bodily injury, sickness, disease, emotional distress, mental anguish, outrage, humiliation or death; injury to or destruction of any tangible property including loss of use thereof, unless:

   a. the liability for such **Claim** is caused by the performance of **Professional Legal Services** by the **Insured**; and

   b. such **Claim** would not have otherwise occurred directly or indirectly but for the performance of **Professional Legal Services** by the **Insured**;

6. Based upon, arising out of, directly or indirectly, or in any way involving alleged discrimination, humiliation, harassment, or misconduct by an **Insured** because of race, creed, color, age, gender, sex, sexual preference or orientation, national origin, religion, disability, handicap, marital status, or any other class protected under federal, state, local or other law; or by an employee, former employee, or job applicant, of an **Insured** in their capacity as such.

## V.  CLAIMS

### A.  Notice of Claims

In the event of a **Claim**, an **Insured** shall as a condition precedent to the coverage afforded by this Policy, as soon as practicable:

   1. Forward to the Insurer every demand, notice, summons or pleading received by an **Insured**; and

   2. Give written notice containing particulars sufficient to identify the **Insured** and claimant, Policy Number identifying the policy under which the **Claim** is reported, and complete and comprehensive information regarding the facts and circumstances surrounding the **Wrongful Act.**

This notice shall be mailed to the Insurer at the address referenced in Item 11 of the Declarations or e-mailed to:

professionalliabilityclaims@aspen-insurance.com.

If notices are mailed or e-mailed, the date of mailing or e-mailing of such notice shall constitute the date such notice was given and proof of mailing or e-mailing to the stated address shall be sufficient proof of notice;

### B.  Notice of Potential Claims

If an **Insured** becomes aware of a **Wrongful Act**, fact or circumstance that may reasonably be expected to give rise to a **Claim**, and if the **Insured** reports such **Wrongful Act**, fact or circumstance to the **Insurer** during the **Policy Period** in writing, then any **Claim** subsequently arising from such **Wrongful Act**, fact or circumstance duly reported in accordance with this paragraph shall be deemed under this Policy to be a **Claim** made during the **Policy Period** in which such written notice of a **Wrongful Act**, fact or circumstance is received by the Insurer.  Such written notice to the Insurer shall include a complete and comprehensive statement of the facts and circumstances surrounding the **Wrongful Act**, fact or circumstance and the reasons that a **Claim** is anticipated.

### C.  Defense, Investigation, Consent to Settle

The Insurer has the right and duty to defend any **Claim,** made against an **Insured,** to which this insurance applies.  The Insurer has the sole right to appoint defense counsel and to make such investigation of a **Claim** or potential **Claim** as it deems necessary. The Insurer has no right or duty to defend any **Disciplinary Proceeding.**  If a **Claim** is subject to arbitration or mediation, the Insurer shall be entitled to exercise all of the **Insured's** rights in the choice of arbitrators or mediators and in the conduct of an arbitration or mediation proceeding.

As a condition precedent to coverage under this Policy, the **Insured** shall not admit liability for or settle any **Claim** or incur any **Claims Expenses**, without the prior written consent of the Insurer. The **Insured** must

take all reasonable actions within its ability to prevent or mitigate any **Claim** which would be covered under this Policy.  The Insurer has the right to make such investigation and conduct negotiations and, with the written consent of the Named Insured, effect settlement of any **Claim** as the Insurer deems reasonable.

If the **Insured** refuses to consent to a settlement or compromise recommended by the Insurer and elects to contest or continue to contest the **Claim**, the Insurer's liability for **Damages** shall not exceed the amount for which the Insurer would have been liable if the **Claim** had been so settled when and as so recommended.

The Insurer shall not be obligated to pay any **Damages** or **Claims Expenses**, or to undertake or continue the defense of any **Claim**, after the applicable limit of the Insurer's liability has been exhausted by payment of **Damages** and **Claims Expenses** or after deposit of the applicable limit of the Insurer's liability with or subject to control of a court of competent jurisdiction.  The duty to defend under the **Defense Extension** terminates when all potentially covered **Claims** are dismissed or withdrawn.

### D.  Cooperation

The **Insured** shall provide the Insurer with such cooperation, assistance and information as the **Insurer** may request, all without charge to the Insurer.

### E.  Territory

This Policy applies to **Wrongful Acts** committed by an **Insured** anywhere in the world.

## VI.  GENERAL CONDITIONS

### A.  Limits of Liability

**1.**  Limits of Liability - each **Claim**

Subject to paragraph B. below, the Limits of Liability of the Insurer for **Damages** and **Claim Expenses** for each **Claim** first made against the **Insured** and reported to the
Insurer during the **Policy Period** shall not exceed the amount stated in the Declarations for each **Claim**.

**2.**  Limits of Liability - in the Aggregate

The Limits of Liability of the Insurer for **Damages** and **Claim Expenses** for all **Claims** first made against the **Insured** and reported to the Insurer during the **Policy Period** shall not exceed the amount stated in the Declarations as the Aggregate.

### B.  Deductible

The Deductible amount stated in the Declarations is the amount of the **Insured's** liability for each and every **Claim** and applies to the payment of **Damages** and **Claim Expenses** for each and every **Claim** first made and reported to the Insurer in writing during the **Policy Period**.  The Deductible shall be paid by the Named Insured, or upon the Named Insured's failure to pay, jointly and severally by all Insureds.  The Limits of Liability set forth in the Declarations are in addition to and in excess of the deductible.  Each said Deductible shall be paid within thirty (30) days of written demand therefore by the Insurer.

The **Insured** shall be entitled to a reduced Deductible of fifty percent (50%) of the amount stated in the Declarations, up to a maximum reduction of $25,000, if the **Claim** is resolved within one year of the **Claim** being reported to the Insurer.

### C.  Multiple Insureds, Claims and Claimants

The Limits of Liability shown in the Declarations and subject to the provisions of this Policy is the amount the Insurer will pay as Damages and **Claims Expenses** regardless of the number of **Insureds**, **Claims** made or persons or entities making **Claims**. If **Claims** based on **Interrelated Wrongful Acts** are made against any **Insured** and reported to an Insurer, all such **Claims**, whenever made, shall be considered a single **Claim** first

made and reported to an Insurer within the policy period in which the earliest of the related **Claims** was first made and reported to an Insurer.

If this Policy and any other Policy issued by Aspen applies to the same **Claim**, including any **Extended Reporting Periods** of such Policy or Policies, then only the Policy with the highest remaining Limit of Liability shall apply.

**D.  Extended Reporting Periods**

**1.**  Extended Reporting Period

In the event of cancellation or non-renewal of this Policy by either the Named Insured or the Insurer, the Named Insured shall have the right to elect an **Extend Reporting Period** following the date of such cancellation or non-renewal as follows**:**

- one (1) year for an additional premium of 100% of the total annual premium;

- two (2) years for an additional premium of 135% of the total annual premium;

- three (3) years for an additional premium of 150% of the total annual premium;

- five (5) years for an additional premium of 200% of the total annual premium; or

- an unlimited period for an additional premium of 250% of the total annual premium.

**2.**  Non-Practicing Reporting Period

If an **Insured** as specified in section **III. Definitions**, shall retire or otherwise cease the private practice of law during the **Policy Period**, then such **Insured**, or, if deceased, such **Insured's** estate, shall have the right to elect an extension of coverage following the date of such **Insured's** retirement or termination of private practice, to report to the **Insurer**
any **Claim** which arises from a **Wrongful Act** committed prior to such **Insured's** date of retirement or termination of private practice as follows:

- one (1) year for an additional premium of 100% of the Per Lawyer Annual Premium;

- two (2) years for an additional premium of 135% of the Per Lawyer Annual Premium;

- three (3) years for an additional premium of 150% of the Per Lawyer Annual Premium;

- five (5) years for an additional premium of 200% of the Per Lawyer Annual Premium; or

- an unlimited period for an additional premium of 250% of the Per Lawyer Annual Premium.

In the event an **Insured** as specified in section **III. Definitions** shall: (a) die, except by suicide; (b) become **Totally and Permanently Disabled**; or (c) with three (3) consecutive full years of coverage by the Insurer, retire or otherwise cease the private practice of law during the **Policy Period**, such **Insured** shall be entitled to a five (5) year Non-Practicing Extended Reporting Period at no additional premium.

**3.**  Other Extended Reporting Period Provisions Applicable to sections 1 and 2 above

As a condition precedent to the right to purchase the **Extended Reporting Period**, any and all premiums and deductibles that are due must have been paid and there must be compliance with all other terms and conditions of this Policy.  No **Extended Reporting Period** shall be available when any **Insured's** license or

right to practice his or her profession is revoked or suspended by, or surrendered at the request of, any regulatory
or judicial authority.

The right to purchase the **Extended Reporting Period** must be exercised by notice in writing not later than sixty (60) days following the non-renewal or cancellation date of this Policy, and must include payment of premium for the applicable **Extended Reporting Period**. If such notice is not given to the Insurer, the Named Insured shall not, at a later date, be able to exercise such right.

At the commencement of any **Extended Reporting Period**, the entire premium thereafter shall be deemed earned and in the event the Named Insured terminates the Extended Reporting Period before its expiration date, the Insurer shall not be liable to return any portion of the premium for the **Extended Reporting Period**.

There is no additional policy limit applicable to the **Extended Reporting Period**, and it shall not in any way increase, renew or replenish the Limits of Liability as set forth in the Declarations.

**E.  Firm Changes**

The Named Insured shall report changes during the **Policy Period** which affect 50% or greater of the Named Insured's total lawyer population within sixty (60) days of such change, however, this provision shall not apply if the Named Insured had less than six (6) lawyers who met the definition of **Insured** at the inception of this Policy. In the event of a merger, dissolution or acquisition, the Named Insured shall notify the Insurer at least thirty (30) days prior to the projected date of such change.  In each case, the Insurer will have the right to accept, alter or decline coverage and to charge an additional premium.

**F.  Other Insurance**

This insurance shall be in excess of the amount of the applicable Deductible of this Policy and any other valid insurance available to the **Insured,** whether such other insurance is stated to be primary, pro rata, contributory, excess, contingent or otherwise, unless such other insurance is written only as a specific excess insurance over the Limits of Liability provided in this Policy.  The Insurer shall not have any duty to defend an **Insured** when that **Insured** is defended under another policy of insurance.

**G.  Subrogation**

In the event of any payment under this Policy, the Insurer shall be subrogated to all of the **Insured's** rights of recovery against any person or organization, and the **Insured** shall execute and deliver instruments and papers and do whatever else is necessary to preserve and secure such rights.  The **Insured** shall do nothing to prejudice such rights.

**H.  Reimbursement of the Insurer**

If the Insurer has paid any **Damages** or **Claims Expenses** in excess of the applicable Limits of Liability or within the amount of the applicable Deductible, each **Insured** shall be liable to the Insurer for any and all such amounts and, upon demand, shall pay such amounts to the Insurer promptly. If it is negotiated or determined that any **Claims Expenses** are not covered under this Policy, each **Insured** agrees to repay the Insurer the amount of such **Claims Expenses** not covered.

**I.  Entire Contract**

By acceptance of this Policy, each **Insured** agrees that the statements in the Declarations and Application are its agreements and representations, that this Policy is issued in reliance upon the truth of such representations and that this Policy embodies all agreements existing between each **Insured** and the Insurer.

**J.  Notice of Cancellation**

This Policy may be cancelled by the Named Insured by surrender of this Policy to the Insurer or by giving written notice to the Insurer stating when thereafter such cancellation shall be effective. The Insurer may only cancel this Policy in the event of non-payment of premium by mailing to the Named Insured, at the address referenced in the

Declarations, written notice stating when, not less than ten (10) days thereafter, the cancellation shall be effective. The mailing of such notice shall be sufficient proof of notice and this Policy shall terminate at the date and hour specified in such notice.  If this Policy shall be cancelled by the Named Insured, the Insurer shall retain the customary short rate proportion of the premium hereon.  If this Policy shall be cancelled by the Insurer, the Insurer shall retain the pro-rata proportion of the premium hereon.

Premium adjustments and returns shall be made at the time cancellation is effective or as soon as possible after that time.  Payment or tender of unearned premium shall not be a condition of cancellation.

## K.   Named Insured - Sole Agent

The Named **Insured** shall be the sole agent of all **Insureds** hereunder for the purpose of effecting or accepting any amendments to or cancellation of this Policy, for the purpose of receiving such notices as may be required by law and/or any provision(s) of this Policy,

for the completing of any Application and the making of any representations, for the payment of any premium and the receipt of any return premium that may become due under this Policy, for the payment of any Deductible obligations that may become due under this Policy, and the exercising or declining to exercise any right under this Policy, including declining or exercising any **Extended Reporting Period**.

## L.   Assignment

No change in, modification of, or assignment of, interest under this Policy shall be effective except when made by written endorsement signed by an authorized representative of the Insurer.

## M.   Action Against the Insurer

No action shall be taken against the Insurer unless:  (1) as a condition precedent thereto, the **Insured** has fully complied with all the terms and provisions of this Policy, and (2)

until the amount of any **Insured's** obligation or liability to a third party has been finally determined either by an award or judgment against any **Insured** after an actual contested trial or adjudicatory proceeding or by written agreement of the **Insured** and the claimant with the prior written consent of the Insurer.

No entity shall have the right under this Policy to join any **Insured** in any action or proceeding against an Insurer to determine the Insurer's liability nor shall the Insurer be joined in an action or proceeding by any **Insured** or its legal representative.

## N.   Titles

The titles of paragraph sections or endorsements in, or of, this Policy are intended solely for convenience and reference, and are not deemed in any way to modify the provisions to which they relate.

## Aspen Specialty Insurance Company



IN WITNESS WHEREOF, the Insurer has caused this Policy to be signed by its President and Secretary and countersigned where required by law on the Declarations page by its duly Authorized Representative.

_____          _____
            Secretary                                        President

Aspen Specialty Insurance Company

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# OFAC ENDORSEMENT

In consideration of the premium charged, it is agreed that any payment under this Policy shall only be made in full compliance with all U.S.A economic or trade sanctions or other laws or regulations, including sanctions, laws and regulations administered and enforced by the U.S. Treasury Department's Office of Foreign Assets Control ("OFAC").

**ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.**

Aspen Specialty Insurance Company

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

## MUTUAL CHOICE OF DEFENSE COUNSEL ENDORSEMENT

This endorsement modifies the insurance provided under the following:

**Lawyers Professional Liability**

In consideration of the premium charged, it is hereby understood and agreed that the Policy is modified as follows:

Section **V. CLAIMS**, **C. Defense, Investigation, Consent to Settle** is amended to include the following:

Counsel and/or other experts selected to investigate, defend, and/or settle any **Claim** to which this insurance applies shall be mutually agreed upon by the Insurer and the Named Insured, neither side shall unreasonably withhold such consent, subject always to the condition that such defense shall not be by an **Insured**. The Insurer and the Named Insured shall also mutually agree that the billing rate applicable to the Limits of Liability and the Deductible shall be limited to $400/hour for partners and $300/hour for non-partners. If the Insurer and the Named Insured agree to retain an Attorney at a rate in excess of the agreed upon $400/hour for partner and $300/hour for non-partner rates, the amounts in excess of the agreed upon rate limitations shall be the sole responsibility of the Named Insured and shall not be applied to satisfy the Deductible and shall not operate to reduce the Limits of Liability.

### ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

THIS ENDORSEMENT FORMS A PART OF POLICY NUMBER: LR004CQ18

Issued by: Aspen Specialty Insurance Company

Issued to: Miller Barondess, LLP

Effective date: 05/22/2018

Endorsement No.: 1

 2017 ©Aspen Insurance U.S. Services Inc. All rights reserved.

Aspen Specialty Insurance Company

# GENERAL SERVICE OF SUIT NOTICE

In the event of failure of the Company to pay any amount claimed to be due under the terms of this policy, the Company, at the request of the **Insured,** will submit to the jurisdiction of a court of competent jurisdiction within the United States. Nothing in this condition constitutes or should be understood to constitute a waiver of the Company's rights to commence an action in any court of competent jurisdiction in the United States to remove an action to a United States District Court or to seek a transfer of a case to another court as permitted by the laws of the United States or of any state in the United States. In any suit instituted against the Company upon this policy, the Company will abide by the final decision of such court or of any appellate court in the event of appeal.

It is further agreed that service of process in such suit may be made upon: Aspen Specialty Insurance Management, Inc., c/o General Counsel, 175 Capital Blvd., Rocky Hill, CT 06067; (877) 245-3510; Questions can be directed to: Compliance.us@aspenspecialty.com

Further, pursuant to any statute of any state, territory, or district of the United States which makes provision therefore, the Company hereby designates the Superintendent, Commissioner or Director of Insurance, Secretary of State, or other officer specified for that purpose in the statute, as its true and lawful attorney upon whom service may be made of any lawful process in any action, suit, or proceeding instituted by or on behalf of the **Insured** or any beneficiary hereunder arising out of this policy of insurance and hereby designates the above named General Counsel as the person to whom the said officer is authorized to mail such process or a true copy thereof.

This notice does not change any other provision of the policy.

**THIS INSURANCE IS ISSUED PURSUANT TO THE CALIFORNIA INSURANCE CODE, SECTIONS 1760 THROUGH 1780, AND IS PLACED IN AN INSURER OR INSURERS NOT HOLDING A CERTIFICATE OF AUTHORITY FROM OR REGULATED BY THE CALIFORNIA INSURANCE COMMISSIONER.**

## CALIFORNIA NOTICE

1. THE INSURANCE POLICY THAT YOU HAVE PURCHASED IS BEING ISSUED BY AN INSURER THAT IS NOT LICENSED BY THE STATE OF CALIFORNIA. THESE COMPANIES ARE CALLED "NONADMITTED" OR "SURPLUS LINE" INSURERS.

2. THE INSURER IS NOT SUBJECT TO THE FINANCIAL SOLVENCY REGULATION AND ENFORCEMENT WHICH APPLIES TO CALIFORNIA LICENSED INSURERS.

3. THE INSURER DOES NOT PARTICIPATE IN ANY OF THE INSURANCE GUARANTEE FUNDS CREATED BY CALIFORNIA LAW. THEREFORE, THESE FUNDS WILL NOT PAY YOUR CLAIMS OR PROTECT YOUR ASSETS IF THE INSURER BECOMES INSOLVENT AND IS UNABLE TO MAKE PAYMENTS AS PROMISED.

4. THE INSURER SHOULD BE LICENSED EITHER AS A FOREIGN INSURER IN ANOTHER STATE IN THE UNITED STATES OR AS A NON-UNITED STATES (ALIEN) INSURER. YOU SHOULD ASK QUESTIONS OF YOUR INSURANCE AGENT, BROKER, OR "SURPLUS LINE" BROKER OR CONTACT THE CALIFORNIA DEPARTMENT OF INSURANCE AT THE FOLLOWING TOLL-FREE TELEPHONE NUMBER 1-800-927-4357. ASK WHETHER OR NOT THE INSURER IS LICENSED AS A FOREIGN OR NON-UNITED STATES (ALIEN) INSURER AND FOR ADDITIONAL INFORMATION ABOUT THE INSURER. YOU MAY ALSO CONTACT THE NAIC'S INTERNET WEB SITE AT WWW.NAIC.ORG.

5. FOREIGN INSURERS SHOULD BE LICENSED BY A STATE IN THE UNITED STATES AND YOU MAY CONTACT THAT STATE'S DEPARTMENT OF INSURANCE TO OBTAIN MORE INFORMATION ABOUT THAT INSURER.

6. FOR NON-UNITED STATES (ALIEN) INSURERS, THE INSURER SHOULD BE LICENSED BY A COUNTRY OUTSIDE OF THE UNITED STATES AND SHOULD BE ON THE NAIC'S INTERNATIONAL INSURERS DEPARTMENT (IID) LISTING OF APPROVED NONADMITTED NON-UNITED STATES INSURERS. ASK YOUR AGENT, BROKER, OR "SURPLUS LINE" BROKER TO OBTAIN MORE INFORMATION ABOUT THAT INSURER.

7. CALIFORNIA MAINTAINS A LIST OF APPROVED SURPLUS LINE INSURERS. ASK YOUR AGENT OR BROKER IF THE INSURER IS ON THATLIST, OR VIEW THAT LIST AT THE WEB SITE OF THE CALIFORNIA DEPARTMENT OF INSURANCE:

*WWW.INSURANCE.CA.GOV*

8. IF YOU, AS THE APPLICANT, REQUIRED THAT THE INSURANCE POLICY YOU HAVE PURCHASED BE BOUND IMMEDIATELY, EITHER BECAUSE EXISTING COVERAGE WAS GOING TO LAPSE WITHIN TWO BUSINESS DAYS OR BECAUSE YOU WERE REQUIRED TO HAVE COVERAGE WITHIN TWO BUSINESS DAYS, AND YOU DID NOT RECEIVE THIS DISCLOSURE FORM AND A REQUEST FOR YOUR SIGNATURE UNTIL AFTER COVERAGE BECAME EFFECTIVE, YOU HAVE THE RIGHT TO CANCEL THIS POLICY WITHIN FIVE DAYS OF RECEIVING THIS DISCLOSURE. IF YOU CANCEL COVERAGE, THE PREMIUM WILL BE PRORATED AND ANY BROKER FEE CHARGED FOR THIS INSURANCE WILL BE RETURNED TO YOU.

# Exhibit B

GIBSON, DUNN & CRUTCHER LLP
James P. Fogelman, SBN 161584
    jfogelman@gibsondunn.com
Jay P. Srinivasan, SBN 181471
    jsrinivasan@gibsondunn.com
Shannon E. Mader, SBN 235271
    smader@gibsondunn.com
333 South Grand Ave.
Los Angeles, CA  90071-3197
Telephone:  (213) 229-7000
Facsimile:  (213) 229-7520

Attorneys for Plaintiff
P6 LA MF Holdings SPE, LLC

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| P6 LA MF Holdings SPE, LLC, a limited liability company,<br><br>                    Plaintiff,<br><br>            vs.<br><br>NMS CAPITAL PARTNERS I, LLC; BRENTWOOD LEGAL SERVICES; STEVEN ZELIG; GENGA & ASSOCIATES, P.C.; WLA LEGAL SERVICES, INC.; JOHN GENGA; MILLER BARONDESS LLP; LOUIS R. MILLER; JAMES GOLDMAN; ALEXANDER FRID; JASON TOKORO; and DOES 1-10, inclusive,<br><br>                    Defendants. | CASE NO. 2:19-cv-1150<br><br>**COMPLAINT FOR MALICIOUS PROSECUTION**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff P6 LA MF Holdings SPE, LLC ("AEW" or "Investor Member") hereby alleges:

## NATURE OF THE ACTION

1.     Defendant NMS Capital Partners I, LLC ("NMS"), with the assistance of Defendants Brentwood Legal Services, Steven Zelig, WLA Legal Services, Inc., Miller Barondess LLP, Louis R. Miller, James Goldman, Alexander Frid, Jason Tokoro, Genga & Associates, P.C., and John Genga ("the NMS Counsel Defendants"), wrongfully initiated, and for more than three years continued to prosecute, a lawsuit against Plaintiff P6 LA MF Holdings SPE, LLC ("AEW" or "Plaintiff") that Defendants knew was based on a forgery and false allegations.  *See Lincoln Studios, LLC, et al. v. DLA, et al.*, Case No. BC551551 (the "*Lincoln Studios* Litigation").  And in order to keep their malicious and frivolous lawsuit against AEW alive, Defendants knowingly submitted to the trial court even more forgeries, and perjury, and oversaw one of the most far-reaching and brazen acts of evidence spoliation that any court has ever seen.  After an eight-day evidentiary hearing, the trial court issued terminating sanctions against NMS for its misconduct, expressly finding that NMS had submitted no fewer than three forged agreements to the court, and had engaged in perjury and massive evidence spoliation, in violation of multiple court orders.  A copy of the trial court's Terminating Sanctions Order is attached hereto, and incorporated by reference, as Exhibit 1.  The trial court found that NMS' conduct was not just in violation of its orders, but constituted a "***fraud on the whole [judicial] system***."  The trial court separately found that NMS' claims lacked merit as a matter of law, and, therefore, also sustained demurrers to NMS' claims; Defendants did not even bother to defend at least 25 of the 31 claims alleged by NMS against AEW, and never appealed the dismissal of any of those claims, even though they had represented 80% of the claims NMS had alleged, and had been outlined in hundreds of pages of allegations in both NMS' First Amended Complaint ("FAC") and NMS' Second Amended Complaint ("SAC") in the *Lincoln Studios* Litigation.  As a result of its Terminating Sanctions Order, the trial

court dismissed all of NMS' claims, with prejudice, and entered judgment against NMS both on NMS' complaint against AEW and on AEW's cross-complaint against NMS. The judgments against NMS are attached hereto, and incorporated by reference, as Exhibits 2 and 3.

2. NMS then pursued an appeal from the judgments entered against it, again with the assistance of the NMS Counsel Defendants, even though NMS did not challenge a single finding the trial court had made, including the many findings of forgery, perjury, and evidence spoliation. Defendants also submitted to the Court of Appeal, and relied on in their briefing, declarations that the trial court had already ruled constituted perjury, even though they were not challenging those findings on appeal. California's Second District Court of Appeal subsequently affirmed the trial court's Terminating Sanctions Order and the judgments entered against NMS, finding:

> According to the trial court, there "is no way to effect compliance with civil discovery or the Court's Orders, since [Appellants] have already destroyed countless materials relevant to this case. And there is no way to know the full extent of the damage done." Appellants' "widespread misconduct infects the entirety of these proceedings," such that the "coordinated[,] intentional[,] widespread destruction of evidence has placed into doubt everything they produced, failed to produce, and any witness testimony [they] may intend to offer. We find no error in the imposition of terminating sanctions.

A copy of the Court of Appeal's decisions are attached hereto, and incorporated by reference, as Exhibits 4 and 5.

3. NMS, with the assistance of the NMS Counsel Defendants, then filed a Petition for Rehearing with the Court of Appeal, which was denied, and subsequently filed a Petition for Review with the California Supreme Court, which was also denied. Thus, the judgments on the merits against NMS are now final.

4. Defendants filed, and continued to pursue, the *Lincoln Studios* Litigation against AEW for an improper purpose: to enrich themselves, wrongfully, at AEW's expense. NMS and AEW had entered into a Joint Venture Agreement ("JVA") in September 2010 in order to acquire and develop residential and mixed use buildings in West Los Angeles, and eventually developed nine properties ("the JV Properties"),

collectively worth hundreds of millions of dollars.  The value of the JV Properties appreciated far more, and far faster, than NMS had originally anticipated, and NMS, therefore, forged a version of the JVA by replacing the five-year Buy/Sell provision in Article 11 of the JVA with a three-year Buy/Sell provision in the forged JVA, which NMS called "Version 2" of the JVA.

5.      NMS did this by using pdf over-writing software called Adobe Acrobat, and replaced the number "5" and the word "five" in Article 11 of a pdf of the JVA with the number "3" and the word "three" in its forged "Version 2."  NMS also used, as the "baseline" for its forgery, an earlier copy of the JVA, before numerous important amendments had been made; this included amendments related to "Specified Properties" that allocated capital contributions for most JV Properties as 90% AEW/10% NMS, rather than the 70% AEW/30% NMS included in the original executed JVA in September 2010, on which NMS' forgery was based.  By doing this, NMS hoped not only to force AEW to sell its interest in the Joint Venture to NMS, but also to do so in less than five years, and at a wildly reduced price.

6.      NMS' lawsuit was based on the forged "Version 2."  NMS falsely alleged in its lawsuit that the "5 year" Buy/Sell provision contained in the executed JVA was merely a "typo" and should have read "3 years," and further falsely alleged that AEW had agreed in September 2010 that it was a typo and had sent NMS the revised JVA ("Version 2") that same month.  Of course, NMS knew that was all a lie.  In actuality, NMS forged "Version 2" in July 2013.

7.      There was no typo in Article 11 of the JVA.  NMS had specifically requested a 5-year Buy/Sell provision during the negotiations.  The 5-year Buy/Sell was contained in every draft circulated among the parties and their respective counsel after NMS' request.  The 5-year Buy/Sell was contained in the executed JVA in September 2010 (NMS called this copy of the JVA "Version 1").  And the 5-year Buy/Sell was contained in every copy of the JVA exchanged and circulated by the parties, despite at least thirteen separate amendments made to the JVA.  There was not

a single document, let alone a single draft of the JVA, in which the 3-year Buy/Sell language contained in the forged "Version 2" ever appeared, or was even requested by NMS.

8.      NMS also had the audacity to falsely allege in its lawsuit that the "Specified Properties" language contained in the amended JVA, which NMS called "Version 3" of the JVA, was forged by AEW and never agreed to, even though that language had been negotiated and agreed to by NMS and its counsel in early January 2011, and that it was agreed to at NMS' request.  NMS could not afford to fund 30% of the capital for JV Properties and needed to reduce its commitment to 10%.  AEW agreed to the change to accommodate NMS.  NMS also certified the amended JVA with the Specified Properties language to the Joint Venture's lenders.  NMS also certified the validity of the JVA with the Specified Properties language in numerous executed amendments to the JVA (at least five of which also included the "Specified Properties" language in the amendment separately executed by NMS).  NMS had also called capital from AEW on a 90/10 basis for years before it wrongfully made these false allegations in the *Lincoln Studios* Litigation.  Indeed, not only was what NMS called "Version 3" the only copy of the JVA maintained by and relied on by NMS' in-house counsel, but NMS' deal counsel expressly informed NMS, before it ever filed its lawsuit, that "Version 3" was the operative JVA, and had been since January 11, 2011.

9.      NMS knew that its lawsuit had no merit, and that it was based on both a forgery and patently false allegations.  NMS' forgeries, perjury and evidence destruction were designed to keep the lawsuit alive long enough to force the Joint Venture Properties into default on the senior loans and prevent AEW from either re-financing the JV Properties or selling them, leaving AEW no choice, NMS hoped, but to give in to NMS' extortionate demands.

10.      The NMS Counsel Defendants were aware of NMS' wrongdoing, and the improper purpose for which the *Lincoln Studios* Litigation had been filed, and for which it was pursued, and/or acted with reckless disregard for the truth.  There was

literally no evidence to support NMS' absurd allegations or its forgery, and there was overwhelming evidence to the contrary. The NMS Counsel Defendants were in possession of irrefutable evidence of the falsity of the claims they pursued on NMS' behalf, yet they filed and pursued the action for years. Indeed, on June 16, 2015, the NMS Counsel Defendants were provided copies of the specific July 2010 request made by NMS, in writing, demanding a 5-year Buy/Sell in Article 11 of the JVA. The NMS Counsel Defendants also attended the September 2015 depositions of NMS' former President and deal counsel, as well as the depositions of AEW's deal counsel, who all confirmed that NMS expressly requested a 5-year Buy/Sell in Article 11, and that there was no "typo" in Article 11 of the executed JVA with respect to the 5-year Buy/Sell or otherwise.

11. The NMS Counsel Defendants also made numerous false statements to the trial court about the forgeries and NMS' misconduct, hid evidence of NMS' misconduct from AEW and the trial court, even though the trial court had ordered that evidence be produced, and the NMS Counsel Defendants knowingly submitted NMS' perjured testimony to the trial court, and actively and knowingly assisted NMS in its fraudulent and malicious scheme. The NMS Counsel Defendants even went so far as to repeat NMS' allegations, that they knew to be false, to AEW's investors, to lenders for the JV Properties, and to title insurance companies and potential buyers, all with the intent to help NMS carry out its fraudulent scheme and to enrich itself in the process. The NMS Counsel Defendants not only pursued the *Lincoln Studios* Litigation on behalf of NMS, knowing it was frivolous, but also filed copycat lawsuits for NMS, repeating the same false allegations, against AEW, AEW's affiliates, and even against AEW's counsel, only to abandon such copycat lawsuits both before and after demurrers were sustained. Thus, the NMS Counsel Defendants were knowing and willing participants in the fraud and misconduct.

12. AEW now brings this action against Defendants for malicious prosecution to seek redress for the harm caused by their misconduct.

<center>**THE PARTIES**</center>

**A.    Plaintiff**

13.    AEW is a Delaware limited liability company with one member, AEW Partners VI, L.P.  AEW Partners VI, L.P. is a Delaware limited partnership whose only general partner is AEW VI, L.P.  AEW VI, L.P. is a Delaware limited partnership whose only general partner is AEW Partners VI, Inc.  AEW Partners VI, Inc. is a corporation organized under the laws of Delaware with its principal place of business in Boston, Massachusetts.  Therefore, AEW is a citizen of the States of Delaware and Massachusetts.

**B.    Defendants**

14.    NMS is a limited liability company organized under the laws of California and with its principal place of business in Los Angeles County.  NMS' sole member is Neil Shekhter, an individual domiciled in Los Angeles County, California.  Therefore, NMS is a citizen of California.

15.    Defendant BRENTWOOD LEGAL SERVICES, PLC is a professional corporation organized under the laws of California and with its principal place of business in Santa Monica, California, and is therefore a citizen of the State of California.

16.    Defendant STEVEN ZELIG is an individual domiciled in Los Angeles County, California, and is therefore a citizen of the State of California.

17.    Defendant WLA LEGAL SERVICES, INC. is a corporation organized under the laws of California and with its principal place of business in Los Angeles, California, and is therefore a citizen of the State of California.

18.    Defendant GENGA & ASSOCIATES, P.C. is a professional corporation organized under the laws of California, and with its principal place of business in Sherman Oaks, California, and is therefore a citizen of the State of California.

19.    Defendant JOHN GENGA is an individual domiciled in Los Angeles County, California, and is therefore a citizen of the State of California.  On information

and belief, at all relevant times, Defendant Genga was acting individually and on behalf of Defendant Genga & Associates, P.C.

20.     Defendant MILLER BARONDESS LLP is a California limited liability partnership.  All partners of the firm—Louis R. Miller, Jim M. Miller, Alexander Frid, Brian Procel, Dan Miller, J. Mira Hashmall, Amnon Siegel, James, Goldman, Benazeer Roshan, Jason Tokoro, Christopher Beatty, Jay Rakow, and Mark Barondess—are domiciled in Los Angeles County, California.  Miller Barondess LLP is therefore a citizen of the State of California.

21.     Defendant LOUIS R. MILLER is an individual domiciled in Los Angeles County, California, and is therefore a citizen of the State of California.  On information and belief, at all relevant times, Defendant Miller was acting individually and on behalf of Defendant Miller Barondess.

22.     Defendant JAMES GOLDMAN is an individual domiciled in Los Angeles County, California, and is therefore a citizen of the State of California.  On information and belief, at all relevant times, Defendant Miller was acting individually and on behalf of Defendant Miller Barondess.

23.     Defendant ALEXANDER FRID is an individual domiciled in Los Angeles County, California, and is therefore a citizen of the State of California.  On information and belief, at all relevant times, Defendant Frid was acting individually and on behalf of Defendant Miller Barondess.

24.     Defendant JASON TOKORO is an individual domiciled in Los Angeles County, California, and is therefore a citizen of the State of California.  On information and belief, at all relevant times, Defendant Tokoro was acting individually and on behalf of Defendant Miller Barondess.

25.     The true names and capacities, whether corporate, associate, individual, or otherwise of Defendants DOES 1 through 10, inclusive, are unknown to Plaintiff, which therefore sues said Defendants by such fictitious names.  Plaintiff is informed and believes and thereupon alleges that each Defendant designated herein as Doe is

responsible in some manner for the events and happenings referred to herein and proximately caused damages to Plaintiff as alleged herein, either by such Doe Defendant's own conduct or through the conduct of his, her or its agents, servants, employees, representatives, associates, partners, joint venturers, co-conspirators, or alter egos. Plaintiff will amend this Complaint to allege their true names and capacities when the same have been ascertained.

## SUBJECT MATTER JURISDICTION AND VENUE

26. This court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332. There is complete diversity of citizenship between the parties, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

27. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1) and (2) because all Defendants are domiciled and transact their affairs in this District and because a substantial part of the events giving rise to Plaintiffs' claims occurred in this District.

## PERSONAL JURISDICTION

28. Exercise of jurisdiction over Defendant NMS is reasonable and proper in this District because NMS is based in the State of California, is organized under the laws of the State of California, and has its principal place of business in the State of California. Exercise of jurisdiction over NMS Capital is proper pursuant to the United States Constitution, the Federal Rules of Civil Procedure, and California Code of Civil Procedure § 410.10.

29. Exercise of jurisdiction over Defendant BRENTWOOD LEGAL SERVICES, LLC is reasonable and proper in this District because it is based in the State of California, is organized under the laws of the State of California, and has its principal place of business in the State of California. Exercise of jurisdiction over BRENTWOOD LEGAL SERVICES is proper pursuant to the United States Constitution, the Federal Rules of Civil Procedure, and California Code of Civil Procedure § 410.10.

COMPLAINT FOR MALICIOUS PROSECUTION

EXHIBIT B - PAGE 47

Gibson, Dunn & Crutcher LLP

30.     Exercise of jurisdiction over Defendant STEVEN ZELIG is reasonable and proper in this District because ZELIG is an individual who is domiciled and practices law in this District.  Exercise of jurisdiction over ZELIG is proper pursuant to the United States Constitution, the Federal Rules of Civil Procedure, and California Code of Civil Procedure § 410.10.

31.     Exercise of jurisdiction over Defendant GENGA & ASSOCIATES, P.C. is reasonable and proper in this District because it is based in the State of California, is organized under the laws of the State of California, and has its principal place of business in the State of California.  Exercise of jurisdiction over GENGA & ASSOCIATES, P.C. is proper pursuant to the United States Constitution, the Federal Rules of Civil Procedure, and California Code of Civil Procedure § 410.10.

32.     Exercise of jurisdiction over Defendant JOHN GENGA is reasonable and proper in this District because GENGA is an individual who is domiciled and practices law in this District.  Exercise of jurisdiction over GENGA is proper pursuant to the United States Constitution, the Federal Rules of Civil Procedure, and California Code of Civil Procedure § 410.10.

33.     Exercise of jurisdiction over Defendant MILLER BARONDESS LLP is reasonable and proper in this District because it is based in the State of California, is organized under the laws of the State of California, and has its principal place of business in the State of California.  Exercise of jurisdiction over MILLER BARONDESS LLP is proper pursuant to the United States Constitution, the Federal Rules of Civil Procedure, and California Code of Civil Procedure § 410.10.

34.     Exercise of jurisdiction over Defendant LOUIS R. MILLER is reasonable and proper in this District because MILLER is an individual who is domiciled and practices law in this District.  Exercise of jurisdiction over MILLER is proper pursuant to the United States Constitution, the Federal Rules of Civil Procedure,  and California Code of Civil Procedure § 410.10.

35.    Exercise of jurisdiction over Defendant JAMES GOLDMAN is reasonable and proper in this District because GOLDMAN is an individual who is domiciled and does business in this District.  Exercise of jurisdiction over GOLDMAN is proper pursuant to the United States Constitution, the Federal Rules of Civil Procedure, and California Code of Civil Procedure § 410.10.

36.    Exercise of jurisdiction over Defendant ALEXANDER FRID is reasonable and proper in this District because FRID is an individual who is domiciled and does business in this District.  Exercise of jurisdiction over FRID is proper pursuant to the United States Constitution, the Federal Rules of Civil Procedure, and California Code of Civil Procedure § 410.10.

37.    Exercise of jurisdiction over Defendant JASON TOKORO is reasonable and proper in this District because TOKORO is an individual who is domiciled and does business in this District.  Exercise of jurisdiction over TOKORO is proper pursuant to the United States Constitution, the Federal Rules of Civil Procedure, and California Code of Civil Procedure § 410.10.

## FACTUAL BASIS FOR CLAIMS

**A.    The Negotiations That Lead To The 5-Year Buy/Sell in Article 11**

38.    On May 26, 2010, AEW and NMS executed a non-binding term sheet with respect to what was then only a potential joint venture to develop apartment and mixed use buildings in West Los Angeles.  The fact that the term sheet was non-binding was never in dispute.  NMS' head, Neil Shekhter, who executed the term sheet on behalf of NMS, even confirmed in the cover correspondence attaching his signature on it that the term sheet was non-binding.

39.    At the time the parties were contemplating such a joint venture, the real estate market was dismal, and affiliates of NMS owned four properties that were then each worth less than their respective outstanding loans and most, if not all, were either already in default on their loans or soon would be.  NMS was looking to avoid a total loss and needed an investment to save it from disaster; AEW was looking for an

opportunity to invest and develop properties in that marketplace.  The non-binding term sheet suggested that AEW would invest tens of millions of dollars in the joint venture if it were created.  It also contained a potential Buy/Sell provision.  A Buy/Sell provision is a mechanism by which either party, at the agreed upon time, can trigger a sale process by offering to buy the other party's interest or to sell its own interest at a particular stated price.  Until the process was over, neither side would know in advance whether they will be a buyer or a seller.  The Buy/Sell provision contained in the May 26, 2010 non-binding term sheet was a formula : the later of one of two events (a) three years from the acquisition of the property or (b) "stabilization" of that property, which meant that the property would by then be 95% leased up.  At the time of the term sheet's execution, in fact, the Buy/Sell was actually directed toward specific properties that might be acquired, rather than interests in the potential joint venture. The term sheet stated that either party would be able to "trigger a Buy/Sell for individual properties at ***the later of*** (i) three years from the acquisition of the property for which the Buy/Sell is being triggered or (ii) ***the stabilization of the property*** for which the Buy/Sell is being triggered."  To understand how different the originally contemplated Buy/Sell provision was from the forged "3-year" Buy/Sell provision in "Version 2," the properties were not "stabilized" until almost ***seven years*** after execution of the JVA – far later than even the 5-year Buy/Sell provision the parties eventually agreed to when they executed the JVA.  There was never any term sheet or draft term sheet containing a straight 3-year Buy/Sell like the one contained in NMS' forgery.

40.     The parties subsequently negotiated the JVA, with each represented by independent counsel.  DLA Piper, LLC ("DLA") represented AEW and Sheldon Chernove ("Chernove") and Schultz & Wright, LLP ("S&W") represented NMS.  Both the parties and their respective counsel communicated regarding the drafts of the JVA almost exclusively in writing.

41.     On or about July 7, 2010, DLA circulated the first draft of the joint venture agreement to the parties and their counsel (the "July 7 Draft").  The July 7 Draft included a Buy/Sell provision in Article 11 that contained a slightly revised version of the formula that the parties had been discussing, specifically, that "[a]t any time after the later to occur of (i) twelve (12) months after the expiration of the Investment Period, and (ii) the last Property purchased by the Company or any Subsidiary Company [of the Joint Venture] prior to the end of the Investment Period has achieved a stabilized occupancy of 95%, either the Operating Member or the Investor Member may give a Buy/Sell Offer Notice."  Twelve months after the Investment Period was equal to three years based on the two-year Investment Period that was contemplated in the July 7 Draft, and "stabilization" was defined as 95% occupancy at the last Property acquired by the Joint Venture.  The Buy/Sell Provision was defined in the draft JVA, and ultimately in the executed JVA, as "**_the_** Buy Out Rights."

42.     On or about July 28, 2010, Chernove, one of the **deal counsel for NMS**, provided extensive comments and edits to the July 7 Draft of the JVA.  In his comments to Article 11, Chernove stated that the Buy/Sell Provision should not be activated at any time before **_five years_**:

COMPLAINT FOR MALICIOUS PROSECUTION

Gibson, Dunn & Crutcher LLP

## Plaintiffs' Requested The 5-Year Buy/Sell Provision In 2010

**From:** Sheldon Chernove [mailto:schernove@chernovelaw.com]
**Sent:** Wednesday, July 28, 2010 2:50 PM
**To:** Jim
**Subject:** NMS - AEW

Here is the agreement marked with the changes in "track changes" to promote easy reading.

**Sheldon B. Chernove, Esq.**
Chernove & Associates, Inc.
16027 Ventura Boulevard, Suite 660
Encino, CA 91436
Phone: (818) 377-8102 (direct)
Fax: (818) 377-9132
schernove@chernovelaw.com

ARTICLE 11.

Buy/Sell

11.1 Buy/Sell.[THIS ENTIRE SECTION NEEDS FURTHER DISCUSSION BUT IT SHOULD NOT BE TRIGGERED BEFORE THE EXPIRATION OF THE 5 YEAR PERIOD WHEN THE TARGET DISTRIBUTION IS TO BE ACHIEVED]

ARTICLE 11.

BUY/SELL

~~Buy/Sell~~

11.1 Buy/Sell.

(a) Buy/Sell Offer Notice. The operation of this Section 11.1 may be triggered upon written notice (the "Buy/Sell Offer Notice") at the times and upon the conditions set forth below:

(i) At any time after ~~the later to occur of (i) twelve (12) months after the expiration of the Investment Period, and (ii) the last Property purchased by the Company or any Subsidiary Company prior to the end of the Investment Period has achieved a stabilized occupancy of 95%~~five (5) years from the date hereof, either the Operating Member or the Investor Member may give a Buy/Sell Offer Notice at any time, provided, however, that in no event shall the Operating Member be entitled to give a Buy/Sell Offer Notice at any time after the occurrence of a Removal Event. In addition to the foregoing, if at any time an Event of Default, Removal Event or Incentive Loss Event occurs, the Investor Member may give a Buy/Sell Offer Notice. Notwithstanding the foregoing, neither Member may give a Buy/Sell Offer Notice while any Property is under a contract for sale and the consummation of such sale is pending.

43. Thus, NMS' deal counsel expressly advised NMS to request a change in the Buy/Sell provision in Article 11 from the formula to a straight 5-year Buy/Sell. NMS then expressly made that same request to AEW. Specifically, on July 28, 2010, Jim Andersen, then the Chief Operating Officer of NMS, forwarded Chernove's email and the attached copy of the Chernove mark-up, to AEW's Eric Samek, copying Neil Shekhter on the email to Samek. Thus, not only was it NMS that specifically asked AEW to agree to a 5-year Buy/Sell in Article 11, but the decision to make that request was made at the highest levels of NMS based on the advice of NMS' own counsel.

44. NMS made this request for a simple 5-year Buy/Sell provision in Article 11, rather than the formula they had been discussing, at least ***twice***. Around the same

time that NMS' Anderson sent the Chernove mark-up to AEW's Samek on July 28, 2010, Andersen, the primary negotiator for NMS, also separately called AEW's Jonathan Watson to request that the formula in the July 7 draft be changed to a 5-year Buy/Sell provision. Anderson explained to Watson that NMS was requesting this change because NMS did not believe it would have the financial resources to compete with AEW in any Buy/Sell scenario before the end of the 5th year of the Joint Venture. Watson documented this conversation contemporaneously.

45.   AEW agreed to NMS' multiple requests to include a 5-year Buy/Sell Provision in Article 11. On or about August 11, 2010, DLA, counsel for AEW, circulated the next draft of the joint venture agreement (the "August 11 Draft"). The August 11 Draft inserted (in redline) the five-year Buy/Sell provision that NMS had requested: "At any time after five (5) years from the date hereof, either the Operating Member or the Investor Member may give a Buy/Sell Offer Notice."



46.   DLA included both NMS' deal counsel and NMS' most senior officers—Shekhter and Andersen—on its email attaching the redline change to Article 11 to a 5-year Buy/Sell. Countless drafts of the JVA were subsequently circulated between the parties and their respective counsel, and every single one contained the 5-year Buy/Sell in Article 11 that NMS had requested.

COMPLAINT FOR MALICIOUS PROSECUTION

Gibson, Dunn & Crutcher LLP

47.     AEW even noted the change to a 5-year Buy/Sell in an August 30, 2010 memo to its investors:



**B.      The Parties Executed The JVA With the 5-Year Buy/Sell Provision**

48.     The parties executed the JVA on or about September 10, 2010.  The executed JVA, which was circulated to all counsel and parties, included the same 5-year Buy/Sell language in Article 11 that had been included in every draft circulated among the parties and their counsel since the August 11 Draft:

> **11.1    Buy/Sell**.
>
> (a)     **Buy/Sell Offer Notice**.  The operation of this <u>Section 11.1</u> may be triggered upon written notice (the "<u>Buy/Sell Offer Notice</u>") at the times and upon the conditions set forth below:
>
> (i)     At any time after five (5) years from the date hereof, either the Operating Member or the Investor Member may give a Buy/Sell Offer Notice at any time, <u>provided</u>,

Article 11 of the JVA contained the only mechanism by which either party to the Joint Venture could "buy out" the interest of the other, defined in Article 11 as "***the*** Buy Out Rights."

49.     The executed JVA also contained several other provisions that ultimately became relevant to the *Lincoln Studios* Litigation.  First, the JVA contained provision related to contributions of capital to the Joint Venture.  Specifically, the JVA provided that AEW would contribute 70% of the capital, and NMS would contribute 30% of the capital. Second, the JVA provided, in Article 6, the order in which distributions would be made from the JVA to members of the JVA, though the decision to make any such distribution was left entirely up to AEW, in its sole discretion, in Article 8.1.  Article

8.1 also provided that the decision to sell or re-finance any Joint Venture Property was up to AEW in its sole discretion.  Article 6 also provided for the possibility that AEW's return on its investment would be "capped" at a certain amount, if AEW received every distribution from the Joint Venture set forth in Article 6 before the fifth-year anniversary of the executed JVA, for example, if a sale of the Joint Venture Properties before the end of the 5th year provided enough money for all of the distributions to AEW identified in Article 6 and AEW elected to make/take all such distributions, and assuming that NMS was not in default under the JVA.  There was no possibility of such a "cap" after the 5th year anniversary.  AEW, of course, was in complete control over all such decisions pursuant to Article 8.1, so it was entirely within AEW's discretion as to whether or not it would ultimately agree to cap its own return.

**C.    The Parties Amended The JVA Thirteen Times But Never Amended The 5-Year Buy/Sell Provision in Article 11**

50.    The JVA was amended by agreement thirteen times after September 10, 2010.  The first three amendments were by "slip-sheet" pages agreed to by the parties and their counsel; the ten other amendments were effectuated by separately documented stand-alone amendments, executed by both AEW and NMS.  The last of the "slip sheet" amendments was agreed to, in writing, on January 11, 2011.  By that time, NMS alerted AEW that it did not have enough money to fund 30% of the capital required after the first Joint Venture Property was acquired.  NMS requested that the capital contribution requirements be amended so that AEW would fund 90% of the required capital, and NMS would fund only 10% of the capital.  That would substantially increase both the cost and the risk of the Joint Venture to AEW, but it also would expand substantially the amount of return AEW could earn from the Joint Venture given that the return was tied to the amount of capital invested.  AEW agreed, and the concept of "Specified Properties" was incorporated throughout the JVA in the

form of slip sheet pages. For "Specified Properties," the parties were free to fund capital on a basis other than the originally agreed to 70/30 split.

51. The ten stand-alone amendments executed by NMS' Shekhter in 2011 and 2012 all affirmed the validity of the JVA, including with both the 5-year Buy/Sell language in Article 11 and the Specified Property language; indeed, at least five of the separately executed amendments also specifically referenced "Specified Properties," and also included specific capital contribution allocations on a 90/10 basis for a number of the Joint Venture Properties. Despite thirteen amendments to the JVA in 2010, 2011 and 2012, however, no amendment was ever made to the 5-year Buy/Sell language in Article 11; nor was one ever requested.

52. The amended JVA, with the Specified Properties language and the 5-year Buy/Sell provision, was submitted to the Joint Venture's lenders and certified by NMS as authentic and valid. NMS also called capital for the Joint Venture on a 90/10 basis for years after the Specified Properties amendment was agreed to.

**D.     In June 2013, NMS Asks AEW to "Consider" Selling Its Interest**

53. By June 2013, the Joint Venture owned nine properties through subsidiary companies, and the real estate market had rebounded. Indeed, the real estate turnaround was so remarkable that the Joint Venture Properties were now worth hundreds of millions of dollars. NMS wanted to take advantage of this unexpected good fortune by engineering a sale of AEW's interest in the Joint Venture to NMS in 2013, far earlier than the 5th year anniversary of the JVA; specifically, NMS hoped AEW would voluntarily agree to cap its investment return by selling its interest within five years. The JVA left such a decision entirely to AEW, as NMS confirmed in a June 2013 letter in which it asked AEW merely to "consider" selling its interest, and amending the JVA in order to make such a sale possible. AEW declined the request.

**E.     NMS Forges A Copy Of The JVA – "Version 2"**

54. Recognizing that AEW was not going to voluntarily sell its interest to NMS and forgo the huge return to which it was entitled, NMS set out to forge a

Gibson, Dunn & Crutcher LLP

COMPLAINT FOR MALICIOUS PROSECUTION

EXHIBIT B - PAGE 56

version of the JVA to include a "3-year" Buy/Sell provision in Article 11.  NMS' hope, apparently, was that AEW would feel compelled to sell its interest to NMS and do so at a time when its return would be "capped," thereby reducing the price NMS would have to pay.  But NMS' greed knew no bounds, so it also sought to forge a version without the "Specified Properties" language in it, so that it could also claim a right to a 30% capital contribution, even though it only put in 10%, and AEW would only be able to recover a portion of its 90% investment and a portion of the return to which it was entitled.

55.    On July 12, 2013, NMS' Neil Shekhter forwarded to his son, Adam Shekhter, a September 10, 2010 email attaching a pdf copy of the September 2010 executed JVA before the Specified Properties language had been added.  That weekend, Neil Shekhter and his son Adam used the September 10, 2010 pdf as the basis for the forgery NMS created on July 15, 2013, which NMS later called "Version 2."  Using pdf overwriting software, they deleted the number "5" and the word "five" in Article 11 and replaced them with the number "3" and the word "three."  They then circulated copies of the forgeries to others, both in and outside of NMS, so that the forgery would enjoy large circulation.

## F.    NMS' Own Counsel Confirms "Version 3," Not The Forged "Version 2" Is The Operative JVA

56.    On July 19, 2013, in an apparent attempt to provide cover for the sudden appearance of a 3-year Buy/Sell provision when the executed JVA, always relied upon by the Joint Venture, contained a 5-year Buy/Sell provision, NMS' Shekhter emailed a number of NMS employees, including NMS' General Counsel, Steve Williford.  In one email, Shekhter cut-and-pasted the language from the May 26, 2010 non-binding term sheet, four months before the JVA was executed, that discussed the concept of a Buy/Sell formula -- the later of three years or stabilization – 95% leased up.  Shekhter knew that this non-binding formula had been abandoned in July 2010 at the express

1  request of NMS, and replaced with the 5-year Buy/Sell provision that was included in

2  almost every draft of the JVA and executed JVA in September 2010.

3      57.    Williford knew that Version 2 was not genuine and that the January 11,

4  2011 copy of the JVA with the Specified Property language and the 5-year Buy/Sell

5  was the operative JVA.  The January 11, 2011 amended JVA, what NMS later

6  misleadingly called "Version 3," was the ***only*** copy of the JVA that Williford

7  maintained, and he kept it literally on his desk.  In response to Shekhter's email that

8  identified the 3-year Buy/Sell plus 95% stabilization formula from the non-binding

9  term sheet, Williford stated the obvious:  "***This concept did not make it into the actual***

10 ***LLC agreement***."  Yet NMS pressed ahead with its fraud and ultimate lawsuit based

11 on its fraud and forgery.  Mere hours after confirming that there was no 3-year

12 Buy/Sell provision in the JVA, Williford emailed AEW's counsel attaching a copy of

13 the forged "Version 2"  (labeled "P6 LA MF Holdings I LLC v.2.pdf"), and describing

14 it as the "last version of the LLC Agreement that was approved by Neil [Shekhter],

15 which was sent hard copy to our offices in September 2010 – with the buy-sell

16 permitted after 3 years, which is consistent with the executed term sheet and the

17 conversations of NMS and AEW over the last three years."  This was a knowing lie.

18 Williford would later testify that Neil Shekhter, the head of NMS, "ghost wrote" that

19 email.

20     58.    NMS' Williford also sent a copy of the forged "Version 2" to Tom

21 Johnston, of S&W, who had been one of NMS' lead deal counsel in 2010 and

22 subsequently with the various amendments.  Williford asked Johnston if he had seen

23 "Version 2" before.  Johnson obviously had not.  In his response email in August 2013,

24 Johnson confirmed that the operative JVA was what NMS called "Version 3," and not

25 the "Version 2" forged by Shekhter.  Johnston stated: "On or about January 21, 2011

26 the 'Change Pages' regarding 'Specified Properties' were substituted into the PA LA

27 MF Holding I LLC Agreement and presented to [a Joint Venture Lender] as ***the true***

28 ***and correct copy*** of the P6 LA MF Holding I LLC Agreement.  ***Since January 21,***

Gibson, Dunn &
Crutcher LLP

EXHIBIT B - PAGE 58

*2011, the P6 LA MF Holding I LLC Agreement with the 'Change Pages' has been* **treated as the P6 LA MF Holding I LLC Agreement and presented as so on all** **transactions after January 21, 2011** . . . **NMS has consistently certified that the P6** **LA MF Holding I LLC Agreement with the 'Change Pages' is the P6 LA MF** **Holding I LLC Agreement on transactions after January 11, 2011**." In other words, as early as August 2013—almost two years before NMS and the NMS Counsel Defendants filed the *Lincoln Studios* Litigation—NMS' deal counsel made clear to NMS, including to NMS' General Counsel and Shekhter, the head of NMS, that "Version 3," not the forged "Version 2" created by NMS, is and has been the operative JVA, certified by NMS and relied upon by lenders, since January 11, 2011. Of course, NMS already knew this to be true, contrary to the allegations it would later make in the *Lincoln Studios* Litigation.

59. A few months later, in December 2013, NMS' General Counsel again asked NMS' outside deal counsel Johnston to provide his "files for [the] AEW [matter]." Of course, the JVA forgery created by NMS in July 2013 was not in Johnston's files. Johnston's response attached the operative JVA as amended on January 6, 2011 with the approved slip-sheeted pages, along with all ten standalone amendments to the JVA, thereby confirming once again that the JVA always had a 5-year Buy/Sell term, not the 3-year term that NMS would later falsely allege in the *Lincoln Studios* Litigation.

**G.    NMS And The NMS Counsel Defendants File The Lincoln Studios** **Litigation**

60. In the summer of 2014, NMS filed the *Lincoln Studios* Litigation, after first filing a different lawsuit against its former deal counsel for negligence, for purportedly "not" including a 3-year Buy/Sell provision in the JVA. Meanwhile, the initial defendants in the *Lincoln Studios* Litigation were AEW's former deal counsel, including DLA, alleging that, like NMS' own former counsel, AEW's deal counsel failed to include a 3-year Buy/Sell in the JVA.

COMPLAINT FOR MALICIOUS PROSECUTION          EXHIBIT B - PAGE 59

Gibson, Dunn & Crutcher LLP

61.     In April 2015, NMS and the NMS Counsel Defendants filed their FAC in *Lincoln Studios*, adding as defendants AEW and its employees and affiliates, alleging for the first time that "Version 2" was the operative JVA (although NMS denied that there was any valid JVA), setting forth the bogus story that the 5-year Buy/Sell provision contained in the executed September 10, 2010 copy of the JVA was a "typo" that AEW agreed to "fix" and delivered "Version 2" to NMS in September 2010, and that "Version 3" with the Specified Properties language was an unauthorized forgery created by AEW.  In a separate document served by the NMS Counsel Defendants on behalf of NMS, NMS alleged that it was seeking $12 billion in compensatory and punitive damages, even though NMS alleged that the entire Joint Venture Properties portfolio was worth no more than $400 million.

## H.     The June 15, 2015 Discovery Conference And Subsequent Forgeries

62.     On June 15, 2015, counsel for AEW met with the NMS Counsel Defendants for a court-ordered and court-reported discovery conference.  At the conference, the NMS Counsel Defendants were handed copies of the July 2010 email from NMS' deal counsel, Chernove, forwarded to AEW, demanding that Article 11 include a 5-year Buy/Sell.  The NMS Counsel Defendants were told, expressly, that the evidence proved the "typo" story was a lie and that "Version 2" was a forgery.  The NMS Counsel Defendants said they would look into it.

63.     Rather than withdraw as counsel, however, the NMS Counsel Defendants continued representing NMS in the *Lincoln Studios* Litigation.  They did not even retain an expert to opine that "Version 2" was a genuine document from September 2010, as NMS claimed.

64.     NMS, for its part, not only pursued its fraudulent claims, but indeed created and submitted to the trial court two more forgeries, in an attempt to keep its baseless case alive.

65.     On June 21, 2015, only days after the discovery conference in which NMS' fraud was undeniably exposed to the NMS Counsel Defendants, NMS, and, in

COMPLAINT FOR MALICIOUS PROSECUTION

particular, NMS' Neil Shekhter, created a forged "Cover Letter" from AEW to NMS dated September 14, 2010 that purported to state that it enclosed "Version 2" and expressly referenced the "3-year Buy/Sell."  Shekhter forged that document by cutting and pasting text, and the signature block, from an earlier, genuine letter from AEW. NMS' Shekhter also set back the clock on his computer from June 21, 2015 to September 21, 2010, and then loaded a pdf of the forged "Cover Letter" onto his computer in order to attach "metadata" to the document that would make it appear as if the document had been on his computer since September 21, 2010.  One of the many mistakes NMS and Shekhter made in creating this forgery, however, was that the pdf software from Adobe that NMS used to create it did not exist until December 2014, making the metadata date impossible.  Notwithstanding the fact that NMS created this forgery in June 2015, however, NMS and the NMS Counsel Defendants kept it hidden, and neither produced it nor even referenced it until what they thought was an opportune time in September 2015.

66.     On June 21, 2015, NMS and, in particular, NMS' Shekhter, forged yet another document, a copy of a Property Management Agreement ("PMA") for the Joint Venture's La Cienega Property.  NMS knew it was about to lose a preliminary injunction motion in a related case, forcing its affiliate NMS Properties off of all the Joint Venture Properties because AEW had exercised its right, on behalf of the Joint Venture, to terminate all of the PMAs with NMS. So it forged a copy of the La Cienega PMA with a longer notice provision in order to avoid being forced off the Properties.  NMS' Shekhter used an older PMA from another Joint Venture Property as the base for this third forgery.

67.     NMS' Shekhter, however, mistakenly sent a botched version of the forged La Cienega PMA to the NMS Counsel Defendants, in which he inadvertently identified as the owner of the La Cienega Property the subsidiary company owner of a different property that was listed on the older PMA on which the forgery was based. NMS' Shekhter realized his mistake later in the evening on June 25, 2015, and sent a

COMPLAINT FOR MALICIOUS PROSECUTION

"fixed" version of the forgery to the NMS Counsel Defendants, who submitted the forgery to the court in the related action, and later submitted to the trial court in the *Lincoln Studios* Litigation. The mere possession of the botched forgery, however, is sufficient to confirm that the NMS Counsel Defendants knew that the La Cienega PMA they submitted to the trial court was a forgery.

68. In September 2015, the NMS Counsel Defendants introduced the forged Cover Letter as an exhibit at the deposition of NMS' Samek, but all they wanted to know was whether Samek recognized the signature, not whether it was genuine, whether it was sent, or whether Shekhter's story of a typo was true. Indeed, Samek was not asked at all about NMS' allegations of a typo. Samek, however, expressly stated that the Cover Letter and "Version 2" were forgeries.

## I.     The September 2015 Depositions

69. In September 2015, the depositions of AEW's former deal counsel, NMS' former deal counsel, Chernove, and NMS' former President, Andersen, took place. Every single witness testified under oath that NMS requested the 5-year Buy/Sell provision and that there was no typo in Article 11 of the JVA.

70. Notwithstanding that NMS' own witnesses confirmed the falsity of the "typo" story underling the forged "Version 2" and NMS' entire *Lincoln Studios* Litigation, NMS and the NMS Counsel Defendants pressed ahead with their malicious prosecution of frivolous claims against AEW and its affiliates.

## J.     The Trial Court's Forensic Preservation and Production Orders

71. In September and October 2015, AEW brought the forgeries to the attention of the trial court, and filed motions seeking forensic preservation and production orders. AEW's motions were backed by declarations from forensics experts that left almost no doubt that "Version 2" was a forgery. NMS and the NMS Counsel Defendants, however, affirmed the alleged genuineness of the forgeries to the trial court, including under oath, repeated the false story of the "typo," including under

1   oath, and expressly told the court that all documents were being preserved.  These

2   were all lies.

3          72.    The trial court entered an order in September 2015 ordering NMS to

4   freeze all of its computers and electronic devices, to produce a list of every device on

5   which forged "Version 2,"  "Cover Letter" and La Cienega PMA had ever appeared,

6   and to produce all electronic versions of such documents.  In October 2015, the trial

7   court ordered that all NMS devices and documents, including all originals and copies

8   of the JVA, Cover Letter and the La Cienega PMA, be produced to AEW's experts for

9   forensic examination.

10  **K.    NMS Engages In Massive Evidence Spoliation**

11         73.    Rather than identify all devices it had been ordered to produce, the NMS

12  Counsel Defendants identified only a single device.   The evidence proved that dozens

13  of devices and computers should have been identified and preserved.

14         74.    NMS, however, panicked that its forgeries would be uncovered, began

15  engaging in widespread document and device manipulation, destruction and

16  suppression, all with the aid of the NMS Counsel Defendants, who should have made

17  sure such identification and preservation was taking place, not only pursuant to their

18  ethical obligations, but because they had made express representations to the trial court

19  that such devices and documents would be identified and preserved.

20         75.    In October 2015, NMS' Neil Shekhter and his son Alan Shekhter engaged

21  in text messages with each other in which they discussed NMS' plan to swap out the

22  hard drive on Shekhter's computer – texts they deleted after the trial court's

23  preservation order:

Gibson, Dunn &
Crutcher LLP

COMPLAINT FOR MALICIOUS PROSECUTION          EXHIBIT B - PAGE 63



76.    NMS carried out that plan and more.  Shekhter and his son swapped out the hard drive, back-dated the clock on the new hard drive and then loaded tens of thousands of files on the new drive to make it look like the drive, and the documents, were older.  Shekhter, his son and other NMS employees performed Google searches looking for ways to avoid being caught by the forensic examination:

77.    NMS hid Shekhter's older computer from 2012, hid the hard drive that was replaced in the newer (2013) computer, hid the Seagate back-up drive on which the files from the older drive were saved, hid dozens of other devices, took Adam Shekhter's computer offline and removed it during the forensics examination, deleted files related to the forgeries and the Joint Venture, back-dated the clock on Shekhter's computer dozens of times and loaded hundreds of thousands of files onto the computer

while it was back-dated, re-named Joint Venture files to make them harder to find, replaced the operating software on Shekhter's computer to eliminate still more evidence, used data wiping software on NMS devices, and more.  NMS took these actions after the trial court issued its preservation and production orders, and despite repeated statements by NMS and the NMS Counsel Defendants to the trial court that all documents and devices were being preserved and produced.

78.    Notwithstanding this unseemly and illegal effort, AEW's experts were able to piece together enough evidence to establish all of NMS' wrongdoing.

**L.    In An Effort To Avoid Having The Frivolous Case Dismissed, Defendants File A Third Amended Complaint Switching To A Bogus Article 6 Theory**

79.    AEW had filed a demurrer to NMS' FAC, and in response NMS was required to amend.  NMS filed its SAC that repeated spanning hundreds of pages the same false allegations that were in its FAC.  AEW demurred to the SAC, in response to which NMS did not bother to even defend the vast majority of the claims it had alleged.  This alone shows such claims lacked probable cause.  The claims Defendants abandoned included: causes of action numbers: 2–Negligent Misrepresentation; 3–Statutory Violations (Sections 496 and 484 of the Penal Code); 4–Estoppel (Promissory and Equitable); 7–Cancellation of Instruments and Transfers; 8 –Reformation; 9–Statutory Violations (Revenue and Tax Code); 10–Breach of Contract (Breach of Agreement re Acquisition); 14–23 Breach of Contract (Breach of the First through Tenth Amendments to the JVA); 24–Breach of Contract (Breach of Oral and Implied Agreement Relating to the Sale of Entities that own Broadway); 25–Breach of Contract (Breach of Oral and Implied Agreement Relating to the Sale of Lincoln); 26–Breach of Contract (Breach of Oral and Implied Agreement Relating to the Sale of Washington); 27–Breach of Contract (Breach of Oral and Implied Agreement Relating to the Sale of La Cienega); 28–Breach of Contract (Breach of Oral and Implied Agreement Relating to contribution of $1.5 million); 29–Negligence/Gross Negligence; and 30–Unjust Enrichment.  These claims had been alleged over hundreds

of pages and represented almost 80% of all claims alleged in the SAC. NMS also subsequently dropped its 31st claim for declaratory relief. NMS did not even appeal from the dismissal of any of these claims.

80. NMS filed a Third Amended Complaint ("TAC") in early January 2016, switching theories. The TAC continued to falsely assert that "Version 2" was genuine and that the "typo" story was true, but knowing that "Version 2" would soon be shown to be a forgery, Defendants advanced a new theory that did not rely on Article 11 and its Buy/Sell provision.

81. The new theory, just as frivolous as the old, also depended on knowingly false allegations, including, among many others, the false allegations that "Version 3" was an unauthorized forgery, that NMS never agreed to the Specified Property amendments, and that NMS had "exercised its right" under Article 6 to "buy out" AEW's interest in the Summer 2013 when it sent AEW a letter asking it to "consider" selling its interest – a letter that itself undermined the new claims and included a request to amend the JVA. Nobody could genuinely believe that a letter asking AEW to "consider" amending the JVA and selling its interest to NMS was the exercise of a "right," and nobody could reasonably believe that Article 6, which had nothing to do with buying out another's interests, provided a "buy out" right.

## M. AEW Files Its Motion for Terminating Sanctions

82. In late January 2016, AEW filed its motion for terminating sanctions against NMS, supported by irrefutable evidence, in the form of contemporaneous documents, deposition testimony and expert declarations, which established beyond any reasonable doubt that "Version 2," the "Cover Letter" and the La Cienega PMA were all forgeries created by NMS, on July 15, 2013, June 21, 2015, and June 24, 2015, respectively, and that NMS had engaged in widespread destruction of evidence. There could be no doubt that NMS had forged the documents and destroyed evidence based on review of the supporting evidence, notwithstanding the numerous false

statements to the contrary that NMS and the NMS Counsel Defendants had made to the trial court before then, often under oath.

83.     Rather than dismiss its case, NMS pushed ahead with its frivolous case, reaffirming the alleged authenticity of the known forgeries and submitting still more perjury.  And rather than withdrawing as counsel, the NMS Counsel Defendants continued to represent NMS in its malicious prosecution of the *Lincoln Studios* Litigation, submitted what they had to know was more perjury by NMS witnesses, and retained experts to try to mislead the trial court rather than retain experts that could in any way support NMS' claims that the documents were genuine and from the time period that NMS had claimed.

**N.     AEW Also Files A Demurrer To NMS' TAC**

84.     In addition to filing its motion for terminating sanctions, in late January 2016, AEW also filed a demurrer to NMS' TAC.  In its demurrer, AEW explained  that Article 6 of the JVA had nothing to do with the acquisition of one member's interest in the Joint Venture by another, and makes no mention of it.  Instead, Article 6 related solely to the order of distributions of money by the Joint Venture to members of the Joint Venture, and distributions are within the sole discretion of AEW under Article 8.1 of the JVA.  Article 11(g) also defined the Buy/Sell provisions contained in Article 11.1 of the JVA as "***the*** Buy Out Rights," leaving no room for NMS' new argument. AEW also pointed out that the June 2013 letter attached to the TAC actually undermined the new claim, rather than supported it, because: (1) it asked for AEW to "***conside***r" selling its interest to NMS, thus it was not the "exercise" of a "right"; and (2) the letter expressly acknowledged that the JVA would have to be "***amended***" in order for any such acquisition to be effective.

**O.     The Trial Court Sustains The Demurrer**

85.     In June 2016, the trial court dismissed NMS' TAC, with prejudice. Among other findings, the trial court found that NMS' theory that it had a right to "buy-out" AEW's interest in the Joint Venture pursuant to Article 6 of the JVA was

Gibson, Dunn & Crutcher LLP

COMPLAINT FOR MALICIOUS PROSECUTION

contrary to the terms of the JVA and not a reasonable interpretation of the JVA. The trial court found, just as Article 6 itself provided, that Article 6 related only to the distribution of money by the Joint Venture to the members of the Joint Venture (something AEW controlled in its sole discretion pursuant to Article 8.l of the JVA), and had nothing to do with one member acquiring the interest of another.

## P.     The Trial Court's July 29, 2016 Sanctions Order

86.     On July 29, 2016, the trial court issued an order granting, at least in part, AEW's motion for terminating sanctions, but setting an evidentiary hearing to take place before determining the full extent of the sanctions to be issued and the complete grounds for such sanctions.  In its July 29, 2016 Order, the trial court held in part:

(a)     "***This Order hereby sets forth the purposeful, bold, breathtaking violations of this Court's Orders that are UNDISPUTED and ADMITTED. These violations are on a grand scale and the motion for sanctions is granted***."

(b)     "***By his own admission, Shekhter violated the Court's discovery orders by failing to produce his personal computer for examination, deleting files from his personal computer, changing the hard drive of his personal computer, and/or failing to transfer all of the files to the new hard drive, all with the admitted intention of preventing the forensic expert(s) from discovering deleted files***."

## Q.     The October 2016 Evidentiary Hearing

87.     The trial court held an eight-day evidentiary hearing in October 2016. The trial court had expressly stated, in advance, that it wanted to hear from every witness who submitted a declaration or deposition testimony, Defendants made the decision not to produce Neil Shekhter, even though he was literally the only witness to have claimed there was a "typo" in Article 11 of the originally executed JVA, the only

person to have claimed to have received "Version 2" and the "Cover Letter" in September 2010, and to have "found" them later, and the only person to have claimed that "Version 2," the "Cover Letter" and the La Cienega PMA were genuine; Shekhter had also already admitted in NMS' opposition to have texted with his son, Alan, in October 2015 about swapping out the hard drive in his computer, deleted the texts (among other documents) and actually swapped out his hard drive in violation of the court's Orders. Defendants also chose not to produce: Alan Shekhter, who they admitted to swapping out the hard drive: Adam Shekhter, who claimed only to have "scanned" "Version 2" in July 2013 rather than help forge it; or Enrique Sanchez or Eddie Valentine, each of whom had been caught, like Neil Shekhter, deleting and wiping various files from NMS' devices.

88.    Defendants did not claim that any of these witnesses were unavailable to testify during the eight days of testimony that took place over a three-week period; and, indeed, the NMS Counsel Defendants had expressly agreed to the hearing dates. Nor did Defendants ever offer any explanation for this glaring omission, and the only logical explanation is that Defendants knew their lies would be exposed on cross-examination.

89.    The testimony of the two "fact" witnesses that Defendants did put on showed them to be both untruthful and without any relevant information related to the key forgeries, perjury and document destruction at issue. Indeed, one witness testified he did not even know there was a Buy/Sell provision in the JVA. And the other witness, Brian Bowis, admitted on the stand that the declaration prepared by the NMS Counsel Defendants, and that he had signed, was false; while the declaration had stated that he had not deleted any joint venture records, in fact he had done so, and NMS' IT Director, Enrique Sanchez, had helped him to do it.

90.    NMS also failed to present a single expert who testified that any of the three documents at issue were genuine documents from the time period NMS had claimed to have received them. Indeed, NMS' key document expert admitted that

COMPLAINT FOR MALICIOUS PROSECUTION

"Version 2" was printed at NMS' offices in July 2013, and was not sent to NMS in September 2010.  Worse still for Defendants, NMS' expert testified that neither NMS nor the NMS Counsel Defendants had ever told him that NMS was claiming in the *Lincoln Studios* Litigation that "Version 2" was an original document from September 2013.

91.     The NMS Counsel Defendants tried to change NMS' story to argue, without evidence, that "Version 2" may just be a "copy" of the original made in July 2013.   This argument, however, was not only contrary to all of the evidence, but it was also contrary to repeated statements by NMS and by the NMS Counsel Defendants to the trial court, sometimes under oath, that "Version 2" was the "original" document received by NMS in September 2010.  And Defendants failed to explain what allegedly happened to the "original" if this was a copy, after spending years lying to the trial court stating that it was the "original."

92.     AEW's experts also explained that the new argument was just as false as the argument that it was an original.  "Version 2," they explained, was an original forgery created by NMS, and in particular NMS' Neil Shekhter and his son, Adam Shekhter, on July 15, 2013 at NMS' offices.  They further explained in painstaking detail how and where NMS had created it, what document it had been based it on, and how NMS had destroyed the evidence to try cover it up.  Gerry LaPorte, for example, who had been trained by the secret service, explained because NMS had used pdf over-writing software to edit a pdf of the JVA to create the forgery, rather than using a Word document and Word software, the forgery did not re-justify on the right hand side.  The result is that because the word "three" is longer than the word "five," when NMS switched the words in Article 11 it caused that sentence to hang over the right margin by a single letter, creating a "hanging g:"

Gibson, Dunn & Crutcher LLP

COMPLAINT FOR MALICIOUS PROSECUTION

EXHIBIT B - PAGE 70

**Changing "five" to "three" Causes A Single Overhanging Letter**

ARTICLE 11.

BUY/SELL

11.1 Buy/Sell.

(a) Buy/Sell Offer Notice. The operation of this Section 11.1 may be triggered upon written notice (the "Buy/Sell Offer Notice") at the times and upon the conditions set forth below:

(i) At any time after three (3) years from the date hereof, either the Operating Member or the Investor Member may give a Buy/Sell Offer Notice at any time, provided, however, that in no event shall the Operating Member be entitled to give a Buy/Sell Offer Notice at any time after the occurrence of a Removal Event. In addition to the foregoing, if at any time an Event of Default, Removal Event or Incentive Loss Event occurs, the Investor Member may give a Buy/Sell Offer Notice. Additionally, with respect to Operating Member, upon the occurrence of any Impasse Buy/Sell pursuant to Section 4.6, the Operating Member may give a Buy/Sell Offer Notice. Notwithstanding the foregoing, neither Member may give a Buy/Sell Offer Notice while any Property is under a contract for sale and the consummation of such sale is pending.

93. Mr. LaPorte demonstrated that this one line in Article 11 was the only line in the entire document where that had occurred. Mr. LaPorte also explained that the CPS Code found on "Version 2" established that it had been printed on NMS' Xerox copier on July 15, 2013 between 3 and 4 p.m. PST. It was not delivered to NMS in September 2010, as NMS had claimed. The CPS Code, Mr. LaPorte explained, is an anti-counterfeiting technology, in which color printers identify when and where a color document is printed:

**The CPS Code Found On "Version 2"**
**Confirms It Was Printed On July 15, 2013 At NMS' Offices**

94.     Mr. LaPorte explained that "Version 2" was an original forgery from July 15, 2013, not a copy.  He also explained the CPS Code appeared on the back of every page of "Version 2" except one; the 79th page of "Version 2," the AEW signature page, which had been switched out and replaced with an older copy in attempt to make the signature page appear older.

95.     Mr. LaPorte also explained that the 2 other copies of "Version 2" produced by Defendants in the Lincoln Studios Litigation were actually copies of the original forgery, "Version 2."  For example, he identified original ink marks that appeared on "Version 2" that also appeared, in lighter form, on the two other copies, making it clear that they were merely copies of the original forgery NMS called "Version 2."

96.     Mr. LaPorte also explained how he had established that both the Cover Letter and the La Cienega PMA were forgeries.  He explained, for example, that the entire signature block on the so-called "Cover Letter" had been cut-and-pasted from an older genuine document and for that reason they matched perfectly.  He also explained how the La Cienega PMA had been based on an older PMA from another property, and for that reason it included a number of typographical errors and anomalies that had long since been fixed before the La Cienega PMA was actually drafted and circulated among the parties, and that did not contain such errors and anomalies.

97.     Mr. Rubin addressed not only the origins of the various forgeries, but also how NMS had withheld and destroyed evidence, and lied about it, to cover up the forgeries.  He explained how they had recovered the deleted text exchange between Neil and Alan Shekhter in which they agreed to swap out Neil Shekhter's hard drive, and how they had actually carried it out.  He also established that Shekhter had backed up his hard drive first using a Seagate back-up drive, and that the Seagate back-up drive had remained in use on NMS devices at least through December 2, 2015, yet had never been produced.  He also explained that Neil Shekhter had another computer that he had used to create the forgeries, which was still in use through at least late

Gibson, Dunn &
Crutcher LLP

September 2015, after the trial court's forensic freeze order, yet it also was never produced. He further testified that NMS had failed to produce the hard drive that had been swapped out, the back-up hard Seagate drive and at least 21 other electronic devices. Moreover, he explained that NMS continued to delete records, including files that matched the forgeries, long after the forensic preservation and production orders, that NMS had renamed a file from AEW to just "W," and that NMS and Shekhter had backdated Shekhter's computer at least seventeen times just between October and December 2015, had loaded tens of thousands of new files onto the computer while it was backdated, and had even replaced his operating software, all in an effort to inhibit the forensic examination.

98. Indeed, not only did Mr. Rubin testify that NMS and Shekhter continue to backdate Shekhter's computer and load more than 60,000 new files onto the computer mere minutes before the forensics examination took place on December 2, 2015, but NMS' own expert testified that at that exact time, when the NMS Counsel Defendants were also supposed to be there, Neil Shekhter, Alan Shekhter and NMS' IT Director, Enrique Sanchez, were all with that very computer, making it clear that this misconduct was not only company-wide, but also almost certain that the NMS Counsel Defendants were actively engaged in the same misconduct.

99. With respect to the creation of "Version 2," Mr. Rubin testified that NMS created that forgery through a complex, multi-step process that AEW's experts were later able to reconstruct through a detailed forensic examination of the few NMS devices and electronic data that NMS did not hide, alter or destroy. Specifically, on July 12, 2013, Shekhter, the head of NMS, sent an email to his son Adam Shekhter, who was, at that time, working as a research analyst intern at NMS; this email attached a PDF version of the original executed JVA with the 5-year Buy/Sell Provision (before many important amendments were made to the JVA) in an electronic file named "P6 LA MF Holdings I LLC.pdf." It was this PDF file that was used as the basis for the forgery of the JVA.

100.    On July 14, 2013, the electronic version of the forged JVA was created. At 9:46 p.m., Neil Shekhter, who conducted his NMS business largely on his "home computer" opened a file on his home computer named "P6 LA MF Holdings I LLC clean NS 123 PRINT.pdf"—a title identical to that of the PDF that Shekhter forwarded to Adam Shekhter two days earlier, but for the appended language "clean NS 123 PRINT." Notably, the inclusion of "NS," Shekhter's initials, in the document title confirmed that Shekhter created the PDF, as he commonly added his initials to documents he created for NMS. The file was opened by Neil Shekhter on his home computer, called "DELLNEIL2012-PC," and edited with an Adobe Acrobat application to change the "five (5)" language in Section 11.1(a)(i) to read "three (3)." This alteration caused the single line of text—the line containing the fabricated term— to hang over the right-hand justification that exists in every other line of the page and on every other page in the JVA.

101.    On July 15, 2013, at 1:24 p.m., the electronic "clean NS 123 PRINT" forgery was transferred from the "DELLNEIL2012-PC" computer to a USB flash drive (which was also never produced by NMS or its attorneys, despite the Court order requiring its production) and subsequently opened on Adam Shekhter's NMS desktop computer at 3:51 p.m. The forgery was then printed by Adam Shekhter at NMS' offices on NMS' Xerox WorkCenter 7775 printer, Serial Number RFX001896. After it was printed, the forgery was scanned by Adam Shekhter to Adam Shekhter's NMS' email account shortly after 4:00 p.m., eliminating all metadata that would have been associated with the PDF file (to conceal the origins of the forgery).

102.    After scanning the forgery and saving it as a PDF, Mr. Rubin explained that Adam Shekhter emailed this "CLEAN" file to his father, Neil Shekhter, at 4:51 p.m. all part of NMS' fraudulent scheme. After he received the PDF of the forgery from his son, Shekhter, on behalf of NMS, began circulating the forgery internally at NMS to make it appear that others had always had a copy of the forgery. A review of

NMS' electronic server and devices, however, showed that no electronic copy of the forgery ever existed on any NMS server or device before July 15, 2013.

**R.     The November 22, 2016 Terminating Sanctions Order**

103.   On November 22, 2016, the trial court issued its Terminating Sanctions Order, finding NMS had engaged in wide-spread forgery, perjury and destruction of evidence.  Among other findings, the trial court concluded:

(a)     "*__Plaintiffs' coordinated, intentional, widespread destruction of evidence has placed into doubt everything they produced, failed to produce, and any witness testimony Plaintiffs may intend to offer__*."

(b)     "*__Plaintiffs fabricated evidence, submitted perjury about the same, and destroyed evidence, while simultaneously representing to the Court that they were proffering authentic documents and that they had preserved evidence__*."

(c)     "*__Indeed, the level of document and evidence destruction here is so shocking, intentional, and pervasive that violations of prior court orders are not even required for the imposition of such sanctions—although such violations do exist here and justify terminating sanctions__*."

(d)     "At the Evidentiary Hearing, Plaintiffs did not call several witnesses to testify, including NMS principal Neil Shekhter and NMS employees Adam Shekhter, Alan Shekhter, Enrique Sanchez (NMS' IT Administrator), and Eddie Valentin (Neil Shekhter's assistant), all of whom submitted declarations in opposition to Defendants' Motion.  Plaintiffs did not explain why these witnesses were not called.  The failure to call these witnesses despite an opportunity to do so undermines all of their credibility."

(e)     "There can be no question that Plaintiffs' failure to call these key witnesses, as well as Plaintiffs' willful destruction of evidence and document

COMPLAINT FOR MALICIOUS PROSECUTION

Gibson, Dunn & Crutcher LLP

destruction, leads to the inference that Plaintiffs are guilty of the forgery, perjury, and spoliation Defendants claim.  After hearing all of the evidence, the Court has no doubt this is the case."

(f)      "***Terminating and monetary sanctions are appropriate in light of the extensive evidence that Plaintiffs forged several pieces of evidence—at least "Version 2," the "La Cienega PMA," and the "Cover Letter."  This by itself constitutes a fraud on the court, the unlawful spoliation of evidence, and attempts to undermine the judicial system***."

(g)      "***The Court also finds ample evidence that Plaintiffs—in particular Neil Shekhter—have provided false testimony under oath in order to mislead the Court and cover up their own misconduct***."

(h)      "Among the many actions, including those discussed above, Plaintiffs fraudulently altered and modified Neil's New Home Computer, destroying evidence in the process; lied about and have failed to produce Neil's 2012 Home Computer; intentionally deleted relevant materials provided by a witness; intentionally downloaded and installed updates that destroyed evidence; downloaded and installed data sweeping software that destroyed evidence; altered and attempted to backdate key files; failed to produce at least four key devices with critical evidence and at least 21 devices in total; by their own admission, intentionally destroyed key hard drives and a backup; and deleted specific files relating to the forgeries in this case."

(i)      "Plaintiffs' misconduct was knowing and intentional, in plain violation of this Court's September 8 and October 6, 2015 Orders.  Intentional, willful, coordinated destruction of evidence certainly justifies terminating sanctions, especially here where many of those actions were in plain violation of the Court's Orders."

Gibson, Dunn & Crutcher LLP

(j)     "***Plaintiffs forged at least one key document—the JVA their claims relied upon—in 2013.  This was followed by additional forgeries, perjury, and the coordinated and widespread spoliation and concealment of evidence in this case***.  There is no way to effect compliance with civil discovery or the Court's Orders, since Plaintiffs have already destroyed countless materials relevant to this case.  And there is no way to know the full extent of the damage done.  Plaintiffs' actions, particularly those since the Court entered its Orders, were willful and show a history of abuse that continues to this day, and nothing less than terminating sanctions would produce compliance with this Court's Orders."

(k)     "***Version 2" is not an authentic document.  It is a forgery***."

(l)     "***Two versions of the "La Cienega PMA" were created on June 24, 2015, and both were fabrications***."

(m)     "***The 'La Cienega PMA' is a forgery***."

(n)     "***The 'Cover Letter' is a forgery***."

(o)     "In total, there are at least 21 devices that have been plugged into Neil's New Home Computer alone that have not been produced by Plaintiffs.  Plaintiffs offered no evidence to credibly refute this evidence."

(p)      "***Neil Shekhter's testimony was knowingly false***."

(q)     "Plaintiffs also offered no explanation regarding the provenance of the three alleged forgeries, two of which were allegedly created during the pendency of this action.  Plaintiffs have not proffered anyone, including Plaintiffs' own principal Neil Shekhter, to explain why the three documents are not forgeries, or to explain the discrepancies in the sworn statements of NMS' employees and the briefs submitted by NMS' counsel.  ***Nor have Plaintiffs proffered any***

COMPLAINT FOR MALICIOUS PROSECUTION

Gibson, Dunn & Crutcher LLP

*testimony or explanation to rebut Defendants' showing that Plaintiffs failed to produce documents related to the alleged forgeries in the normal course of discovery even though this material was in Plaintiffs' and Plaintiffs' counsel's possession.*"

(r)     "***Terminating and monetary sanctions are also appropriate in light of Plaintiffs' perjury regarding the authenticity of and circumstances surrounding all of the forged documents.  This misconduct is also reprehensible.***"

(s)     "Terminating and monetary sanctions are also appropriate here in this case, with respect to both Plaintiffs' claims and Cross-Complainant's Cross-Complaint, given Plaintiffs' massive, intentional, coordinated effort to destroy evidence, especially in light of, and in plain violation of, the specific September 8, 2015 Order of this Court directing them to preserve and not alter evidence and the October 2015 Order requiring them to produce evidence for forensic examination."

(t)     "Plaintiffs, like the plaintiff in *R.S. Creative*, brought this case based upon forged documents, committed perjury, and then intentionally and purposefully destroyed a wide swath of evidence relating to the forgeries (which related to Plaintiffs' original claims and Cross-Complainant's Cross-Complaint claims).  It does not remedy the situation that Plaintiffs' claims based upon the forgery have been dismissed; rather, their widespread misconduct infects the entirety of these proceedings."

(u)     "Additionally, the Court considers the fact that, despite their actions being front and center in Defendants' Motion, Plaintiffs did not call as witnesses at the Evidentiary Hearing (despite more than ample opportunity to do so) Neil Shekhter (who engaged in the outrageous actions of spoliation, perjury, and

COMPLAINT FOR MALICIOUS PROSECUTION

Gibson, Dunn & Crutcher LLP

forgery presented to the Court), Adam Shekhter (who participated with Neil Shekhter in creating the forgery of "Version 2"), and Alan Shekhter (who assisted Neil Shekhter with the hard drive swap discussed above). Plaintiffs likewise failed to present testimony from Enrique Sanchez and Eddie Valentin at the Evidentiary Hearing. The absence of any live testimony from these individuals was stunning."

(v)    "The home computer Neil Shekhter used in 2014-2015 . . . is indisputably a critical piece of evidence. On it, Neil Shekhter conducted [the NMS Plaintiffs'] business during much of the time period in this litigation . . . Despite this computer's obvious relevance, [the NMS Parties] set out on a scheme to destroy and alter its contents."

(w)    "Neil Shekhter [and his son] initiated and executed a plan to: (i) remove a hard drive from Neil's New Home Computer; (ii) replace it with a new hard drive that looked similar to the old one; (iii) manipulate and alter the computer by artificially backdating the computer's clock to make the files appear older than they were; and then (iv) flood the new hard drive with more than 75,000 backdated files and folders."

(x)    "While [the NMS Parties] state that they 'discarded' both the old hard drive [of Neil's New Home Computer] and the Seagate device on which they backed up the old hard drive, forensic evidence shows that the Seagate device was connected to Neil's computer as late as December 2, 2015 . . . [but] [n]either the old hard drive nor the back-up [Seagate] drive was ever produced, in violation of this Court's Orders."

(y)    "Like Neil's New Home Computer, the home computer that Neil Shekhter used in the summer of 2013 when allegedly receiving the scan of [the Joint Venture Agreement] . . . is another critical piece of evidence. . . . Neil Shekhter

Gibson, Dunn & Crutcher LLP

testified . . . simply that he 'threw [this device] away' by 'put[ting] it in the trash,'" but in reality, forensic analysis confirms the computer "was in use as late as September 19, 2015, after this Court issued its [Freeze Order]."

**S.    The December 1 and 2, 2016 Judgments Against NMS**

104.   On December 1, 2016, the trial court entered judgment against NMS on all of its affirmative claims.

105.   Also, on both December 1 and December 2, 2016, the trial court heard further evidence from AEW in support of the relief AEW sought in its cross-complaint against NMS.  After hearing the evidence, the court noted "I appreciate the fact that the fraud was revealed because it's not just this court's order, it's the whole system, the fraud on the whole system."  The Court entered a default judgment against NMS and in favor of AEW on its cross-complaint on December 2, 2016.  The default judgment, entered only after a two-day prove-up hearing, confirmed, among other things, that NMS had already committed misconduct and was in breach of the JVA before it ever filed the frivolous *Lincoln Studios* Litigation.  Among other findings included in the default judgment against NMS, the Court found the following:

(a) "The document referred to as "Version 2" of the JVA in NMS' First and Second Amended Complaints (and referenced in Paragraph 40 of AEW's Cross-Complaint) is a fabrication and forgery created by NMS and its affiliates. Specifically, NMS and its affiliates changed the Buy/Sell provision in Section 11.1(a)(i) of the JVA from a five-year term to a three-year term that was never agreed upon by the parties."  (¶ 4.)

(b) "NMS breached the JVA in the following respects:"

- "Fraud, Misrepresentation, and Forgery.  As the Court found in its November 22, 2016 Order Granting Defendants' and Cross-Complainant's Motion for Terminating and Other Sanctions, NMS committed a broad variety of fraudulent conduct [and] misrepresentations."  (¶ 6.a)

- "In particular, as explained above in Paragraph 4, the Court found that 'Version 2' of the JVA in NMS' First and Second Amended Complaints (and referenced

in Paragraph 40 of AEW's Cross-Complaint) is a fabrication and forgery created by NMS and its affiliates."   (¶ 6.a)

- "The Court also found that a cover letter dated September 14, 2010 from Eric Samek and Neil Shekhter, which NMS and its affiliates first proffered in September 2015 and claimed accompanied the alleged hard copy of "Version 2" of the JVA, is a fabrication and a forgery created by NMS and its affiliates."   (¶ 6.a)

- "The Court further found that the property management agreement ("PMA") for the Luxe La Cienega Property ("La Cienega PMA") that was first proffered by NMS and its affiliates in June 2015 and contained a 60-day termination provision in Section 12.1, as opposed to a 30-day termination provision in all other PMAs for the Properties, is a fabrication and a forgery created by NMS and its affiliates."   (¶ 6.a)

- "Moreover, the Court found that NMS and its affiliates made numerous misrepresentations and false statements in connection with these forgeries, including such statements to AEW and this Court."   (¶ 6.a)

- "NMS and its affiliates also committed several violations of the PMAs, including but not limited to NMS' related entity, NMS Properties, Inc.'s ("NMS Properties"), refusal to recognize the valid termination of the PMAs, failure to vacate the Properties (with the exception of the Luxe Washington Property), failure to return the books and records of the Properties to AEW and the Subsidiary Companies, and failure to otherwise cooperate with the transition of management to a new property manager."   (¶ 6.a)

- "Furthermore, NMS failed to disclose any of the multiple, pending litigations in which NMS' principal, Neil Shekhter, was involved when the JVA was executed;" (¶ 6.a)

- "The conduct set forth in Paragraph 6(a) constitutes breaches of Sections 2.3, 4.1, 8.1, 8.4, 8.9, 10.1(a), and 10.1(q) of the JVA;" (¶ 6.b)

- "Misappropriation and Mishandling of Joint Venture Funds.  NMS has misappropriated funds from the Joint Venture by refusing to comply with AEW's instruction on July 31, 2015 to NMS and its related entity NMS Properties to transfer all cash funds of the Joint Venture and the Subsidiary Companies to designated accounts and by denying AEW access to such funds. NMS Properties also refused to comply with AEW and the Subsidiary Companies' instructions to seek AEW approval before making expenditures and provide a weekly summary of expenses to be paid along with invoices and back-

COMPLAINT FOR MALICIOUS PROSECUTION

up for such expenses. NMS also failed to fund its share of capital calls after AEW gave notice requiring such capital calls on July 15, 2015;" (¶ 6.c)

- "The conduct set forth in Paragraph 6(c) constitutes breaches of Sections 3.2, 4.1(b), and 8.1 of the JVA;" (¶ 6.d)

- "Misappropriation and Mishandling of Joint Venture Records. NMS has misappropriated and mishandled the Joint Venture records in several respects. NMS has not maintained the books and records of the Joint Venture and the Properties as required by the JVA. NMS also failed to provide AEW with access to the Yardi Systems, Inc. ("Yardi") records relating to the Properties, including information for the Luxe La Cienega Property by removing AEW from the weekly Yardi distribution list for Luxe La Cienega." (¶ 6.e)

- "NMS further failed to provide AEW's retained accountant, Grobstein Teeple LLP, the required access to the books and records of the Joint Venture as requested by AEW, by failing to provide AEW with relevant information for the Luxe La Cienega Property, and by abruptly removing AEW from the weekly distribution list for such information in July 2015." (¶ 6.e)

- "NMS further commingled documentation, records, and funds of the Joint Venture's Properties with unrelated documentation, records, and funds. Moreover, NMS and NMS Properties refused to provide AEW with a final accounting concerning the Properties upon the termination of NMS Properties as property manager, despite AEW's repeated demands;" (¶ 6.e)

- "The conduct set forth in Paragraph 6(e) constitutes breaches of Sections 4.1(a), 4.7, and 8.18 of the JVA;" (¶ 6.f)

- "Other Breaches. NMS has committed several other breaches of the JVA. NMS filed the First Amended Complaint in the above-captioned lawsuit and by naming as defendants the Joint Venture, and other entities and individuals— including Eric Samek, Marc Davidson, AEW Capital Management, L.P., AEW Partners VI, L.P., AEW Partners VI, Inc., and AEW VI, L.P.—all of which are indirect owners of or affiliated with AEW, in violation of several provisions of the JVA, and seeking to dissolve the Joint Venture, and asserting claims in this action against AEW for breach of fiduciary duty;" (¶ 6.g)

- "The conduct set forth in Paragraph 6(g) is a breach of Sections 8.4(t), 8.17, 15.11, and 15.17 of the JVA;" (¶ 6.h)

- "NMS also entered into two unauthorized agreements with related parties of NMS without AEW's approval, which also involved the misappropriation of

Joint Venture funds and the wrongful attempt to increase NMS's own profits and stake in the Joint Venture;" (¶ 6.i)

- "The conduct set forth in Paragraph 6(i) constitutes a breach of Sections 8.4 and 8.9 of the JVA;" (¶ 6.j)

- "NMS has committed Events of Default pursuant to Sections 10.1(a), (d), (o), and (q) of the JVA." (¶ 7.a)

**T. The Terminating Sanctions and Judgments Against NMS Are Affirmed On Appeal**

106.   Defendants appealed from the judgments against NMS, though did not challenge any of the trial court's findings of forgery, perjury or destruction of evidence on appeal.  On June 20, 2018, the Court of Appeal affirmed the Terminating Sanctions Order, and affirmed both the December 1, 2016 and December 2, 2016 judgments against NMS.  The Court of Appeal held, in part:

(a)   "We affirm the judgment as to the Cross-Complaint because we find that appellants' acts of intentional destruction and suppression of evidence and perjury constitute discovery abuse that is egregious and intolerable and infects the entire proceedings."

(b)   "The trial court found pervasive, massive destruction of documents and files directly relating to the Joint Venture, that caused the "permanent loss of untold evidence and metadata" on Shekhter's computer, including the manipulation and deletion of files, backdating the computer more than 17 times which affected more than 800,000 files and folders and failing to identify and produce at least 21 devices that had access to the documents in question. All of this misconduct irreparably damaged respondents' ability to defend the litigation and pursue crossclaims, even those unrelated to the take-out or buy out of respondents' interest under either Article 6 or 11."

(c)     "The misconduct here was extensive, intentional and in violation of court orders designed to prevent the very abuse which occurred."

(d)     "According to the trial court, there "is no way to effect compliance with civil discovery or the Court's Orders, since [Appellants] have already destroyed countless materials relevant to this case. And there is no way to know the full extent of the damage done." Appellants' "widespread misconduct infects the entirety of these proceedings," such that the "coordinated[,] intentional[,] widespread destruction of evidence has placed into doubt everything they produced, failed to produce, and any witness testimony [they] may intend to offer." We find no error in the imposition of terminating sanctions."

(e)     "Appellants do not challenge the trial court's findings that the misconduct here included willful tampering with computers and documents and the failure to produce devices, all of which constituted multiple violations of two court orders. They do not deny that they misused the discovery process."

**U.      The Court of Appeal Also Rejects NMS' New Article 6 Claim**

107.    In addition to affirming the judgments against NMS as a result of the trial court's Terminating Sanctions Order, in a separate opinion the Court of Appeal also rejected NMS' new Article 6 theory on the pleadings, affirming the trial court's order sustaining AEW's demurrer to NMS' Article 6 claim without leave to amend.  The Court of Appeal confirmed that NMS' argument was contrary to the express terms of Article 6 of the JVA, which says nothing about acquiring another member's interest in the Joint Venture, and affirming the trial court's finding that JVA was not reasonably susceptible to NMS' suggested interpretation.  The Court of Appeal also noted that rather than support NMS' argument, the extrinsic evidence undermined its claim:

They offer extrinsic evidence to explain the essential contractual terms they contend "were understood by the parties but would otherwise be

COMPLAINT FOR MALICIOUS PROSECUTION

unintelligible to others." (Sterling v. Taylor (2007) 40 Cal.4th 757, 767.) They offer Samek's May 19, 2010 email to Shekhter indicating that AEW agreed to a "minimum equity multiple of 1.75x" and that if AEW's investment is "monetize[d]" within five years "then NMS will keep all proceeds above AEW's 24% annual return." This email states nothing about acquiring the other party's interest, much less about acquiring it for 1.75 times its investment. It simply describes how profits are distributed and interests are to be "monetized." ***In fact, other extrinsic evidence not mentioned by appellants suggests appellants do not interpret Article 6 to include the right to acquire the other party's interest upon "monetization" that they now advocate here***. Shekhter's June 2013, letter to AEW attached as Exhibit D to the TAC, acknowledges that the JVA needs to be amended both "to provide for the withdrawal of the Investor Member from the Company once its economic interest becomes zero" and "to allow the Operating Member to use outside funds to get the Investor Member to an IRR of 24% and 1.75 multiple." Accordingly, the trial court's finding that appellant's interpretation was not one to which the language of Article 6 was susceptible is not error. Because the contract is not susceptible to that interpretation, leave to amend was properly denied as to this cause of action.

## V.    The Judgments Against NMS Are Now Final

108.    After NMS lost in the Court of Appeal, Defendants filed a Petition for Re-Hearing, which was denied. Defendants then filed a Petition for Review with the California Supreme Court, and that too was denied. Thus, the judgments against NMS are now final.

# FIRST CLAIM FOR RELIEF

## (For Malicious Prosecution Against NMS)

109.   Plaintiff incorporates by reference paragraphs 1 through 108 above, and 117 through 136 below, and reassert those allegations as if set forth in full herein.

110.   The *Lincoln Studios* Litigation was initiated and prosecuted against Plaintiff by and at the direction of NMS.

111.   The *Lincoln Studios* Litigation was continued and prosecuted against Plaintiff by and at the direction of NMS to a legal termination on the merits in favor of Plaintiff and against NMS.  On December 1 and 2, 2016, the trial court entered final judgments in favor of Plaintiff and against NMS.  On June 20, 2018, the Court of Appeal affirmed the entry of judgment against NMS and in favor of Plaintiff.  The judgments against NMS became final in November 2018.

112.   NMS did not have probable cause to file or pursue the *Lincoln Studios* Litigation.  NMS knew its claims were utterly and completely without merit, and that they were based on a forgery and false allegations.  NMS submitted additional forgeries to the Court, submitted testimony it knew constituted perjury, and engaged in widespread evidence spoliation in order to conceal its misconduct and to keep alive a lawsuit it knew to have no merit.

113.   In initiating and continuing to prosecute the *Lincoln Studios* Litigation, NMS acted for purposes other than succeeding on the merits.  NMS knew it could not succeed on the merits on its claims because its claims were based on forgeries and perjury.  NMS' improper purposes included forcing a sale of AEW's interest in the Joint Venture to NMS and at a fraction of what it was worth.  Indeed, in an August 2016 letter to AEW, NMS' Shekhter expressly warned that "[o]ne way or another, I intend to pay-back and/or buy-out AEW and get AEW and its AEW Fund VI investors out of this portfolio," and that ***"[y]our [AEW's] best case scenario is years of litigation before there is any finality or resolution*."**

COMPLAINT FOR MALICIOUS PROSECUTION

Gibson, Dunn & Crutcher LLP

114.   In initiating and continuing to prosecute the *Lincoln Studios* Litigation, NMS acted with oppression, fraud, and malice, including, but not limited to, acting with intent to cause injury to Plaintiff, and engaging in a systematic concealment of the truth in order to advance NMS' baseless claims against Plaintiff.  As such, NMS willfully and consciously disregarded Plaintiff's rights.  No reasonable party would have filed, let alone pursued for more than three years, NMS' lawsuit against AEW.

115.   As a direct and proximate cause of NMS' conduct, Plaintiff was forced to expend enormous time and resources, and to incur millions of dollars in legal fees and costs, defending itself and its affiliates and vendors against the meritless claims asserted by NMS in the *Lincoln Studios* Litigation.  Furthermore, Plaintiff suffered harm to its reputation and business interests.  The conduct of NMS was a substantial factor and proximate cause of the harm to Plaintiff.

## SECOND CLAIM FOR RELIEF

### (For Malicious Prosecution Against the NMS Counsel Defendants)

116.   Plaintiff incorporates by reference paragraphs 1 through 115 above and reasserts those allegations as if set forth in full herein.

117.   The *Lincoln Studios* Litigation was initiated and prosecuted against Plaintiff by or at the direction of the NMS Counsel Defendants, and the Lincoln Studios Litigation resulted in a final judgment on the merits against NMS and in favor of AEW.

118.   The NMS Counsel Defendants did not have probable cause to file or pursue the *Lincoln Studios* Litigation against AEW.  The NMS Counsel Defendants were aware, and/or acted with reckless disregard of the truth that NMS' lawsuit against AEW lacked merit, that "Version 2" on which it was based was a forgery, that the story of a "typo" in Article 11 of the JVA was false, and that "Version 3," as Defendants called it, was actually the operative JVA that had been used by the parties to the Joint Venture, including NMS, since January 11, 2011, and that it was not, as Defendants alleged, a forgery created by AEW without the knowledge or consent of

COMPLAINT FOR MALICIOUS PROSECUTION

NMS.  All the NMS Counsel Defendants had to do was review the contemporaneous records or interview NMS' former President, Andersen, or interview NMS' deal counsel, and the forgery and fraud would have been obvious.  There was no evidence supporting the forgery or fraudulent allegations.  So the NMS Counsel Defendants either did such basic work and knew that the lawsuit had no merit, or they willfully refused to do any investigation at all before filing a complaint based on a forgery and patently false allegations, alleging fraud and breach of contract claims over hundreds of pages, and seeking "billions" of dollars in damages.  In other words, the NMS Counsel Defendants filed the FAC knowing it had no merit and/or acted with reckless disregard of the truth.

119.   In any event, on June 16, 2015, the NMS Counsel Defendants were provided copies of the specific July 2010 request made by NMS, in writing, demanding a 5-year Buy/Sell in Article 11 of the JVA. The NMS Counsel Defendants also attended the September 2015 depositions of NMS' former President, Andersen, and deal counsel, Chernove, as well as the depositions of AEW's deal counsel, all of whom confirmed that NMS had expressly requested a 5-year Buy/Sell in Article 11, and that there was no "typo" in Article 11 of the executed JVA, with respect to the 5-year Buy/Sell or otherwise.  Yet they continued to wrongfully and maliciously pursue the Lincoln Studios Litigation against AEW based on the forged "Version 2" and NMS' false allegations.

120.   Also in September 2015 the NMS Counsel Defendants were in possession of AEW's forensic examination motion, backed by expert testimony, demonstrating that "Version 2" was in all likelihood a forgery created by pdf overwriting software by NMS, and in January 2016 the NMS Counsel Defendants were in possession of AEW's Motion for Terminating Sanctions, backed by expert testimony, conclusively establishing that "Version 2" – a document that NMS and the NMS Counsel Defendants had assured the trial court, including under oath, was an original and genuine document delivered by AEW to NMS in September 2010, was actually a

Gibson, Dunn &
Crutcher LLP

forgery created by the head of NMS, Neil Shekhter, and his son, Adam Shekhter, on July 15, 2013. The CPS Code contained on "Version 2" was alone sufficient to establish that "Version 2" was a forgery created on NMS' devices in July 2013, and not a genuine document prepared and delivered by AEW in September 2010. But AEW's experts also provided extensive additional evidence that "Version 2" was a forgery created by NMS.

121. AEW's Motion for Terminating Sanctions served on NMS and the NMS Counsel Defendants also contained irrefutable evidence that the "Cover Letter" NMS and the NMS Counsel Defendants had assured the trial court was a genuine original document received by NMS in September 2010 was actually a forgery created by NMS' Neil Shekhter in June 2016 after the discovery conference in which the NMS Counsel Defendants were provided evidence that "Version 2" was a forgery and that the "typo" story was a lie. Among other evidence identified, AEW's experts identified the earlier document from which the signature block of the forged "Cover Letter" was cut-and-pasted, they identified earlier electronic versions of the same forgery created by NMS on the same day in June 2015 that NMS and the NMS Counsel Defendants were ordered to produce and that they did not produce, they identified NMS emails from Shekhter to himself and from Shekhter to others at NMS discussing the earlier versions of the forged "Cover Letter" that NMS and the NMS Counsel Defendants were ordered to produce and that they did not produce, and they identified that version of Adobe Acrobat that was used to create the hidden, earlier versions of the forged "Cover Letter." AEW's experts explained that NMS, and Shekhter in particular, used a version of Adobe Acrobat that did not exist until December 2014, even though the metadata associated with the first hidden, earlier version of the "Cover Letter" suggested it was created in September 2010, and they explained that NMS/Shekhter created the document in June 2015 after backdating Shekhter's home computer. The hidden emails identified by AEW's experts included emails from Shekhter asking

other NMS employees if they could tell when the version of the "Cover Letter" he emailed them was created.

122. AEW's experts also provided irrefutable evidence that the La Cienega PMA that NMS and the NMS Counsel Defendants had assured the trial court was an original and genuine document from 2012 was in fact a forgery create by NMS, and by Shekhter in particular, in June 2015 after NMS believed its affiliate was about to lose a preliminary injunction motion in another case. Not only did AEW's experts identify the earlier draft Property Management Agreement related to another JV Property that NMS, and Shekhter in particular, used as the basis for this particular forgery, but they identified the emails sent from closed NMS accounts attaching the older draft to Shekhter just before the forgery was based, all of which had been ordered by the trial court to be produced by NMS and the NMS Counsel Defendants and that were hidden instead. AEW's experts also identified the NMS word document created by NMS' Shekhter with a name matching that of the forgery created at the time the forgery first appeared, which NMS and the NMS Counsel Defendants not only failed to produce, in violation of the trial court's order, but which was actually deleted from Shekhter's computer. And perhaps the most damning evidence of all, AEW's experts identified a botched version of the forged La Cienega PMA that was sent by NMS' Shekhter to the NMS Counsel Defendants the night before the NMS Counsel Defendants first submitted the forged La Cienega PMA to the trial court attached to a perjurious declaration claiming it to be authentic. The botched version of the forgery identified the *wrong owner* of the La Cienega Property; in other words, it was a document that could not have been genuine. Not only did NMS and the NMS Counsel Defendants fail to explain how they could have been in possession of such a document, but they also failed to explain why they never produced it despite multiple court orders that they do so. The only explanation is that the NMS Counsel Defendants knowingly hid from AEW and the trial court both the botched forgery and the emails they were

COMPLAINT FOR MALICIOUS PROSECUTION

Gibson, Dunn &
Crutcher LLP

1  ordered to produce in order to help NMS perpetuate a fraud on the trial court and

2  AEW.

3       123.   AEW's experts also identified explicit and incontrovertible evidence that

4  NMS and the NMS Defendants made false and misleading statements about the

5  number and identity of NMS electronic devices that had been ordered by the trial court

6  to be produced, that dozens of such devices had been hidden from AEW and the trial

7  court, that NMS' Shekhter and his son had texted each other a detailed plan to swap

8  out the hard drive and replace it with a new one and backdate the computer so that the

9  files they loaded onto the new drive appeared older than they were.  AEW's experts

10  also identified uncontroverted evidence that NMS/Shekhter deleted those text

11  exchanges and carried out their despicable plan.

12       124.   Yet the NMS Counsel Defendants continued to prosecute the *Lincoln*

13  *Studios* Litigation.  They did so after the June 2015 discovery conference.  They did so

14  after the September 2015 depositions of the former NMS President and deal counsel.

15  They did so after the expert declarations of likely forgery in September 2015.  They

16  did so after receiving AEW's Motion for Terminating Sanctions in January 2016 (with

17  the exception of Defendant Genga, who quietly stopped working on the case in late

18  December 2015 without explanation, after making (and never correcting) numerous

19  false statements to the trial court about the genuineness of NMS' forgeries and about

20  NMS' alleged preservation of evidence).  They did so through the eight-day

21  evidentiary hearing in October 2016, even though they never retained, let alone

22  presented, a single expert who opined that the forgeries NMS advanced in the *Lincoln*

23  *Studios* Litigation were genuine documents from 2010, as NMS had claimed.  Indeed,

24  the key expert retained and presented by the NMS Counsel Defendants at the October

25  2016 evidentiary hearing testified that the so-called "Version 2" was created by NMS

26  at its offices in July 2013, and that he had never even been told by the NMS Counsel

27  Defendants that NMS was claiming that it was an original document from AEW in

28  September 2010.

125.   The NMS Counsel Defendants also failed to present any of the key NMS witnesses to the forgery and document destruction at the evidentiary hearing, even though the trial court expressly said it wished to evaluate their credibility and they never made any claim of unavailability of any such witnesses.  They did not present Neil Shekhter, Adam Shekhter, Alan Shekhter, Enrique Sanchez, or Eddie Valentine. They did present Brian Bowes, but his testimony actually confirmed that the declaration the NMS Counsel Defendants had prepared for him before the evidentiary hearing was perjurious because he admitted, contrary to the declaration he signed, that he and others at NMS had deleted joint venture records from NMS' devices.

126.   The NMS Counsel Defendants continued to represent NMS in pursuing NMS' appeal from the Terminating Sanctions Order, even though they did not contest any of the trial court's findings of forgery, perjury and destruction of evidence. Despite not challenging such findings, the NMS Counsel Defendants submitted to the Court of Appeal, and relied on, the declarations that the trial court held were perjurious.

127.   Before the Terminating Sanctions Order was issued by the trial court, the NMS Counsel Defendants also made numerous false statements to counsel for AEW and the trial court about the forgeries in an effort to hide NMS' misconduct and advance NMS' fraudulent scheme.  For example, in a September 28, 2015 brief they submitted to the Court they asserted that "the original [Version 2] has remained in Shekhter's possession until recently, when he turned it over to NMS' counsel for handling and maintaining in accordance with the September 8, 2015 order of this Court."  The NMS Counsel Defendants also stated in the same brief that "plaintiffs have assembled the original hard copies of the agreements for holding in escrow by a third party . . . They produced for copying by AEW the original hard copies of the JVA Version 2 and the La Cienega PMA."  These statements were false and the NMS Counsel Defendants knew them to be false and/or acted with reckless disregard to the truth.  The NMS Counsel Defendants also submitted to the Court a perjured

COMPLAINT FOR MALICIOUS PROSECUTION

Gibson, Dunn & Crutcher LLP

declaration from NMS' Neil Shekhter on September 28, 2015 in which Shekhter testified, under oath: "Since my receipt of the documentation . . . in mid-September 2010, I have carefully maintained the original hard copies of Version 2 and Mr. Samek's September 14, 2010 cover letter for it."  These statements were false and the NMS Counsel Defendants knew them to be false and/or acted with reckless disregard to the truth.  The NMS Counsel Defendants also submitted deposition testimony to the trial court in which NMS' Shekhter said with regard to "Version 2": "This document, sir, is the document that was sent to our office [in September 2010], that is correct." This testimony was false and the NMS Counsel Defendants knew it to be false and/or acted with reckless disregard to the truth.  Even after the trial court found that the testimony was false, the NMS Counsel Defendants submitted it and relied on it before the Court of Appeal.

128.   The NMS Counsel Defendants also made false statements to the trial court about NMS' document preservation and production, and submitted testimony from NMS' Shekhter, that they knew to be false and/or they acted with reckless disregard to the truth.  For example, they submitted a declaration from NMS' Shekhter in which he stated: "***I also instituted a litigation hold within my company around the time this lawsuit commenced, so as to prevent deletion of emails and other files***." The NMS Counsel Defendants also represented to the trial court in a brief: "For their part, plaintiffs have taken appropriate steps to preserve electronic and other evidence in their possession.  ***They unilaterally implemented an internal 'litigation hold' around the beginning of the case so that documents and emails would not be deleted***.  They have begun to take forensic images of all of approximately a dozen devices that they have identified as possible sources of electronic evidence in this case.  As such, ***plaintiffs have preserved their records fully for examination***, and have nothing to hide."  The NMS Counsel Defendants also represented to the trial court at oral argument: "But a litigation hold was implemented in this case at the very beginning by Mr. Shekhter.  ***Systems were set up so that emails couldn't be deleted, files could not***

Gibson, Dunn & Crutcher LLP

**_be deleted_** . . . ." (emphasis added.)  All of these statements were false.  They knew them to be false and/or they acted with reckless disregard to the truth.  None were ever corrected by the NMS Counsel Defendants.

129.   The NMS Counsel Defendants also knew that eventually Version 2 would be proven to be a forgery but rather than withdraw they cooked up a scheme to falsely accuse AEW of switching out the document for another before conducting the forensic examination.  For example, on October 16, 2015, the NMS Counsel Defendants sent an email to AEW's counsel stating: "If you take the letter, and it ends up being dated at any time other than in 2010, it will be our position that you have altered or substituted the document."  The only reason this wrongful scheme failed is because the CPS Code and the electronic evidence proved that the document was created at NMS' offices on July 15, 2013, making it impossible for the NMS Counsel Defendants to falsely accuse AEW or its counsel, as they had planned.

130.   The NMS Counsel Defendants also repeated NMS' allegations, that they knew to be false, to AEW's investors, to lenders for the JV Properties, and to title insurance companies and potential buyers, all with the intent to help NMS carry out its fraudulent scheme and to enrich themselves in the process.  The NMS Counsel Defendants not only pursued the _Lincoln Studios_ Litigation on behalf of NMS, knowing it was frivolous, but also filed copycat lawsuits for NMS, repeating the same false allegations, against AEW, AEW's affiliates, and even against AEW's counsel, only to abandon such copycat lawsuits both before and after demurrers were sustained.  Thus, the NMS Counsel Defendants were knowing and willing participants in the fraud and misconduct.

131.   The NMS Counsel Defendants did not have probable cause to file NMS' lawsuit against AEW, did not have probable cause to assert that "Version 2" was genuine, did not have probable cause to assert that "Version 3" was a forgery, did not have probable cause to assert that Article 11 or Article 6 had been breached by AEW, or probable cause for filing or pursuing any claim in the _Lincoln Studios_ Litigation.

132.   The NMS Counsel Defendants did not even bother to defend at least 25 of the 31 claims alleged by NMS against AEW, and never appealed the dismissal of any of those claims, even though they had represented 80% of the claims NMS had alleged, and had been outlined in hundreds of pages of allegations in both NMS' FAC and NMS' SAC.

133.   The NMS Counsel Defendants knew that NMS' claims against AEW were utterly and completely without merit at the time they filed the FAC, and at every time thereafter.  The NMS Counsel Defendants willfully and consciously disregarded Plaintiff's rights.  No reasonable attorney would have filed NMS' lawsuit, let alone pursued it for more than three years.

134.   In initiating and continuing to prosecute the *Lincoln Studios* Litigation, the NMS Counsel Defendants acted for purposes other than succeeding on the merits. The NMS Counsel Defendants knew NMS could not succeed on the merits on its claims because its claims were based on forgeries and perjury.  The NMS Counsel Defendants improper purposes included assisting NMS in its fraudulent scheme to force AEW to sell its interest in the Joint Venture to NMS, and to be paid millions of dollars in fees they would not otherwise have earned had they not filed and pursued litigation they knew to be frivolous.

135.   In initiating and continuing to prosecute the *Lincoln Studios* Litigation, the NMS Counsel Defendants acted with oppression, fraud, and malice, including, but not limited to, acting with intent to cause injury to Plaintiff, and engaging in a systematic concealment of the truth in order to advance NMS' baseless claims against Plaintiff.  As such, the NMS Counsel Defendants willfully and consciously disregarded Plaintiff's rights.

136.   As a direct and proximate cause of the NMS Counsel Defendants, Plaintiff was forced to expend enormous time and resources, and to incur millions of dollars in legal fees and costs, defending itself against the meritless claims asserted by NMS in the *Lincoln Studios* Litigation.  Furthermore, Plaintiff suffered harm to its

COMPLAINT FOR MALICIOUS PROSECUTION

Gibson, Dunn & Crutcher LLP

reputation and business interests as a result of the misconduct of the NMS Counsel Defendants in filing and pursuing the *Lincoln Studios* Litigation.  The conduct of the NMS Counsel Defendants was a substantial factor and proximate cause of the harm to Plaintiff.

COMPLAINT FOR MALICIOUS PROSECUTION

EXHIBIT B - PAGE 96

Gibson, Dunn &
Crutcher LLP

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as set forth below:

1.      For special damages, including attorneys' fees and other costs incurred in defense of the *Lincoln Studios* Litigation, damage to reputation and harm to business interests, in an amount to be proven at trial but which exceeds $75,000;

2.      For general damages according to proof at trial;

3.      For punitive damages in such amount as the Court may deem appropriate to penalize Defendants for their intentional and malicious misconduct;

4.      For prejudgment interest; and

5.      For costs of suit and such other relief as this Court deems just and proper.

Dated:  February _, 2019            GIBSON, DUNN & CRUTCHER LLP


By: _____/s/ James P. Fogelman___
               James P. Fogelman

Attorneys for Plaintiff
P6 LA MF Holdings SPE, LLC

## **DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a trial by jury in the above-captioned action, pursuant to Federal Rule of Civil Procedure 38(b) and L.R. 38-1.


Dated:  February 14, 2019          GIBSON, DUNN & CRUTCHER LLP


By:  _____/s/ James P. Fogelman_____
                James P. Fogelman

Attorneys for Plaintiff
P6 LA MF Holdings SPE, LLC

COMPLAINT FOR MALICIOUS PROSECUTION          EXHIBIT B - PAGE 98

# Exhibit C

EXHIBIT C - PAGE 99

1  GIBSON, DUNN & CRUTCHER LLP
2  JAMES P. FOGELMAN, SBN 161584
     *jfogelman@gibsondunn.com*
3  JAY P. SRINIVASAN, SBN 181471
     *jsrinivasan@gibsondunn.com*
4  RACHEL N. PERAHIA, SBN 266877
     *rperahia@gibsondunn.com*
5  MARYSA LIN, SBN 295429
     *mdlin@gibsondunn.com*
6  333 South Grand Avenue
   Los Angeles, CA  90071-3197
7  Telephone:     213.229.7000
   Facsimile:      213.229.7520
8
9  Attorneys for Defendants Eric Samek;
   Marc Davidson; P6 LA MF Holdings SPE, LLC;
10 AEW Capital Management, L.P.;
   AEW Partners VI, L.P.; AEW Partners VI, Inc.;
11 AEW VI, L.P.; P6 LA MF Holdings I LLC;
12
13 Attorneys for Cross-Claimant
   P6 LA MF Holdings SPE, LLC
14                 SUPERIOR COURT OF THE STATE OF CALIFORNIA
15                       FOR THE COUNTY OF LOS ANGELES
16
17 Lincoln Studios, LLC, et al.,              CASE NO. BC551551
                                              [*Related Case Nebraska Studios, LLC et. al v.*
18              Plaintiffs,                    *Chernove, et al., Case No. BC550227*]

19      v.                                    **NOTICE OF MOTION AND MOTION FOR**
                                              **TERMINATING AND OTHER SANCTIONS**
20 DLA, et al.,                               **AGAINST PLAINTIFFS FOR SPOLIATION**
                                              **OF EVIDENCE**
21              Defendants.
                                              **[FILED CONDITIONALLY UNDER SEAL]**
22 P6 LA MF HOLDINGS SPE, LLC,
                                              [*Declaration of Jay P. Srinivasan, Declaration of*
23              Cross-Complainant,            *Gerald M. LaPorte, Appendix of Supportive*
                                              *Evidence to Declaration of Gerald M. LaPorte,*
24      v.                                    *Declaration Of Samuel S. Rubin, Appendix of*
                                              *Supportive Evidence to Declaration of Samuel S.*
25 NMS CAPITAL PARTNERS I, LLC                *Rubin, and Notice of Lodging filed concurrently*
                                              *herewith*]
26              Cross-Defendant.
                                              ***Reservation No. [160121098640]***
27                                            Date:    March 7, 2016
                                              Time:    10:00 a.m.
28                                            Dept.:   71

Gibson, Dunn &
Crutcher LLP
            NOTICE OF MOTION AND MOTION FOR TERMINATING AND OTHER SANCTIONS AGAINST
               PLAINTIFFS FOR SPOLIATION OF EVIDENCE [FILED CONDITIONALLY UNDER SEAL]

Exhibit 39
Page 2                                                                    EXHIBIT C - PAGE 100



Assigned to Hon. Suzanne G. Bruguera
Department 71
Complaint Filed:          July 15, 2014
Cross-Complaint Filed: November 6, 2015
Trial Date:               None

Gibson, Dunn &
Crutcher LLP

2

NOTICE OF MOTION AND MOTION FOR TERMINATING AND OTHER SANCTIONS AGAINST
PLAINTIFFS FOR SPOLIATION OF EVIDENCE [FILED CONDITIONALLY UNDER SEAL]

Exhibit 39
Page 3

EXHIBIT C - PAGE 101

**TABLE OF CONTENTS**

Page

I.    INTRODUCTION ...................................................................................... 1

II.   FACTUAL BACKGROUND ....................................................................... 4

      A.    The September 2010 Joint Venture Agreement ............................... 4

      B.    NMS Suffers Buyer's Remorse And Forges So-Called "Version 2"
            Of The Joint Venture Agreement in 2013 ....................................... 5

      C.    NMS Creates and Attempts To Rely Upon At Least Two
            Additional Forgeries ....................................................................... 9

            1.   Plaintiffs Forge The "La Cienega PMA" The Day After A
                 Preliminary Injunction Was Granted To Avoid An Adverse Ruling ............... 9

            2.   Plaintiffs Forge A Fake Cover Letter To Accompany "Version 2" ............... 11

      D.    Plaintiffs Engage In A Nefarious, Illegal Scheme To Fraudulently
            Destroy And Alter Evidence ........................................................... 13

            1.   Plaintiffs Conspire To Destroy And Alter Neil's New Home
                 Computer In Advance Of The Court-Ordered Forensic Inspection ............... 14

            2.   Neil Testifies That He "Threw Away In The Garbage" His 2013
                 Home Computer After This Action Was Filed, But The Story Is
                 Even Worse ............................................................................. 15

            3.   Plaintiffs Have Violated the Court's Orders In Still More Respects ............ 16

            4.   Other NMS Employees Conspire to Delete and Wipe Devices Prior
                 To The Court-Ordered Forensic Examination ........................................ 18

            5.   Plaintiffs Conceal Evidence And Blatantly Violate Court Orders ............... 19

III.  THE COURT SHOULD ISSUE TERMINATING SANCTIONS AND FEES
      AND COSTS FOR PLAINTIFFS' EGREGIOUS MISCONDUCT AND
      SPOLIATION ........................................................................................... 19

IV.   CONCLUSION ......................................................................................... 25

i

Gibson, Dunn &
Crutcher LLP

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Aoude v. Mobil Oil Corp*
    (1st Cir. 1989) 892 F.2d 1115 ...............................................................................21

*Cedars-Sinai Medical Center v. Superior Court*
    (1998) 18 Cal. 4th 1 ...............................................................13, 21, 22, 23, 24

*Cont'l Ins. Co. v. Lexington Ins. Co.*
    (1997) 55 Cal.App.4th 637 .....................................................................................9

*Doppes v. Bentley Motors, Inc.*
    (2009) 174 Cal.App.4th 967 .................................................................................23

*Electronic Funds Solutions. v. Murphy*
    (2005) 134 Cal.App.4th 1161 ...............................................................................23

*Kravitz v. Superior Court*
    (2001) 91 Cal.App.4th 1015 .................................................................................24

*Los Defensores, Inc. v. Gomez*
    (2014) 223 Cal.App.4th 377 ............................................................................2, 22

*Michaely v. Michaely*
    (2007) 150 Cal.App.4th 802 .................................................................................21

*R.S. Creative, Inc. v. Creative Cotton, Ltd.*
    (1999) 75 Cal.App.4th 486 ........................................................................2, 20, 22

*Sinaiko Healthcare Consulting, Inc. v. Pacific Healthcare*
    (2007) 148 Cal.App.4th 390 .................................................................................24

*Stephen Slesinger, Inc. v. Walt Disney Co.*
    (2007) 155 Cal.App.4th 736 ...............................................................................1, 20

*Van Sickle v. Gilbert*
    (2011) 196 Cal.App.4th 1495 ...............................................................................22

*Williams v. Russ*
    (2008) 167 Cal.App.4th 1215 .......................................................................20, 22

**Statutes**

Code Civ. Proc., § 2023.010(c) ...............................................................................1

Code Civ. Proc., § 2023.010(f) ...............................................................................1

Code Civ. Proc., § 2023.010(g) ...............................................................................1

Code Civ. Proc., § 2023.030 ............................................................................1, 20

Code Civ. Proc., § 2023.030(a) ........................................................................1, 23

Gibson, Dunn & Crutcher LLP

ii

<center>**TABLE OF AUTHORITIES**
(continued)</center>

Page(s)

Code Civ. Proc., § 2023.030(d) ...........................................................................1

Code Civ. Proc., § 2023.030(g) .........................................................................22

Penal Code, § 135 .............................................................................................14

iii

NOTICE OF MOTION AND MOTION FOR TERMINATING AND OTHER SANCTIONS AGAINST
PLAINTIFFS FOR SPOLIATION OF EVIDENCE

Exhibit 39
Page 6

EXHIBIT C - PAGE 104

1    **TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

2    **PLEASE TAKE NOTICE** that on March 7, 2016, at 10:00 a.m., or as soon thereafter as the

3    matter may be heard in the above-entitled Court, located at 111 North Hill Street, Los Angeles,

4    California, in Department 71, Defendants Eric Samek, Marc Davidson, P6 LA MF Holdings SPE,

5    LLC, AEW Capital Management, L.P., AEW Partners VI, L.P., AEW Partners VI, Inc., AEW VI,

6    L.P., and P6 LA MF Holdings I LLC (collectively, "Defendants") and Cross-Claimant P6 LA MF

7    Holdings SPE, LLC ("Cross-Claimant") hereby move, pursuant to California Code of Civil

8    Procedure section 2023.010, *et seq.* and under the Court's inherent power to issue sanctions, *Stephen*

9    *Slesinger, Inc. v. Walt Disney Co.* (2007) 155 Cal.App.4th 736, 740, for an order:

10       1. Dismissing Plaintiffs' Third Amended Complaint with prejudice and entering

11          judgment as to Plaintiffs' claims in Defendants' favor (Code Civ. Proc. §

12          2023.030(d)(3));

13       2. Striking the Answer of Cross-Defendant NMS Capital Partners I, LLC as to the Cross-

14          Complaint of P6 LA MF Holdings SPE, LLC, and entering judgment in favor of P6

15          LA MF Holdings SPE, LLC as to the Cross-Complaint[1] (Code Civ. Proc. §

16          2023.030(d)(1), (4)); and

17       3. Issuing monetary sanctions against all Plaintiffs and their counsel of record for all

18          attorney fees, expert fees, and costs incurred by Defendants in this matter, including,

19          but not limited to, attorney fees, expert fees, and costs involved in moving for and

20          conducting the forensic examination of Plaintiffs' materials and for the relief sought

21          by this Motion.[2] (Code Civ. Proc. § 2023.030(a).) Specifically, this Motion seeks

22          monetary sanctions against Plaintiffs Neil Shekhter, Margot Shekhter, Lincoln

23          Studios, LLC, The NMS Family Living Trust Dated September 3, 1991 (2000

24          Restatement), NMS Capital Partners, LLC, NMS Capital Partners I, LLC,

---

[1]  Should judgment in favor of the Cross-Claimant be awarded, Cross-Claimant requests a prove-up to be scheduled at a later date to establish the amount of damages suffered.

[2]  Should fees and costs be awarded, Defendants will provide supplemental briefing on fees and costs incurred to date.

Gibson, Dunn &
Crutcher LLP

1

NOTICE OF MOTION AND MOTION FOR TERMINATING AND OTHER SANCTIONS AGAINST
PLAINTIFFS FOR SPOLIATION OF EVIDENCE

Exhibit 39
Page 7

EXHIBIT C - PAGE 105

1    NMSLUXE375, LLC, NMSLUXE415, LLC, and 9901 LUXE, LLC, as well as

2    Plaintiffs' counsel of record, Louis R. Miller, James Goldman, A. Sasha Frid, and

3    Jason H. Tokoro of Miller Barondess LLP, along with Steven Zelig of WLA Legal

4    Services, Inc. and John Genga of Genega & Associates, P.C.

5        There is good cause for this relief.  As detailed in the accompanying Memorandum of Points

6    and Authorities, Plaintiffs have engaged in a shocking campaign of fabrication, perjury, and the

7    intentional destruction and concealment of key evidence, all the while blatantly ignoring and

8    violating the Court's specific Orders that Plaintiffs preserve all evidence and produce all sources of

9    data for forensic review.  Plaintiffs have immensely prejudiced Defendants as well as Cross-

10   Claimant.  Moreover, Plaintiffs have engaged in these actions all the while represented by counsel.

11       The parties have met and conferred with opposing counsel in a reasonable and good faith

12   effort to resolve the issues raised in this Motion, but were unable to do so.  (Declaration of Jay

13   Srinivasan, ¶ 3.)

14   //

15   //

16   //

17   //

18   //

19   //

20   //

21   //

22   //

23   //

24   //

25   //

26   //

27   //

28   //

Gibson, Dunn &
Crutcher LLP

2

NOTICE OF MOTION AND MOTION FOR TERMINATING AND OTHER SANCTIONS AGAINST
PLAINTIFFS FOR SPOLIATION OF EVIDENCE

Exhibit 39
Page 8
EXHIBIT C - PAGE 106

1        This Motion is based on this Notice of Motion, the accompanying Memorandum of Points &

2   Authorities, the accompanying Declaration of Jay Srinivasan, Declaration of Gerald M. LaPorte,

3   Appendix of Supportive Evidence to the Declaration of Gerald M. LaPorte, Declaration of Samuel S.

4   Rubin, Appendix of Supportive Evidence to the Declaration of Samuel S. Rubin (each with attached

5   exhibits), and the accompanying Notice of Lodging filed concurrently herewith, all pleadings, papers

6   and records in these actions, all matters of which judicial notice may be taken, and all other evidence

7   and oral argument as may be presented at the hearing on this matter.

8

9   DATED: January 29, 2016            GIBSON, DUNN & CRUTCHER LLP

10

11                        By:                                       
                                      James P. Fogelman

12

13                        Attorneys for Defendants Eric Samek;
                        Marc Davidson; P6 LA MF Holdings SPE, LLC;

14                        AEW Capital Management, L.P.;
                        AEW Partners VI, L.P.; AEW Partners VI, Inc.;

15                        AEW VI, L.P.; P6 LA MF Holdings I LLC;

16

17                        Attorneys for Cross-Claimant P6 LA MF Holdings SPE,
                        LLC

18

19

20

21

22

23

24

25

26

27

28

3

NOTICE OF MOTION AND MOTION FOR TERMINATING AND OTHER SANCTIONS AGAINST
PLAINTIFFS FOR SPOLIATION OF EVIDENCE

Exhibit 39
Page 9

EXHIBIT C - PAGE 107

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I. INTRODUCTION

What began as the forgery of a single Joint Venture Agreement ("Version 2") has now become the forgery of multiple documents, perjury, and the willful, coordinated spoliation and destruction of evidence in direct violation of this Court's Orders. It is doubtful that any court has ever seen the magnitude of wrongdoing and widespread spoliation of evidence that Plaintiffs have engaged in here, and no court can or should tolerate such behavior. This Court correctly ordered Plaintiffs to preserve all of their hard copy and electronic documents and to produce them and their electronic devices for forensic examination. In response, Plaintiffs engaged in a massive intentional effort to destroy, alter, and conceal critical evidence *after* the Court issued its Orders. If there was ever a case deserving of termination sanctions, this is it, and such sanctions have been issued by courts for a fraction of the wrongdoing perpetrated by Plaintiffs here. In light of Plaintiffs' complete and utter disregard for the specific directives of this Court, the discovery process, and principles of honesty and fairness, the only appropriate remedy for Plaintiffs' egregious actions —and the only one that will relieve the prejudice suffered by Defendants—is the dismissal of Plaintiffs' case and for judgment to be entered in Defendants' favor on both Plaintiffs' claims and Defendants' Cross-Complaint. Defendants should also be awarded their fees and costs incurred in this matter to date.

The Court is entitled to issue these sanctions pursuant to its inherent power under *Stephen Slesinger, Inc. v. Walt Disney Co.* (2007) 155 Cal.App.4th 736 and section 2023.030 of the Code of Civil Procedure, which specifically provides that the Court may impose "a terminating sanction" as well as a "monetary sanction" against anyone engaging in conduct that is a "misuse of the discovery process." (See *Stephen Slesinger, Inc. v. Walt Disney Co.* (2007) 155 Cal.App.4th 736, 740 [hereinafter *Slesinger*]; Code Civ. Proc., § 2023.030, subds. (a), (d).) "Misuses of the discovery process include, but are not limited to" "[e]mploying a discovery method in a manner or to an extent that causes . . . undue burden or expense," "[m]aking an evasive response to discovery," and "[d]isobeying a court order to provide discovery." (Code Civ. Proc., § 2023.010, subds. (c), (f), (g).) Courts also have universally found that the willful destruction of evidence constitutes a misuse of the

1

NOTICE OF MOTION AND MOTION FOR TERMINATING AND OTHER SANCTIONS AGAINST
PLAINTIFFS FOR SPOLIATION OF EVIDENCE

Exhibit 39
Page 10

EXHIBIT C - PAGE 108

1    discovery process deserving of terminating sanctions, particularly where there has been a court order

2    to preserve evidence. (See, e.g., *Los Defensores, Inc. v. Gomez* (2014) 223 Cal.App.4th 377, 391.)

3    "The [court's] power to impose discovery sanctions is a broad discretion subject to reversal only for

4    arbitrary, capricious, or whimsical action." (*R.S. Creative, Inc. v. Creative Cotton, Ltd.* (1999) 75

5    Cal.App.4th 486, 496.) And in *R.S. Creative*, the court affirmed an order for terminating sanctions in

6    a case involving a forged contract, perjury, and the spoliation of evidence, holding that the case was

7    exactly "illustrat[ive] [of] a kind of discovery abuse that is intolerable in civil litigation" and clearly

8    deserving of terminating sanctions. (*Id.* at p. 488.)

9       The scope of Plaintiffs' misconduct here is far worse than in *R.S. Creative*, and it began with

10    their bringing this action based upon a forged version of the Joint Venture Agreement. The forensic

11    analysis ordered by the Court has conclusively shown that this version of the Joint Venture

12    Agreement—which Plaintiffs swore under penalty of perjury they received from Defendants in hard

13    copy form in 2010—was not even printed until 2013, when Plaintiffs first made the fabricated claim

14    that this document existed, and it was created on Plaintiffs' own computers and printed at Plaintiffs'

15    offices. This and other evidence outlined in this brief proves the document—upon which Plaintiffs'

16    case depends—is a blatant, intentional forgery.

17       Plaintiffs' forgeries did not end with just one document. The forensic evidence demonstrates

18    that Plaintiffs forged ***another*** document—the so-called "La Cienega Property Management

19    Agreement"—to obtain a reversal of an adverse court decision. And they then forged ***yet another***

20    document—the so-called "Cover Letter"—which they claim Defendants had delivered in 2010 in

21    hard copy along with the forged version of the Joint Venture Agreement. The forensic evidence

22    shows that Plaintiffs made multiple attempts to create this letter, attempting each time to manipulate

23    the document's electronic properties to make it appear to be from 2010, and when that did not work,

24    destroying their electronic footprints—all while under this Court's preservation order.

25       This is just the beginning. Despite orders to preserve evidence and produce relevant data for

26    forensic analysis, Plaintiffs—along with a number of NMS employees and lead Plaintiff Neil

27    Shekhter's ("Neil") adult sons—engaged in a concerted effort to destroy, alter, and conceal critical

28    evidence. These actions are described in detail in the accompanying Declaration of Samuel S. Rubin,

Gibson, Dunn &
Crutcher LLP

NOTICE OF MOTION AND MOTION FOR TERMINATING AND OTHER SANCTIONS AGAINST
PLAINTIFFS FOR SPOLIATION OF EVIDENCE

Exhibit 39
Page 11

EXHIBIT C - PAGE 109

Case 2:19-cv-04308-AB-AFM Document 1 Filed 05/20/21 Page 110 of 158 Page ID #:10
Case 2:19-cv-04308-AB-AFM Document 67-41 Filed 05/04/19 Page 12 of 44 Page ID
#:10893

1   Managing Director of Digital Forensics at Stroz Friedberg, who has extensive experience conducting

2   digital forensic acquisitions and analyses of laptops, desktops, servers, and mobile devices.  Mr.

3   Rubin's declaration describes Plaintiffs' efforts to destroy and conceal evidence and to impede his

4   forensic analysis.  (See Declaration of Samuel S. Rubin ["Rubin Decl."], ¶ 52 & fig. 7.)  Among

5   many other things, Plaintiffs have: concealed and withheld at least twenty-one electronic devices,

6   including those that were used to make the above forgeries; lied under oath concerning one of

7   Plaintiffs' key computers, claiming it had been "thrown in the garbage" after this case was filed,

8   while it was actually still online and operating even after the Court's freeze order; downloaded and

9   run data deletion software in advance of the Court-ordered forensic imaging; installed unscheduled

10  operating system updates to wipe computers of data; and identified and deleted evidence of their

11  forgeries.  (Rubin Decl., ¶¶ 6, 69 & fig. 9.)  Plaintiffs did all of this while represented by counsel and

12  while swearing to the Court that they were in full and complete compliance with the Court's

13  preservation orders, "had nothing to hide," and would provide the Court and Defendants "everything"

14  they had for forensic imaging.

15          Mr. Rubin has also determined that on October 15, 2015, after Neil and his counsel swore

16  under penalty of perjury to the Court that everything had been preserved and one day before the

17  forensic examination was to take place, Neil took a series of actions that would manipulate and

18  destroy any remaining evidence relating to the forgeries.  That morning, Neil's adult son, Alan

19  Shekhter, ran internet searches on his computer for the following topics:

20                  secure wipe hard drive
21                  backdated secure wipe
                    how to avoid computer forensics
22                  los angele [sic] anti-computer forensics

23  (Rubin Decl., ¶ 85 & fig. 10.)  Hours later, Neil and Alan discussed in a text—which Neil then

24  attempted to delete, but was recovered as a result of the forensic investigation ordered by the Court—

25  their plan to destroy and alter evidence in advance of the Court-ordered computer collection.  (Id.,

26  ¶¶ 52, 53 & fig. 7.)  This full dialogue is attached as **Exhibit A**.  Among other things, it outlines Neil

27  and Alan's plan to remove Neil's old hard drive, buy a new one that is similar to the old one, replace

28  Neil's old hard drive with the new one, and then backdate the computer and load it with files so that

Gibson, Dunn &
Crutcher LLP

3

NOTICE OF MOTION AND MOTION FOR TERMINATING AND OTHER SANCTIONS AGAINST
PLAINTIFFS FOR SPOLIATION OF EVIDENCE

Exhibit 39
Page 12

EXHIBIT C - PAGE 110

the files appear to have already been on the computer.  (See Exhibit A; Rubin Decl., fig. 7).  The forensic evidence confirms that Neil and Alan later carried out this plan:  Neil, with the assistance of Alan, **removed** a hard drive from his computer, **replaced** the old hard drive with one that looked similar, manually **back-dated** the computer's clock so that files loaded onto it would appear older than they were, and then **flooded** the hard drive with approximately 75,000 files to make it appear as though the computer had been in use longer than it had been.  (*Id.*, ¶ 56.)

As explained in this Motion, the prejudice to Defendants from these actions is immense.  Plaintiffs forged the document they attempt to sue upon, lied about their actions in this case, created additional forgeries and lied about those, and then knowingly, willingly, and affirmatively destroyed evidence about their forgeries and about their destruction of evidence.  As outlined in the Declaration of Mr. Rubin, Plaintiffs have destroyed, altered, or failed to produce an untold number of files and materials.  (Rubin Decl., ¶¶ 6, 28, 61, 67.)  But at the least it is known that they have knowingly destroyed absolutely critical evidence, including evidence relating to the very forgeries Plaintiffs built this case upon.  (*Id.*, ¶ 63, 64.)  In light of Plaintiffs' actions, there is no trusting any materials that they produce or anything they or their counsel say, and there is no way to further guarantee the administration of justice in this matter with Plaintiffs' and their counsel's involvement.

Accordingly, and for the reasons set forth in detail in this Motion, Plaintiffs and their counsel must be sanctioned, and that sanction must consist of the dismissal of Plaintiffs' action, judgment to be entered in Defendants' favor on Plaintiffs' claims, judgment to be entered in Cross-Claimant's favor on the cross-claims, and attorney fees, expert fees, and costs awarded to Defendants from both Plaintiffs and their counsel.  This remedy is the only one that will account for Plaintiffs' violations of the Court's orders and protect the principles of honesty and fairness.

## II.     FACTUAL BACKGROUND

### A.     The September 2010 Joint Venture Agreement

In 2010, Neil Shekhter of NMS Capital Partners I, LLC ("NMS") and Eric Samek of P6 LA MF Holdings SPE, LLC ("AEW") initiated discussions regarding a potential real estate joint venture in light of the lack of available capital in the depressed real estate market.  The parties discussed that AEW would provide the majority of the capital for the joint venture while NMS (run and operated by

4

NOTICE OF MOTION AND MOTION FOR TERMINATING AND OTHER SANCTIONS AGAINST PLAINTIFFS FOR SPOLIATION OF EVIDENCE

Exhibit 39
Page 13

EXHIBIT C - PAGE 111

1    Neil) would manage the properties subject to the joint venture. (Declaration of Jay P. Srinivasan

2    ["Srinivasan Decl."], Exh. A.) At the time, both parties were represented by skilled and able counsel

3    (AEW being represented by DLA Piper, LLC, and NMS being represented by Sheldon Chernove and

4    then Schultz & Wright, LLP), and all aspects of the joint venture agreement were heavily negotiated

5    in arm's-length discussions. (See *id.*, Exh. B at 39:18-25.)

6         Of import here, one of the many items discussed and negotiated was the ability of either party

7    to have a buy/sell opportunity after a certain amount of time had passed. Early in those negotiations,

8    the parties discussed a "Buy/Sell term" (whereby either party could have the opportunity to buy or

9    sell interests in the joint venture at a certain price) to be triggered on a property-by-property basis

10   after three years from the date of the agreement or stabilization of the property at issue, whichever

11   occurred last. (Srinivasan Decl., Exh. A; *id.*, Exh. C at Art. 11.1.)[3] However, because *NMS* did not

12   believe a three-years-or-stabilization term would sufficiently protect the potential growth of the

13   capital it was investing in the joint venture, *NMS's counsel* insisted in edits to the draft agreement

14   that the alleged Buy/Sell term not be available until *after five years*, writing regarding Article 11.1 to

15   a draft joint venture agreement: "***SHOULD NOT BE TRIGGERED BEFORE THE EXPIRATION***

16   ***OF THE 5 YEAR PERIOD.***" (*Id.*, Exh. D at Art. 11.1 [capitalization in original, emphasis added].)

17   NMS (*i.e.*, Neil) received a copy of these redlines (*id.*), and the five-year term requested by NMS's

18   counsel is what made it into the final agreement signed by all parties. (*Id.*, Exh. E at Art. 11.1.)

19        NMS's counsel testified that this inclusion of the five-year term reflected AEW's acceptance

20   of NMS's request for a longer alleged Buy/Sell provision (Srinivasan Decl., Exh. F at 129:18-130:8.),

21   and NMS repeatedly provided third parties with copies of this agreement containing the five-year

22   provision. (See, e.g., *id.*, Exhs. G, H.)

23   **B.    NMS Suffers Buyer's Remorse And Forges So-Called "Version 2" Of The Joint Venture**
          **Agreement in 2013**

24
          What then occurred was the beginning of the misconduct that leads us to where we are today.
25

26   _____

27   [3]  "Stabilization" means the point at which that property "achieved a stabilized occupancy of 95%." (Srinivasan Decl.,
     Exh. I at Art. 11.1(a)(i).)

28

Gibson, Dunn &
Crutcher LLP

NOTICE OF MOTION AND MOTION FOR TERMINATING AND OTHER SANCTIONS AGAINST
PLAINTIFFS FOR SPOLIATION OF EVIDENCE

Exhibit 39
Page 14                                                    EXHIBIT C - PAGE 112

1     In 2013, approximately three years into the Joint Venture, NMS suffered a case of buyer's remorse

2     about the five-year Buy/Sell term upon which it insisted. NMS's General Counsel **confirmed**, in July

3     2013, that the three-year term "didn't make it into the **actual** LLC Agreement." (Srinivasan Decl.,

4     Exh. I [emphasis added].) That very week, the so-called "Version 2" of the agreement suddenly

5     appears, **for the very first time**, on NMS's devices. (Rubin Decl., ¶ 24.) This "Version 2" contains a

6     **three-year term**, not the five-year term negotiated by NMS's lawyers and found in the actual

7     agreement as confirmed by NMS's General Counsel. (Srinivasan Decl., Exh. K at Exh. 5 at Art.

8     11.1.) And in his sworn testimony, Neil explained that he received "Version 2" in hard copy from

9     Eric Samek in 2010, after claiming that the original version of the agreement's inclusion of a five-

10    year Buy/Sell provision was a "typo" and that it should have been three years instead. (Srinivasan

11    Decl., Exh. J at 47:10-14; 52:24-53:1; Exh. K at ¶ 13.) Neil also testified that he has "carefully

12    maintained" the original document since receiving it from Mr. Samek, even keeping it **in his safe**.

13    (Sriniyasan Decl., Exh. K at ¶ 14; Exh. J at 59:20-60:5.)

14        *The forensic analysis ordered by the Court now conclusively demonstrates that "Version 2"*

15    *is a forgery.*[4]

16        **First**, Mr. Gerald LaPorte, the Director of the Office of Investigative and Forensic Sciences at

17    the National Institute of Justice, a division of the United States Department of Justice, who is a

18    nationally recognized expert trained by the Secret Service, has now had the chance to examine the

19    actual document Neil claims he received in 2010 and kept in his safe. (Declaration of Gerald M.

20    LaPorte ["LaPorte Decl."], ¶¶ 3, 15.) Mr. LaPorte's unequivocal opinion in examining the document

21    is that it is **not authentic.** (*Id.*, ¶ 116.) Specifically, in examining the "CPS" code of the document—

22    an anti-counterfeiting code that is created by some office printers—Mr. LaPorte has conclusively

23    determined that the document was first created on a Xerox WorkCenter 7775 multifunction office

24    machine **at Plaintiffs' offices** on *July 15, 2013* – not in September 2010, as Neil testified. (*Id.*, ¶

25    116; see also *id.*, ¶¶ 38-45 [emphasis added].) Thus, the evidence disproves Plaintiffs' assertion that

26

27

28

---

[4]   This is despite the fact that Plaintiffs and their counsel have repeatedly verified their story about "Version 2" under oath. (See, e.g., Srinivasan Decl., Exh. K, ¶ 13; *id.* Exh. L, ¶ 12; *id.*, Exh. M, ¶ 3 ["At least on Plaintiffs' end, there has been no document alteration, spoliation or fabrication . . . ."].)

NOTICE OF MOTION AND MOTION FOR TERMINATING AND OTHER SANCTIONS AGAINST
PLAINTIFFS FOR SPOLIATION OF EVIDENCE

Exhibit 39
Page 15

EXHIBIT C - PAGE 113

1   this was a document provided to anyone by anyone in 2010; *it is a forgery created by Plaintiffs in*

2   *July 2013.*[5]

3         *Second*, Mr. Rubin of Stroz Friedberg was able to tie *this very document* to computers used

4   by Neil and his son, Adam, on which this forgery was created. As Mr. Rubin recounts, the forensic

5   review ordered by the Court now shows that on July 12, 2013, Neil emailed his son Adam a PDF of

6   the original, executed agreement with the five-year Buy/Sell provision without explanation—in an

7   electronic file called "P6 LA MF Holdings I LLC." (Rubin Decl., ¶ 27(a).) Then, on Sunday, the

8   night of July 14, 2013, at 9:46 p.m., *an unknown computer then opened and <u>modified</u>* a file called

9   "P6 LA MF Holding I LLC clean NS 123 PRINT.pdf"—a conspicuously similar title to the PDF of

10  the original agreement, but with additions indicating it was "*clean*" for "*NS*," and to "*PRINT*." (*Id.*,

11  ¶ 27(b) [emphasis added].) Defendants suspect that this unknown computer, which has never been

12  provided for forensic examination by Plaintiffs despite the Court's Order, is Neil's 2013 Home

13  Computer (which Neil claims he "threw in the garbage" after this case was filed, but the forensic

14  evidence demonstrates otherwise). (See Section D.2. *infra*; see Rubin Decl., ¶¶ 50(a)-(c).) The next

15  day, on July 15, 2013, *this same file* was then transferred to a USB flash drive also never produced,

16  from the unknown computer at 1:24 p.m., and opened on Adam Shekhter's NMS desktop computer at

17  3:51 p.m. (Rubin Decl., ¶¶ 27(c)-(d).) The file was then printed—*<u>matching perfectly with the</u>*

18  *<u>timing of the printing seen on the CPS code discovered by Mr. LaPorte</u>*. (See LaPorte Decl., ¶¶ 15,

19  39 ["Version 2] was printed between 1500 and 1600 hours, or 3:00 p.m.– 4:00 p.m. PDT on July 15,

20  2013"].) Then, just after 4 p.m. and after Version 2 was printed, it was scanned (eliminating all

21  metadata) and emailed at 4:51 p.m., by Adam to his father. (Rubin Decl., ¶¶ 27(f)-(h).) Between

22  these two occurrences—"Version 2" (allegedly from 2010) being actually printed on July 15, 2013 at

23  the NMS offices and the precipitating event of Neil emailing *the original agreement* to Adam—the

24  conclusion is clear. It is a forgery. And both experts agree. (LaPorte Decl., ¶ 116 ["[I]t is my

---

[5]  Defendants have already outlined for the Court how the document, *on its face*, also has indications that it is a forgery. This includes, among other things, the fact that the line with the alleged "three (3)" year term is misaligned *with the entire rest of the document*, hanging over the right margin which is otherwise justified throughout. Because the Court is already aware of these arguments, Defendants do not present them again in full here, but refer to the Court to paragraphs 19 and 68 of Mr. LaPorte's Declaration.

7

Gibson, Dunn &
Crutcher LLP

Exhibit 39
Page 16
EXHIBIT C - PAGE 114

unequivocal opinion that the Q1 VERSION 2 LLC AGREEMENT is not authentic."]; Rubin Decl., ¶ 15 ["Forensic evidence . . . establishes that "Version 2" of the JV Agreement is a forgery"].)

*Third*, when Plaintiffs began to get wind that the "Version 2" they produced would be discovered as having been created in 2013, they suddenly changed course and claimed that Neil might have accidently distributed the original "Version 2" within NMS and that the "Version 2" in his possession (which he previously testified under oath was the original that he kept in his safe) was just a "copy" of the original made on a copy machine. (Srinivasan Decl., Exh. N at 283:21-284:5, 289:12-290:1, 295:25-296:11.) But, the forensic evidence dispels this too:

- As Mr. LaPorte testifies based upon his microscopic examination, the "Version 2" produced by Plaintiffs is a first generation creation of the document, sent from a computer directly to the printer. (LaPorte Decl., ¶¶ 18, 48-49.) *It is not a photocopy. It is the original forgery*.

- As Mr. LaPorte also testifies, the "Version 2" produced by Plaintiffs contains a CPS code on every page, but for one page—Mr. Samek's signature page, which differs from the rest of the document in other ways as well. (*Id.*, ¶¶ 46-53.) This means that Mr. Samek's signature page on "Version 2" was removed or taken from another source and substituted into the document after it was first printed on July 15, 2013. (*Id.*, see also *id.*, ¶ 16.) This again demonstrates the July 2013 "Version 2" *is not a photocopy, which would not have any variance within and among the pages in the document. It is the original forgery*.

- And finally, because Plaintiffs testified that no copies of "Version 2" have been destroyed, Mr. LaPorte examined the other copies produced by Plaintiffs. (Srinivasan Decl., Exh. N, at 291:9-12.) Mr. LaPorte concluded, based upon examining these other documents and their various imperfections and trash marks, that *these other copies are copies of the July 2013 Version 2, not the other way around*. (LaPorte Decl., ¶¶ 17, 54-67.)

*Fourth*, not one witness or any piece of evidence supports Neil's claim or recollection that there was a "typo" in the original agreement's five-year Buy/Sell provision, instead of a three-year term. In fact, NMS's own deal counsel testified that the five-year term was not a typo. (Srinivasan Decl., Exh. F at 131:9-132:5).

The forensic evidence now confirms what Defendants have always asserted. "Version 2"— upon which Plaintiffs have brought this case[6]—is a forgery. It was not created and delivered in 2010

---

[6] Recently Plaintiffs have made the absurd claim that "Version 2," and particularly Article 11.1 of "Version 2," plays no role in their claims. Plaintiffs, however, ignore the fact that they continue to contend that "Version 2" is the operative agreement under which they seek relief. (Third Amended Complaint, ¶ 22(b).) They also ignore prior

*(Cont'd on next page)*

8

1    by AEW; it was fabricated and printed by Plaintiffs at their own offices in 2013. As Mr. LaPorte

2    states, "it is my unequivocal opinion that [Version 2] is not authentic." (LaPorte Decl., ¶ 116.) And

3    as Mr. Rubin states, "Forensic evidence on the NMS Devices establishes that 'Version 2' of the JV

4    Agreement is a forgery." (Rubin Decl., ¶ 15.)[7]

5    **C.    NMS Creates And Attempts To Rely Upon At Least Two Additional Forgeries**

6           Having created a forgery to establish their lawsuit, Plaintiffs continued to forge more

7    documents to sustain it.

8           **1.    Plaintiffs Forge The "La Cienega PMA" The Day After A Preliminary Injunction
                Was Granted To Avoid An Adverse Ruling**

9

10          Once it became clear that Plaintiffs were committing all manner of misconduct, AEW sought

11   the removal of Plaintiff-affiliate NMS Properties, Inc. as property manager of the various properties

12   associated with the joint venture in the matter of *P6 LA MF Holdings I LLC, et al. v. NMS Properties,*

13   *Inc.,* BC 584878 (Los Angeles Superior Court, filed June 11, 2015). AEW's chief grounds for

14   removal was a 30-day notice "no cause" termination provision contained in the property management

15   agreements ("PMAs") governing each specific property. (See generally Srinivasan Decl., Exh. Q.)

16   On June 23, 2015, the Court conducted a lengthy hearing on AEW's request for a preliminary

17   injunction—a request that had been extensively briefed over the previous two weeks. At the hearing

18   on that motion and in connection with the briefing, Plaintiffs submitted only a single PMA—for 1410

19   5th Street—which also contained the 30-day notice provision, *as did all other PMA versions and*

20   _____

21   *(Cont'd from previous page)*

22        admissions that the question of whether Version 2 is authentic is at the core of this case. (Srinivasan Decl., Exh. O at
          8:7-9:2 [Plaintiffs' counsel stating that the disagreement over different "versions" of the JVA is "really at the heart of

23        the case" and equating the "buy/sell arrangement" with the right to "buy out AEW"]; *id.*, Exh. P at 5 [explaining that
          the alleged Buy/Sell right was "critical to the deal insofar as Shekhter was concerned."].) To walk away from these

24        claims now not only ignores the current pleadings, but also violates the sham pleading doctrine. (*Cont'l Ins. Co. v.
          Lexington Ins. Co.* (1997) 55 Cal.App.4th 637, 646 [Plaintiffs cannot "discard factual allegations of a prior
          complaint, or avoid them by contradictory averments, in a superseding amended pleading."] [internal marks and

25        citations omitted].) Defendants further address the portions of the agreement Plaintiffs purport to rely upon in their
          concurrently filed demurrers.

26   [7]  There is a host of additional evidence only further confirming that "Version 2" is a forgery. Among other things,

27        there is no forensic record or discussion of "Version 2" at all in NMS's files until it is created in July 2013. (Rubin
          Decl., ¶ 5(a).)

28

                                                         9

     NOTICE OF MOTION AND MOTION FOR TERMINATING AND OTHER SANCTIONS AGAINST
                  PLAINTIFFS FOR SPOLIATION OF EVIDENCE

Exhibit 39
Page 18                                                EXHIBIT C - PAGE 116

1    *copies*. (*Id.*, Exh. R, ¶¶ 25, 25.1 & Exh. F.)  On June 24, 2015, the Court granted AEW's motion for

2    a preliminary injunction removing NMS Properties, Inc. based upon the 30-day notice provision.

3    (*Id.*, Exh. S at 5-6 of 9.)  ***The next day*** NMS Properties moved *ex parte* to have the ruling reversed

4    based on Neil's sudden discovery of a purported 2012 PMA for a property on La Cienega—"the La

5    Cienega PMA"—that purported to include a ***60-day*** termination provision, as opposed to the 30-day

6    termination provision in the form PMA used for all of the properties.  (See generally *id.*, Exh. T.)

7              ***This document—the La Cienega PMA—is another forgery created by Plaintiffs.***

8              On June 24, 2015, the morning after the hearing and when it appeared an adverse decision

9    was on its way, Neil, beginning sometime between 7:00 a.m. and 7:30 a.m., suddenly received

10   multiple emails from the email accounts of former NMS employees containing Word and PDF

11   versions of PMAs for various properties, all of which contained the 30-day provision.  (Rubin Decl.,

12   ¶ 48(a).)  Shortly thereafter, around 7:40 a.m., the Court notified the parties that it had granted

13   AEW's request for a preliminary injunction.  (Srinivasan Decl., Exh. S.)  Then, on or around 9:00

14   a.m., Neil suddenly "found" and scanned at home a "final," "signed" agreement for the La Cienega

15   property.[8]  (Rubin Decl., ¶ 48(b).)  Notably, Neil's scan occurs in two parts, with the break in the two

16   scans occurring at the exact page where the termination provision appears—the first and only

17   termination provision anywhere in the record that specifies a 60-day term.  (*Id.*)  But, as the facts

18   uncovered by Mr. Rubin show, Neil was sloppy in fabricating this document.  This scan, while

19   purporting to be for the La Cienega PMA with a never-before-seen 60-day termination provision,

20   ***contained a cover page showing that this PMA was for a different property*** (for which Neil had

21   received the PMA earlier that morning)—***not La Cienega***.  (*Id.*, ¶ 48(c).)  Later that same day, but

22   after Plaintiffs provided *ex parte* notice based upon this botched forgery, Neil apparently realized his

23   oversight and at 11:22 p.m. that night emails himself yet another made-up version of the La Cienega

24   PMA, but this time with the corrected owner.  (*Id.*, ¶ 48(d).)  Less than 10 hours later, Neil submitted

25

26   _____

[8]   Although Neil scanned this from home, he would later testify that he found the document in his office.  (Srinivasan
27    Decl. Exh. N., at 390:15-20.)  It makes no sense why Neil would take the document from his office and then bring it
      home to scan.  Neil also swore under oath, in a declaration submitted before the morning of June 24, that he did not
28    have this document in his possession.  (*Id.* Exh. R, ¶ 25.1.)

Gibson, Dunn &
Crutcher LLP

NOTICE OF MOTION AND MOTION FOR TERMINATING AND OTHER SANCTIONS AGAINST
PLAINTIFFS FOR SPOLIATION OF EVIDENCE

Exhibit 39
Page 19                                                        EXHIBIT C - PAGE 117

a declaration with NMS's *ex parte* application swearing that he suddenly found this La Cienega PMA *after* the Court's hearing somewhere he had not previously looked and that it had been "misfiled." (Srinivasan Decl., Exh. T, ¶¶ 3, 4.) These facts on their own demonstrate the La Cienega PMA was a forgery.

But there is still more evidence establishing that this document is a forgery:

- All final versions of all of the PMAs, the form PMA upon which they were based, and even all drafts of the La Cienega PMA, contain a 30-day term, not the 60-day term that appears only in this version Neil proffered on the morning after receiving an adverse legal ruling. (Rubin Decl., ¶ 42.)

- A draft La Cienega PMA with a 30-day term was approved by Plaintiffs and circulated with their knowledge and consent to a lender. (Srinivasan Decl., Exh. U, Exh. V, Exh. W.)

- There is absolutely no evidence or electronic record at all of any PMA with a 60-day termination provision until it magically appears on June 24, 2015, over three years after these agreements were negotiated, and only after AEW's preliminary injunction removing Neil had been granted. (Rubin Decl., ¶¶ 41-43.)

- The La Cienega PMA that Plaintiffs purport is the "final" version is textually different from the actual draft La Cienega agreements. It is, however, consistent in formatting, textual anomalies, and other characteristics with two earlier executed PMAs—both of which were emailed to Neil the morning that he created the forgery. (LaPorte Decl., ¶ 22, 106-115; Rubin Decl., ¶ 48(a)-(c).)

And, finally, Plaintiffs' actions in recent months only further confirm that the La Cienega PMA is a forgery. Indeed, and as discussed in Section D.4., *infra*, immediately prior to the forensic imaging ordered by the Court, at least one individual within NMS manually deleted electronic evidence of the forged La Cienega agreement. (Rubin Decl., ¶ 93.)

## 2. Plaintiffs Forge A Fake Cover Letter To Accompany "Version 2"

Plaintiffs had still one more forgery (that we know of) to go. On *September 21, 2015*, after Defendants had spent months questioning the legitimacy of "Version 2" and over a year after this litigation was initially filed, Plaintiffs proffered *for the very first time*—for use at the deposition of Mr. Samek—what they claimed to be a "cover letter" that Mr. Samek had delivered to Plaintiffs in 2010 accompanying the alleged hard copy of "Version 2." (Srinivasan Decl., Exh. K, ¶ 13.) This "cover letter"—complete with a "Re" line "JV AGREEMENT (3 YEAR BUY/SELL)"—that is

Gibson, Dunn &
Crutcher LLP

11

NOTICE OF MOTION AND MOTION FOR TERMINATING AND OTHER SANCTIONS AGAINST
PLAINTIFFS FOR SPOLIATION OF EVIDENCE

Exhibit 39
Page 20

EXHIBIT C - PAGE 118

conveniently tailored to be directly on point for this lawsuit—*is yet another forgery offered by Plaintiffs in this case.* (*Id.*, Exh. X.)

**First**, as Mr. LaPorte testifies, the cover letter is a low-quality document—indicating "it is not a first generation document or it is a document composed from multiple sources." (LaPorte Decl., ¶¶ 21, 78-81.) Moreover, as Mr. LaPorte states, "the signature and surrounding text block [of Mr. Samek's alleged letter], including the text above, below, and adjacent to the signature, *is a reproduction of the exact same signature and surrounding text block from another source.*" (*Id.*, ¶¶ 20, 82-91.) Specifically, it is identical to the Term Sheet that Neil possessed in Microsoft Word format. (*Id.*)

**Second**, Mr. Rubin's forensic analysis illuminates yet more evidence demonstrating the letter is a forgery. On June 21, 2015, Neil emailed himself a copy of the "cover letter" (which is the first date it ever appears anywhere in any of Plaintiffs' devices) in PDF form. (Rubin Decl., ¶ 34.) The PDF has metadata indicating it was created on September 21, 2010. (*Id.*) However, the PDF was created with a version of Adobe not even available until December 2014, demonstrating that the document was artificially backdated by Neil "turning back" his computer clock when he created the letter. (*Id.*, ¶ 35.) Neil then created two more versions that very day, also backdating them through a computer clock change, but this time using an older version of Adobe. (*Id.*, ¶¶ 36, 37.) After the Court issued its preservation Order, Neil then emailed two of these versions to colleagues, asking if they could tell when those files were created. (*Id.*, ¶ 39(a)-(b).) Plaintiffs then produced in this action a scrubbed version of the cover letter that does not contain any data as to creation, but—as Mr. LaPorte states—"is not a first generation document or it is a document composed from multiple sources." (LaPorte Decl., ¶¶ 21, 78-81.) These actions are not the actions of someone with an original cover letter, let alone someone (like Neil) who claims he saved that cover letter since he claims it was delivered to him in 2010. Indeed, now it appears the "original" cover letter has never been produced, because there is no such thing. It is a complete fabrication.

**Third**, as with "Version 2" and the forged "La Cienega PMA," still more evidence obtained from the Court-ordered forensic investigation demonstrates the cover letter is a forgery:

Gibson, Dunn &
Crutcher LLP

12

- There is absolutely no electronic record or evidence of this "cover letter"—allegedly delivered in September 2010—in any of Plaintiffs' files or materials, until June 2015, when the forgery occurred. (Rubin Decl., ¶¶ 32-37.)[9]

- And as with the PMA, and explained in Section D, *infra*, Plaintiffs intentionally deleted and destroyed other evidence relating to the forged cover letter. Among other things, on October 15, 2015, the day before the Court's forensic imaging order was to take effect, Plaintiffs replaced and altered a hard drive on Neil's home computer, causing the complete loss of data, files, and folders that would have contained relevant forensic evidence. (Rubin Decl., ¶ 54.) And on or after December 2, 2015, Plaintiffs entirely and manually deleted a folder called "AEW" that contained numerous subfolders and files, including a subfolder called "AEW v2 Letter" that contained a file "Letter fr AEW 9 14 2010 001.jpg." (*Id.*, ¶ 63.) This image likely would have contained metadata showing the document to be a forgery. (*Id.*)

The "cover letter," like the July 2013 "Version 2" and the "La Cienega PMA," is a forgery. The evidence above, including the forensic evidence, proves it. And Plaintiffs and their counsel committed a fraud on the Court by presenting these documents to the Court for use in this litigation and committed perjury by swearing to the authenticity of these documents and concocting (and then changing) stories about their origin. These are repeated acts of deceit that the Court cannot countenance and for which Plaintiffs must face the gravest of consequences, including the termination of their lawsuit, entry of judgment on Defendants' cross-claims, and the payment of all of Defendants fees and costs associated with this lawsuit.

**D.    Plaintiffs Engage In A Nefarious, Illegal Scheme To Fraudulently Destroy And Alter Evidence**

Whether motivated by a desire to cover up their forgeries or otherwise, Plaintiffs also have engaged in an intentional, coordinated, widespread effort to destroy and alter evidence in this case and otherwise conceal the whereabouts of critical materials. Moreover, Plaintiffs have engaged in these activities not only in violation of California civil and criminal law (*Cedars-Sinai Medical*

---

[9]    Nor is there any explanation from Plaintiffs as to how this purportedly controlling cover letter—which Plaintiffs' counsel claimed was "fatal" to Defendants' arguments (Srinivasan Decl., Exh. M at ¶ 4)—was not produced or even alluded to until *September 21, 2015*, over five years after it was allegedly received by Neil and months into discovery. Neil testified in his deposition that he found this letter separately from finding "Version 2" in the same "basement" as "Version 2," but months or years after finding "Version 2." (*Id.*, Exh. J at 64:23-67:7.) But he could not remember anything else.

Gibson, Dunn & Crutcher LLP

NOTICE OF MOTION AND MOTION FOR TERMINATING AND OTHER SANCTIONS AGAINST PLAINTIFFS FOR SPOLIATION OF EVIDENCE

Exhibit 39
Page 22
EXHIBIT C - PAGE 120

*Center v. Superior Court* (1998) 18 Cal. 4th 1, 12 (hereafter *Cedars-Sinai*); Pen. Code, § 135), but also in ***direct violation*** of this Court's Orders. On September 8, 2015, the Court specifically ordered Plaintiffs to "immediately take steps to freeze all of their electronic documents so that they cannot be modified or deleted." (Srinivasan Decl., Exh. Y at p. 1.) Then, on October 6, 2015, the Court ordered a forensic examination of all of Plaintiffs' relevant electronic media, and ordered Plaintiffs to produce for forensic imaging ***all*** of Plaintiffs' and Plaintiffs' affiliates' devices that "could have ever sent, received modified, opened, altered, or otherwise would have been used to view any copy of the Joint Venture Agreement (including 'Version 2'), Exhibit 41 [the cover letter], and all Property Management Agreements (including the Luxe LA Cienega PMA), as well as Mr. Shekhter's home and office computers (the 'Devices')." (*Id.*, Exh. Z at p. 2.)

As detailed by the facts outlined below and set forth more fully in Mr. Rubin's declaration, Plaintiffs simply thumbed their noses at these orders and repeatedly and willfully ignored them, along with counsel's independent obligations to preserve all evidence relevant to this dispute.

### 1. Plaintiffs Conspire To Destroy And Alter Neil's New Home Computer In Advance Of The Court-Ordered Forensic Inspection

The home computer Neil used in 2014-2015 ("Neil's New Home Computer") is indisputably a critical piece of evidence. On it, Neil communicated and conducted NMS business during much of the time period of this litigation. It also housed evidence of the Cover Letter and the La Cienega PMA forgeries. Despite this computer's obvious relevance, Plaintiffs, through Neil and his son, Alan—***after the Court had issued its hold order and immediately in advance of the Court-ordered forensic analysis***—set out on a scheme to effectively destroy and alter its contents. Worst of all, Neil's actions were entirely intentional and done while Plaintiffs were fully represented by counsel. This spoliation constitutes a flagrant disregard for and violation of the Court's orders, and counsel's ethical obligations to ensure that relevant information is preserved.

On the morning of October 15, 2015, Neil's son Alan ran a series of incriminating Google searches: "secure wipe hard drive," "backdated secure wipe," "los angele[s] anti-computer forensics," and "how to avoid computer forensics." (Rubin Decl., ¶ 6(a) & fig. 10.) Seeing the results of those searches, Neil and his son then engaged in a text exchange (which Neil then

14

Gibson, Dunn &
Crutcher LLP

1  deleted—a sanctionable act of spoliation on its own) in advance of the Court-ordered inspection that

2  is found in Exhibit A.  Among other things, the text exchange, which Mr. Rubin was able to recover,

3  outlines in excruciating detail Neil and Alan's plan to remove Neil's old hard drive, replace it, and

4  then backdate the computer and load it with files.  (See Exh. A; Rubin Decl., ¶ 51 & fig. 7.)  And that

5  is exactly what they did.  The forensic evidence shows that on October 15, 2015—*one day before*

6  *Plaintiffs' compliance with the October 6 forensic examination order was to become due*—Neil

7  and his son Alan initiated and executed a plan to: (i) *remove* a hard drive from Neil's New Home

8  Computer; (ii) *replace* it with a new hard drive that looked similar to the old one; (iii) manipulate and

9  alter the computer by *artificially backdating* the computer's clock to make the files appear older than

10  they were; and then (iv) *flood* the new hard drive with more than 75,000 backdated files and folders.

11  (Rubin Decl., ¶¶ 54-56.)  They accomplished each of these illegal tasks, causing the permanent loss

12  of untold evidence and metadata.  (Rubin Decl., ¶¶ 54-58.)

13  Plaintiffs did all of this knowing full well that the Court had ordered evidence to be preserved,

14  and in an attempt to avoid the consequences of a forensic examination.  Indeed, there is a reason Neil

15  insists that the actions be done today—because the very next day his computer was to be subject to

16  forensic testing per the Court's Order.

### 2. Neil Testifies That He "Threw Away In The Garbage" His 2013 Home Computer After This Action Was Filed, But The Story Is Even Worse

18  Like Neil's New Home Computer, the home computer that Neil used in the summer of 2013

19  ("Neil's 2013 Home Computer") is another critical piece of evidence because this is another device

20  that Neil used for NMS business.  In fact, it is the computer he used when he emailed NMS's General

21  Counsel and others about the fabricated three-year Buy/Sell provision and when "Version 2" first

22  appeared, and it is likely the "unknown computer" that opened and created the forged document

23  Version 2.  (Rubin Decl., ¶¶ 27, 28.)  As a result, Defendants aggressively sought access to this

24  computer for forensic examination.  (Srinivasan Decl., ¶ 6.)

25  Plaintiffs, however, refused to provide this device to Defendants' experts.  Instead, Neil

26  testified at his December 10, 2015 deposition simply that he "*threw [this device] away*" by "*put[ting]*

27  *it in the trash*," (Srinivasan Decl., Exh. N at 206:18-25; 207:18-208:17), despite his obvious

1    obligation to preserve evidence relevant to a pending lawsuit:

2        Q. So you threw away your computer that you had been using in July and August of
3        2013 sometime at the end of 2014 or the beginning of this year, 2015; is that correct?

4        A. I mostly threw it away, like I said, as I said before, it was two or three months after
         getting the new computer.  So if I got a new computer in the fall [of 2014], *it was in*
5        *few months after that that would have thrown away my old computer*.

6        Q. And when you say you -- you threw it away, did you personally gather up the
7        equipment and walk it out to a garbage can, is that what happened?

8        A. Yes.

9    (*Id.*, Exh. N at 208:5-17 [emphasis added].)

10       This testimony, from the lead Plaintiff no less, admits to spoliation of the worst sort—simply

11   "throwing away" a key computer after Plaintiffs brought this litigation and requested discovery is

12   clearly a sanctionable act.

13       But the situation is much worse.  Rather than being "thrown away" in early 2015, the forensic

14   review ordered by the Court actually shows that Neil's 2013 Home Computer was in use as late as

15   *September 19, 2015*, just days *after* the Court's September 8 Order mandating a freeze of all data,

16   and months after Defendants served document demands on Neil.  (Rubin Decl., ¶¶ 6(b), 50;

17   Srinivasan Decl., ¶ 5.)

18       Yet, Plaintiffs have not produced Neil's 2013 Home Computer, despite the Court's order that

19   it be produced and following months of expensive, demanding diligence by Defendants' experts to

20   force compliance by Plaintiffs with the Order.  This means that Neil's 2013 Home Computer was

21   either destroyed *after* the Court's order requiring that all materials be retained (and Plaintiffs'

22   swearing to the Court they had done so) *or* Plaintiffs still have this computer but have knowingly

23   failed to produce it despite numerous requests from Defendants.  Whatever the truth, Plaintiffs are in

24   flagrant violation of the Court's orders, their discovery obligations, and counsel's ethical obligations,

25   and Neil's testimony that he "threw away" this computer in early 2015 is pure perjury.

26       **3.    Plaintiffs Have Violated The Court's Orders In Still More Respects**

27       Plaintiffs committed yet more acts in an attempt to destroy, alter, and remove evidence and

28   electronic data from Neil's computers.

16

Gibson, Dunn &
Crutcher LLP

1    ***First***, in attempting to artificially backdate the new hard drive that Neil and Alan had

2    purchased to alter and conceal the contents of Neil's New Home Computer (see Section D.1., *supra*),

3    Neil picked the backdating date of January 10, 2015.  (Rubin Decl., ¶ 56.)  This was no accident, as

4    the date coincided with Neil's later false testimony as to when he "threw away" his 2013 Home

5    Computer and "copied information from [his] old computer to the new one."  (Srinivasan Decl., Exh.

6    N at 212:1-12; see also *id.*, at 208:5-13; 213:3-7.)  In other words, Plaintiffs not only lied about the

7    availability of Neil's 2013 Home Computer (which was still in use as of September 2015 and not

8    "thrown away" in January 2015), but then—in altering Neil's New Home Computer by removing a

9    hard drive from that computer, replacing it, and backdating it—they tried to make it appear that the

10   lie that Neil would later tell about Neil's 2013 Home Computer was true.  This therefore constituted

11   both the destruction and fabrication of evidence.

12   ***Second***, on December 2, 2015, ***two days before the imaging of Plaintiffs' computers was***

13   ***finally to occur***, Plaintiffs installed a new Operating System on Neil's New Home Computer.  (Rubin

14   Decl., ¶ 66.)  The installation was not one that would occur automatically, and it instead required an

15   affirmative, manual upload or use of a Windows 10 DVD.  (*Id.*)  This installation of a new operating

16   system made thousands of changes to the file system metadata on the computer, which inhibits

17   forensic examination of what existed on the computer prior to the installation.  (*Id.*, ¶ 67.)

18   ***Third***, on or after December 2, 2015, a folder called "AEW" and its contents—including a

19   subfolder called "AEW/AEW Docs/From AEW/09-21-2010/AEW v2 Letter"—was deleted from

20   Neil's New Home Computer.  (*Id.*, ¶ 63.)  This clearly related to the matters at issue in this case, and

21   the subfolder in particular related to the forged cover letter.  (*Id.*)

22   ***Fourth***, several USB external storage devices used on Neil's New Home Computer were

23   withheld and/or destroyed.  (*Id.*, ¶ 70.)  Of particular note is a Seagate external hard drive that was

24   plugged in on October 15, 2015, and likely "backed up" the hard drive files before it was swapped

25   out for the "new" drive.  In total, at least 21 devices were connected to Neil's New Home Computer

26   that have never been produced.  (*Id.*, ¶ 69 & fig. 9.)

27   ***Fifth***, between the period of October 4, 2015 and December 4, 2015, the computer clock on

28   Neil's New Home Computer was manually changed seventeen times, making forensic examination

17

NOTICE OF MOTION AND MOTION FOR TERMINATING AND OTHER SANCTIONS AGAINST
PLAINTIFFS FOR SPOLIATION OF EVIDENCE

Exhibit 39
Page 26

EXHIBIT C - PAGE 124

1     many times more difficult than it otherwise would have been. (*Id.*, ¶ 59.)  In the aggregate, during

2     the periods when the clock was changed, over 800,000 files and folders were affected. (*Id.*, ¶ 61.)

3         ***Sixth***, sometime between November 25, 2015 and December 4, 2015, a zip file emailed to

4     Neil from Daniel Lennon purporting to contain files related to AEW and NMS was deleted. (*Id.*, ¶

5     64.)

6         **4.**    **Other NMS Employees Conspire to Delete and Wipe Devices Prior To The**

7                **Court-Ordered Forensic Examination**

8         Other employees within NMS participated in the widespread deletion and alteration of

9     evidence as well.

10         For example, in December, just ***days before*** Defendants were to conduct their forensic

11     imaging of Plaintiffs' computers, Enrique Sanchez, the Information Technology employee at NMS

12     searched for "***file deletion utility windows 7***," and "***free SSD secure erase***." (Rubin Decl., ¶ 6(a) &

13     fig. 11.)  He then downloaded an application called "Eraser Portable," which is a computer data

14     destruction and wiping application, and on December 4, 2015, the application was copied to the NMS

15     corporate file server. (*Id.*, ¶ 90.)   This data wiping utility was used by both Enrique Sanchez and by

16     another NMS employee, Brian Bowis (Vice President for Finance at NMS), ***the day the court-***

17     ***ordered imaging was to occur.*** (*Id.*, ¶¶ 90, 91.)

18         These searches were not unique; after the Court had ordered preservation, Mr. Sanchez

19     searched for "***wipe multiple hard drives simultaneously***," "***hard drive destruction service***," and

20     "***hard drive destruction service los angeles***." (*Id.*, fig. 11.)

21         Mr. Sanchez had also searched for "***Adobe Acrobat removal tool***" on November 13, 2015,

22     and Adobe Acrobat was deleted sometime after October 2, 2015 from Adam Shekhter's computer,

23     which had been the host of one of the forged copies of "Version 2." (*Id.*, ¶ 80.)

24         On December 3, 2015, Eddie Valentin, who counsel for NMS described as Neil's assistant of

25     "many years," deleted a copy of the forged La Cienega PMA from his desktop computer. (Srinivasan

26     Decl., Exh. AA at 71:25-72:2; Rubin Decl., ¶ 93.)

27         And finally, on December 4, 2015, the day Defendants were to conduct the imaging,

28     Mr. Sanchez ran the confirming search: "does eraser work on ssd?" (Rubin Decl., fig. 11.) "Eraser"

Gibson, Dunn & Crutcher LLP

18

here referring to the wiping utility he had downloaded, and "SSD" referring to any of the data drives
falling into that category.

### 5. Plaintiffs Conceal Evidence And Blatantly Violate Court Orders

In addition to all of the foregoing, Plaintiffs have unabashedly violated the Court's October 5,
2016 Forensic Examination Order in still more respects:

- There are no less than *four critical data sources* that Plaintiffs have still yet to produce:
(i) Neil's 2013 Home Computer; (ii) the hard drive that was removed from Neil's New
Home Computer; (iii) the Seagate backup that was taken of Neil's New Home Computer;
and (iv) the USB drive containing the "original" Version 2 that was taken from an
"unknown computer" (likely Neil's 2013 Home Computer) and inserted into Adam's
computer to distribute the forged Version 2. These items—the last three of which were
never even listed by Plaintiffs—are either being knowingly concealed or were
intentionally destroyed by Plaintiffs. *In total, there are at least 21 devices that have been
plugged into Neil's computer alone that have not been produced by Plaintiffs.* (Rubin
Decl., ¶ 71 & fig. 9.)

- Plaintiffs refused to comply with the Court's Order that they list all devices responsive to
the Court's Order, simply reassuring AEW that it would receive "everything."
(Srinivasan Decl., Exh. AA at 105:23 ["We intend to give you everything."].) Instead,
Plaintiffs would only "adopt" the list created by Defendants' experts once they had the
chance to conduct a forensic investigation. This list did not include a number of items,
such as the Seagate backup, and Plaintiffs never corrected that list.

- Plaintiffs repeatedly informed Defendants that they had made available all of Adam
Shekhter's computers. But Defendants' experts discovered that a Dell Latitude E6520
desktop computer belonging to Adam, with a host name ADAM-S-PC, had not been
provided by Plaintiffs. This is the same PC that was used to load the forged Version 2 and
email it, and the computer in which Adobe Acrobat was removed after October 2, 2015.
(Rubin Decl., ¶¶ 76, 79-80.) Tellingly, once AEW actually did obtain the device (along
with 13 additional computers Plaintiffs had not previously provided), Plaintiffs' efforts to
hide Adam's computer became clear. (*Id.*, ¶¶ 77-78.) The computer regularly accessed
the NMS network, and it was frequently used at the NMS offices, from as early as 2013
until as recently as December 3, 2015 at 7:26 p.m., *merely 24 hours before Defendants
began their forensic imaging.* (*Id.*, ¶ 78.) The computer was then taken offline while the
imaging and forensic analysis occurred, and it was not used again until December 21,
2015, after most of the imaging had concluded. (*Id.*)

## III. THE COURT SHOULD ISSUE TERMINATING SANCTIONS AND FEES AND COSTS FOR PLAINTIFFS' EGREGIOUS MISCONDUCT AND SPOLIATION

The Court has wide discretion to issue sanctions for the misuse of the judicial system and the
discovery process. The Court finds this authority in both section 2023.030 of the Code of Civil

19

Gibson, Dunn &
Crutcher LLP

Case 2:19-cv-04030-AB-AFM Document 1 Filed 05/20/21 Page 127 of 158 Page ID #27
Case 2:21-cv-01256-AB-AFM Document 67-41 Filed 05/04/19 Page 29 of 449 Page ID
#:10910

1    Procedure and its own inherent authority and powers. (Code Civ. Proc., § 2023.030; *Slesinger*,

2    *supra,* 155 Cal.App.4th at p. 740 ["[T]he trial court has inherent power to impose a terminating

3    sanction"].) Among the sanctions available to the court are issue sanctions, terminating sanctions,

4    and fees and costs. (Code Civ. Proc., § 2023.030.)

5       Here, there can be no question that terminating sanctions and an award of fees and costs are

6    appropriate. *R.S. Creative, supra,* 75 Cal.App.4th 486 is perhaps most on point. There, the Court of

7    Appeal affirmed the lower court's granting of terminating sanctions and fees and costs against a

8    plaintiff who relied upon a forged contract in her pleadings, provided false testimony about the nature

9    of that contract, and altered or deleted data on her own computer and potentially destroyed some

10   floppy discs. (*Id.* at pp. 487-488.) As the court noted, "The [court's] power to impose discovery

11   sanctions is a broad discretion subject to reversal only for arbitrary, capricious, or whimsical action.

12   Only two facts are absolutely prerequisite to imposition of the sanction: (1) there must be a failure to

13   comply . . . and (2) the failure must be willful . . ." (*Id.* at p. 496 [citations omitted].) Moreover,

14   "Section 2023 authorizes terminating sanctions in the first instance in egregious cases such as this

15   one." (*Id.* at p. 497.) Based on the facts before it, the *R.S. Creative* court had no qualms affirming

16   the trial court's decision to issue terminating sanctions, noting that plaintiff's conduct was

17   "illustrat[ive] [of] a kind of discovery abuse that is intolerable in civil litigation." (*Id.* at p. 488.)

18       Here, the core facts found in *R.S. Creative* are present, but magnified ten-fold.

19       **Forgery**. Plaintiffs relied upon a forged contract in their pleadings (Version 2) like the

20   plaintiff in *R.S. Creative*. But they also have forged additional documents ***during the pendency of***

21   ***this litigation*** to attempt to support their claims, including (but perhaps not limited to) the La Cienega

22   PMA and the cover letter. (See Section C, *supra*.) This by itself constitutes a fraud on the court, the

23   unlawful spoliation of evidence, and attempts to undermine the judicial system. (*Williams v. Russ*

24   (2008) 167 Cal.App.4th 1215, 1223 ["Spoliation of evidence means the destruction or significant

25   alteration of evidence or the failure to preserve evidence for another's use in pending or future

26   litigation"]; see also *Slesinger, supra,* 155 Cal.App.4th at p. 758 ["California courts possess [the]

27   power" to dismiss an action "when faced with pervasive litigation abuse"]; *Aoude v. Mobil Oil Corp*

28   (1st Cir. 1989) 892 F.2d 1115, 1118-1119 [affirming terminating sanctions because plaintiff pled a

Gibson, Dunn &
Crutcher LLP

NOTICE OF MOTION AND MOTION FOR TERMINATING AND OTHER SANCTIONS AGAINST
PLAINTIFFS FOR SPOLIATION OF EVIDENCE

Exhibit 39
Page 29

EXHIBIT C - PAGE 127

1 case based upon a forged document and such constituted fraud on the court].)

2 **Perjury.** Plaintiffs committed perjury about the authenticity of a forged document like the

3 plaintiff in *R.S. Creative*. But they also have provided additional perjury. Among other things, they

4 provided oscillating, false testimony about *all* of the forged documents. This has included, for

5 example, first swearing that their copy of Version 2 was the actual one delivered in 2010, and then

6 later swearing it may be a "copy." They also knowingly misled the Court and Defendants when they

7 stated that everything had been—and would be—preserved. And lead plaintiff Neil Shekhter even

8 created an entirely fabricated story about "throwing away" his computer in the garbage in early 2015,

9 which itself would have been an act of spoliation, to keep that computer from being subject to

10 discovery. This conduct is also reprehensible. (See *Cedars Sinai*, *supra*, 18 Cal.4th at p. 9 ["Perjury,

11 like spoliation, undermines the search for truth and fairness by creating the false picture of the

12 evidence before the trier of fact"]; *Michaely v. Michaely* (2007) 150 Cal.App.4th 802, 806 [affirming

13 award of sanctions due to sanctioned party's "consistent evasion, coupled with responses which were

14 blatant untruths and not credible, amounted to an egregious abuse of the discovery process"].)

15 **Spoliation.** And finally, and the primary reason for sanctions here, Plaintiffs did not just alter

16 or delete some computer data like the plaintiff in *R.S. Creative* that the court found justified

17 terminating sanctions, but they have engaged in a massive, intentional, coordinated effort to destroy

18 evidence—all in light of, and in plain violation of, a specific order directing them to preserve and not

19 alter evidence. The Code of Civil Procedure specifically allows for sanctions where there has been a

20 violation of a court order, and that has more than occurred here. Among other things, Plaintiffs

21 fraudulently altered and modified Neil's New Home Computer, destroying evidence in the process;

22 lied about and have failed to produce Neil's 2013 Home Computer; intentionally downloaded and

23 installed updates that destroyed evidence; downloaded and installed data sweeping software that

24 destroyed evidence; altered and attempted to backdate key files; failed to produce at least four key

25 devices with critical evidence and at least 21 devices in total; and deleted specific files relating to the

26 forgeries in this case. Worse, this was all knowing and intentional, in plain violation of this Court's

27 discovery orders. As Neil told his son in the deleted text about removing and altering Neil's

28 computer the day before the Court's forensic imaging order was to take effect and after Alan had just

21

Gibson, Dunn & Crutcher LLP

NOTICE OF MOTION AND MOTION FOR TERMINATING AND OTHER SANCTIONS AGAINST
PLAINTIFFS FOR SPOLIATION OF EVIDENCE

Exhibit 39
Page 30

EXHIBIT C - PAGE 128

1   searched for "backdated secure wipe" and "how to avoid computer forensics": the priority was to

2   complete it that day.

3            Under California law, these actions of document destruction and manipulation in violation of

4   a court order clearly provide the basis for terminating sanctions. (*Cedars Sinai, supra*, 18 Cal.4th at

5   p. 12 ["[d]estroying evidence . . . [is] surely [] a misuse of discovery within the meaning of section

6   2023" subject to terminating sanctions]; *Van Sickle v. Gilbert* (2011) 196 Cal.App.4th 1495, 1518

7   [affirming terminating sanctions where party "fail[ed] to obey a court order to provide discovery"];

8   *Los Defensores, supra,* 223 Cal.App.4th at p. 391 [affirming terminating sanctions where there was

9   "sufficient evidence that [defendants] willfully failed to comply with the [court's orders]" by

10  willfully concealing or destroying materials]; Code Civ. Proc., § 2023.010, subd. (g) [violation of

11  court order, such as the court's preservation and production order, provides grounds for sanctions].)

12           Together, these facts are even worse. Indeed, numerous courts have issued terminating

13  sanctions for conduct *far* less egregious than is present here. In *Russ*, for instance, the Court of

14  Appeal affirmed the granting of terminating sanctions due to plaintiff's failure to pay fees on a

15  storage unit, which then led to the loss of the items in that unit. (*Russ, supra,* 167 Cal.App.4th at pp.

16  1219, 1223.) Here, there is the intentional, willful, coordinated, and widespread destruction of

17  evidence.

18           And there is no question that this case—like *R.S. Creative*—fits the criteria for "authorizing

19  terminating sanctions in the first instance in egregious cases." Indeed, as the court in *R.S. Creative*

20  stated, "We recognize that terminating sanctions are to be used sparingly, only when the trial court

21  concludes that lesser sanctions would not bring about the compliance of the offending party. [We

22  find that here, as] [t]he record demonstrates repeated violations of stipulations and court orders, a

23  forged document proffered as true, and deliberate destruction of evidence pertinent to exposing that

24  fact." (*R.S. Creative, supra,* 75 Cal.App.4th at p. 496.) The same facts are present here, but on a

25  grander, broader scale.

26           Likewise, Plaintiffs' actions clearly meet the standard sometimes employed by courts stating

27  that terminating sanctions are proper when the violation is "willful, preceded by a history of abuse,

28  and the evidence shows that less severe sanctions would not produce compliance with the discovery

Gibson, Dunn &
Crutcher LLP

NOTICE OF MOTION AND MOTION FOR TERMINATING AND OTHER SANCTIONS AGAINST
PLAINTIFFS FOR SPOLIATION OF EVIDENCE

Exhibit 39
Page 31                                                                    EXHIBIT C - PAGE 129

1    rules." (*Doppes v. Bentley Motors, Inc.* (2009) 174 Cal.App.4th 967, 992 [citations omitted].)  Here,

2    the violation is more than willful—it was conspiratorial; the history of abuse began in 2013 with the

3    forging of a key document and has continued to this day through additional forgeries, perjury, and

4    coordinated and widespread spoliation and concealment of evidence; and Plaintiffs' destruction of

5    evidence means that there is no way to produce compliance—they have destroyed the materials

6    relevant to this case, ***which will never be seen by Defendants or the jury***.  Mr. Rubin outlines in

7    detail the huge swath of relevant materials that have either been concealed, destroyed, or altered—all

8    in violation of this Court's orders and all in prejudice of AEW's ability to defend itself and assert its

9    cross claims  in this case.  (Rubin Decl., ¶¶ 61, 63, 88, 91-93.)  This constitutes prejudice of the

10   highest magnitude.  (*Russ, supra,* 167 Cal.App. 4th at p. 1227; see also *Cedars-Sinai, supra,* 18

11   Cal.4th at p. 14).[10]  The Supreme Court has recognized that "[t]he intentional destruction of evidence

12   is a grave affront to the cause of justice and deserves our unqualified condemnation," as it "can

13   destroy fairness and justice,  . . . increases the risk of an erroneous decision, [and] . . . increase[s] the

14   costs of litigation."  (*Id.* at pp. 4, 8.)  All of that is present here.  Terminating sanctions are necessary.

15       So too are sanctions for attorneys' fees, expert fees, and costs against Plaintiffs and their

16   counsel.  In fact, it is incumbent upon the trial court to impose monetary sanctions where, as in the

17   current instance, the responding party has no justification as to why imposition of the sanction would

18   be unjust.  (Code Civ. Proc., § 2023.030, subd. (a)  ["If a monetary sanction is authorized by any

19   provision of this title, the court shall impose that sanction unless it finds that the one subject to the

20   sanction acted with substantial justification or that other circumstances make the imposition of the

21   sanction unjust"].)  Here, Plaintiffs fabricated evidence, submitted perjury about the same, and

22   destroyed reams of evidence, all the while promising the Court that the documents they were

23   proffering were authentic and that they had taken steps to preserve all evidence.  In light of these

24   facts, fees and costs should also be awarded against Plaintiffs.  (*Cedars-Sinai, supra,* 18 Cal.4th at p.

25

26   [10] Because of this fact, the burden is on Plaintiffs to attempt to show that Defendants have not suffered any prejudice on
     account of their widespread spoliation and altering and destruction of evidence. (*Russ, supra,* 167 Cal.App.4th at p.

27   1225; *Electronic Funds Solutions v. Murphy* (2005) 134 Cal.App.4th 1161, 1184.)  This is a standard they cannot
     meet.

28

23

NOTICE OF MOTION AND MOTION FOR TERMINATING AND OTHER SANCTIONS AGAINST
PLAINTIFFS FOR SPOLIATION OF EVIDENCE

Exhibit 39
Page 32

EXHIBIT C - PAGE 130

1   12 [recognizing that spoliating party may be forced to incur "monetary sanctions."]; *Kravitz v.*

2   *Superior Court* (2001) 91 Cal.App.4th 1015, 1016 ["Under the Civil Discovery Act of 1986, the trial

3   court must impose monetary sanctions against anyone engaging in conduct that is a misuse of the

4   discovery process, and must order the abuser to pay the reasonable expenses, including attorney's

5   fees, incurred by anyone as a result of that conduct."].)  Fees and costs should also be awarded

6   against Plaintiffs' counsel for clearly failing to take reasonable steps to prevent this misconduct and

7   spoliation, while at the same time telling the Court everything has been—and would be—preserved.

8   (See Code Civ. Proc., § 2023.030, subd. (a); *Sinaiko Healthcare Consulting, Inc. v. Pacific*

9   *Healthcare Consultants* (2007) 148 Cal.App.4th 390, 401, 413.)  Plaintiffs' counsel was either

10   painfully aware of this massive and coordinated spoliation, forgery and perjury because they did the

11   work that any reasonable attorney would have performed that would have caused such a discovery, or

12   they willfully blinded themselves by failing to do the work required.  Either way, their conduct

13   justifies the sanctions requested.

14   //

15   //

16   //

(remaining lines //)

24

# IV. CONCLUSION

Plaintiffs' conduct throughout this litigation has been nothing short of shocking, contrary to the rules set forth by the California legislature and courts, and wildly disrespectful of the judicial system, the Court, and Defendants' rights. What began with meritless claims and the advancement of three forged documents has now evolved into a pattern of perjury, deceit, failure to comply with court orders, and a coordinated, massive campaign to spoliate evidence in an effort to conceal Plaintiffs' wrongdoing. As established, the appropriate sanctions are: (1) dismissal of Plaintiffs' Third Amended Complaint with prejudice; (2) striking of Cross-Defendant's Answer and any affirmative defense to the Cross-Complaint of P6 LA MF Holdings SPE, LLC, and for judgment to be entered in in Cross-Complainant's favor; and (3) issuing monetary sanctions against Plaintiffs and their counsel for the attorney's fees, expert fees, and costs incurred by Defendants in this matter.

DATED: January 29, 2016

GIBSON, DUNN & CRUTCHER LLP

By: _James P. Fogelman /RM_

James P. Fogelman

Attorneys for Defendants Eric Samek;
Marc Davidson; P6 LA MF Holdings SPE, LLC;
AEW Capital Management, L.P.;
AEW Partners VI, L.P.; AEW Partners VI, Inc.;
AEW VI, L.P.; P6 LA MF Holdings I LLC;

Attorneys for Cross-Claimant P6 LA MF Holdings SPE, LLC

25

NOTICE OF MOTION AND MOTION FOR TERMINATING AND OTHER SANCTIONS AGAINST PLAINTIFFS FOR SPOLIATION OF EVIDENCE

Exhibit 39
Page 34

EXHIBIT C - PAGE 132

# Exhibit D

Case 2:21-cv-04303-AB-AFM Document 1 Filed 05/20/21 Page 184 of 158 Page ID #134
Case 2:19-cv-09190-AB-AFM Document 43-22 Filed 04/13/19 Page 2 of 95 Page #ID
#:1222

<pre>
 1   GIBSON, DUNN & CRUTCHER LLP
     JAMES P. FOGELMAN, SBN 161584
 2     jfogelman@gibsondunn.com
     JAY P. SRINIVASAN, SBN 181471
 3     jsrinivasan@gibsondunn.com
     RACHEL N. PERAHIA, SBN 266877
 4     rperahia@gibsondunn.com
     MARYSA LIN, SBN 295429
 5     mdlin@gibsondunn.com
     333 South Grand Avenue
 6   Los Angeles, CA 90071-3197
     Telephone: 213.229.7000
 7   Facsimile: 213.229.7520

 8   Attorneys for Plaintiffs

 9
</pre>

<div align="center">

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF LOS ANGELES

</div>

| | |
|---|---|
| P6 LA MF HOLDINGS I LLC, et al., | CASE NO. BC584878 |
| Plaintiffs, | **NOTICE OF MOTION AND MOTION FOR TERMINATING AND OTHER SANCTIONS AGAINST DEFENDANT FOR SPOLIATION OF EVIDENCE AND LITIGATION MISCONDUCT** |
| v. | |
| NMS PROPERTIES, INC.; DOES 1-10, inclusive, | *[Declaration of James L. Zelenay, Jr., Declaration of Gerald M. LaPorte, Appendix of Supportive Evidence to Declaration of Gerald M. LaPorte, Declaration of Samuel S. Rubin, Appendix of Supportive Evidence to Declaration of Samuel S. Rubin, Declaration of Eric Samek, Declaration of David J. Chun, Declaration of Allison Corter, and Declaration of Jonathan Watson filed, and [Proposed] Order lodged concurrently herewith]* |
| Defendants. | |
| | ASSIGNED FOR ALL PURPOSES TO: THE HONORABLE MICHAEL JOHNSON DEPARTMENT 56 |
| | Complaint Filed: June 11, 2015<br>Trial Date: Oct. 24, 2016 |
| | Reservation No. 160401117652 |
| | Hearing Date: July 5, 2016<br>Time: 8:30 a.m. |

Gibson, Dunn &
Crutcher LLP

1

NOTICE OF MOTION AND MOTION FOR TERMINATING AND OTHER SANCTIONS AGAINST
DEFENDANTS FOR SPOLIATION OF EVIDENCE AND LITIGATION MISCONDUCT
EXHIBIT D - PAGE 134

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION .................................................................................................. 1

II.    THE COURT HAS THE AUTHORITY TO ISSUE TERMINATING SANCTIONS............ 5

III.   TERMINATING SANCTIONS SHOULD BE AWARDED HERE ...................................... 7

    A.     NM Forged The "La Cienega PMA," Among Other Documents................................. 7

    B.     NMS Has Engaged In A Campaign of Intentional Destruction of Evidence.............. 10

        1.     NMS Conspired To Destroy Evidence on Neil Shekhter's Computer, Including Evidence Relating To The Forgeries NMS Proffered To The Court........................................................................................................ 11

        2.     Other NMS Employees Also Conspired to Destroy Evidence......................... 12

        3.     NMS Also Engaged In A Wide Net Of Other Data and Document Destruction Actions.............................................................................. 13

    C.     The Prejudice to Plaintiffs From NMS' Actions Is Immeasurable .......................... 13

IV.    FEES AND COSTS ALSO SHOULD BE AWARDED .................................................. 15

V.     CONCLUSION .................................................................................................... 16

Gibson, Dunn &
Crutcher LLP

i

NOTICE OF MOTION AND MOTION FOR TERMINATING AND OTHER SANCTIONS AGAINST
DEFENDANTS FOR SPOLIATION OF EVIDENCE AND LITIGATION MISCONDUCT

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Cedars–Sinai Medical Center v. Superior Court* (1998)
18 Cal.4th 1 ....................................................................................................................15

*Ceglia v. Zuckerberg* (W.D.N.Y. Mar. 26, 2013)
2013 WL 1208558 ...................................................................................................7, 11, 15

*Electronic Funds Solutions v. Murphy* (2005)
134 Cal.App.4th 1161 ...................................................................................................6, 11

*Kravitz v. Superior Court* (2001)
91 Cal.App.4th 1015 ....................................................................................................15

*Los Defensores v. Gomez* (2014)
223 Cal.App.4th 377 ................................................................................................6, 11, 15

*Peal v. Lee* (2010)
403 Ill.App.3d 197 ........................................................................................................15

*Peat, Marwick, Mitchell & Co. v. Superior Court* (1998)
200 Cal.App.3d 272 .........................................................................................................7

*R.S. Creative, Inc. v. Creative Cotton, Ltd.* (1999)
75 Cal.App.4th 486 ................................................................................................5, 6, 7, 11

*REP MCR Realty, L.L.C. v. Lynch* (N.D. Ill. 2005)
363 F.Supp.2d 984 ..........................................................................................................7

*Sinaiko Healthcare Consulting, Inc. v. Pacific Healthcare Consultants* (2007)
148 Cal.App.4th 390 ......................................................................................................16

*Stephen Slesinger, Inc. v. Walt Disney Co.* (2007)
155 Cal.App.4th 736 ..................................................................................................1, 1, 7

*Tucker v. Pac. Bell Mobile Servs.* (2010)
186 Cal. App.4th 1548 ......................................................................................................7

*Van Sickle v. Gilbert* (2011)
196 Cal.App.4th 1495 .................................................................................................6, 15

*Victor Stanley, Inc. v. Creative Pipe, Inc.* (D. Md. 2010)
269 F.R.D. 497 .................................................................................................................7

*Williams v. Russ* (2008)
167 Cal.App.4th 1215 .......................................................................................5, 6, 7, 11, 14, 15

*Williamson v. Recovery Ltd. P'ship* (S.D. Ohio May 9, 2014)
2014 WL 1884401 ..........................................................................................................16

Gibson, Dunn &
Crutcher LLP

ii

**Statutes**

Code Civ. Proc., § 2023.010, subds. (c), (f), (g) ...................................................5

Code Civ. Proc., § 2023.010, subd. (g) ...............................................................14

Code Civ. Proc., § 2023.030 ..................................................................1, 5, 6, 7

Code Civ. Proc., § 2023.030, subd. (a) ..........................................................1, 5, 15

Code Civ. Proc., § 2023.030, subd. (d) ...............................................................5

Code Civ. Proc., § 2023.030, subd. (d)(1) ..............................................................1

Code Civ. Proc., § 2023.030, subd. (d)(4) ..............................................................1

NOTICE OF MOTION AND MOTION FOR TERMINATING AND OTHER SANCTIONS AGAINST
DEFENDANTS FOR SPOLIATION OF EVIDENCE AND LITIGATION MISCONDUCT

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

     **PLEASE TAKE NOTICE** that on July 5, 2016, at 8:30 a.m., or as soon thereafter as the matter may be heard in the above-entitled Court, located at 111 North Hill Street, Los Angeles, California, in Department 56, Plaintiffs P6 LA MF Holdings I LLC; P6 LA MF Holdings SPE, LLC; Luxe Broadway, LLC; Luxe La Cienega, LLC; Luxe Washington, LLC; 1410 5th Street, LLC; Luxe 1420 5, LLC; Luxe 1440 5, LLC; NMS Broadway, L.P.; and Lincoln Walk Studios, LP (collectively, "Plaintiffs") hereby move, pursuant to California Code of Civil Procedure section 2023.010, *et seq.* and pursuant to the Court's inherent authority (see *Stephen Slesinger, Inc. v. Walt Disney Co.* (2007) 155 Cal.App.4th 736, 740), for an order:

    1.   Striking the Answer of Defendant NMS Properties, Inc. ("NMS") to Plaintiffs' First Amended Complaint (Code Civ. Proc. § 2023.030, subd. (d)(1));

    2.   Entering judgment in Plaintiffs' favor and against NMS as to the claims asserted in Plaintiffs' First Amended Complaint,[1] (Code Civ. Proc. § 2023.030, subd. (d)(4)); and

    3.   Issuing monetary sanctions against NMS and its counsel of record for attorney fees and costs incurred by Plaintiffs in moving for the relief included in this Motion, in the amount of at least $25,000. (Code Civ. Proc. § 2023.030, subd. (a).) Specifically, this Motion seeks these monetary sanctions against NMS Properties, Inc., as well as NMS's counsel of record, Louis R. Miller, James Goldman, A. Sasha Frid, and Jason H. Tokoro of Miller Barondess LLP, and Steven Zelig of WLA Legal Services, Inc.

     There is good cause for this relief. As detailed in the accompanying Memorandum of Points and Authorities, NMS has engaged in an unprecedented campaign of fabrication, perjury, and the intentional destruction and concealment of evidence, all while ignoring its litigation obligations, counsel's ethical obligations and promises to preserve evidence, and court orders from the Los Angeles Superior Court that NMS principals, employees, and affiliates preserve all evidence and produce all sources of data for forensic review. NMS has immensely prejudiced Plaintiffs as a result

---

[1] To the extent the Court awards this relief, Plaintiffs would be willing to waive their requests for monetary damages and request only the non-monetary relief identified in the First Amended Complaint.

Gibson, Dunn & Crutcher LLP

1

NOTICE OF MOTION AND MOTION FOR TERMINATING AND OTHER SANCTIONS AGAINST DEFENDANTS FOR SPOLIATION OF EVIDENCE AND LITIGATION MISCONDUCT

EXHIBIT D - PAGE 138

1    of these actions. Moreover, NMS engaged in these actions while represented by counsel, who

2    remarkably has not explained whether it participated in these actions or, if not, how it allowed these

3    actions to occur during its representation of NMS.

4       Plaintiffs have met and conferred with opposing counsel in a reasonable and good faith effort

5    to resolve the issues raised in this Motion, but were unable to do so. (Declaration of James L.

6    Zelenay, Jr. ["Zelenay Decl."], ¶ 3.)

7       This Motion is based on this Notice of Motion, the accompanying Memorandum of Points &

8    Authorities, the accompanying Declaration of James L. Zelenay, Jr., Declaration of Gerald M.

9    LaPorte, Appendix of Supportive Evidence to the Declaration of Gerald M. LaPorte, Declaration of

10    Samuel S. Rubin, Appendix of Supportive Evidence to the Declaration of Samuel S. Rubin (each

11    with attached exhibits), Declaration of Jonathan Watson, Declaration of Eric Samek, Declaration of

12    David Chun, Declaration of Allison Corter, all pleadings, papers and records in these actions, all

13    matters of which judicial notice may be taken, and all other evidence and oral argument as may be

14    presented at the hearing on this matter.

15

16    DATED: June 3, 2016

17                   GIBSON, DUNN & CRUTCHER LLP

18

19             By: _James P. Fogelman / RNP_

20                     James P. Fogelman

21                     Attorney for Plaintiffs

22

23

24

25

26

27

28

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.    INTRODUCTION

Plaintiffs bring this Motion because Defendant NMS Properties, Inc., along with its principals, employees, and affiliates (collectively, "NMS"), has fabricated documents submitted to this Court, committed perjury concerning such matters, and engaged in a massive, intentional, and coordinated effort to destroy the evidence of these actions, thereby greatly prejudicing Plaintiffs and undermining public confidence in the judicial system itself.  It is doubtful that any court has seen the sort of widespread, intentional misconduct perpetrated by NMS here, and numerous California courts have issued terminating sanctions for a fraction of the misconduct committed by NMS.  Both the discovery rules (Code Civ. Proc., § 2023.030) and the Court's inherent authority (*Stephen Slesinger v. Walt Disney Co.* (2007) 155 Cal.App.4th 736) permit the issuance of terminating sanctions here.  Terminating sanctions against NMS are the *only* way to remedy the incurable prejudice suffered by Plaintiffs and the only remedy that will maintain faith in the judicial system. Terminating sanctions against NMS, as well as a monetary sanction against NMS and its counsel, should be issued.

Defendant NMS was retained as the property manager for nine properties owned by eight of the Plaintiffs in this action ("the Property Owners")[2] under Property Management Agreements ("PMAs") that permitted the Property Owners to terminate NMS on thirty days' notice without the requirement of having any cause to do so; indeed, the Property Owners could terminate the PMAs "immediately," as long as they provided NMS with payment of one month's management fees.  (See Declaration of Eric Samek ["Samek Decl."], at ¶ 4; see also Declaration of Jonathan Watson ["Watson Decl."], at Exhs. G, at § 12.1, J; Declaration of David Chun ["Chun Decl.] Exhs. C, at § 12.1, E, at § 12.1, P, at § 12.1.)   In other words, the PMAs provide for "no cause" termination either immediately or upon 30-days' notice; NMS was entitled to nothing more than one month's management fee.  NMS was retained as the property manager only because it was an affiliate of NMS Capital LLC, which entered into a Joint Venture Agreement ("JVA") in September 2010 with

---

[2]  Luxe Broadway, LLC, Luxe La Cienega, LLC, Luxe Washington, LLC, 1410 5th Street, LLC, Luxe 1420 5, LLC, Luxe 1440 5, LLC, NMS Broadway, L.P., and Lincoln Walk Studios, LP.

Gibson, Dunn & Crutcher LLP

1

PLAINTIFFS' MOTION FOR TERMINATING AND OTHER SANCTIONS AGAINST DEFENDANTS
FOR SPOLIATION OF EVIDENCE AND LITIGATION MISCONDUCT

EXHIBIT D - PAGE 140

1  Plaintiff P6 LA MF Holdings SPE LLC ("the Investor Member") to form Plaintiff P6 LA MF

2  Holdings I LLC ("the Joint Venture"). (See Samek Decl., ¶¶ 2, 4.) The JVA expressly defines an

3  approved PMA as one terminable without cause and without penalty on 30 days' notice, and further

4  provides that the Investor Member can trigger such termination by the Property Owners in its sole

5  discretion. (Watson Decl., ¶¶ 10, 12.)

6       The Investor Member elected to market the Joint Venture Properties for sale in April 2015,

7  and the Property Owners provided the requisite thirty-day no cause termination notice to NMS on

8  May 6, 2015. (Samek Decl., ¶ 5 & Exh. A.) However, other than for one property, NMS refused to

9  vacate the Joint Venture Properties or to transition the books, records, and bank accounts to the newly

10  hired property manager. Plaintiffs were forced to file this suit seeking the recovery of possession of

11  their properties as well as their books, records, and bank accounts. (*Id.* ¶¶ 7-8.) Plaintiffs sought, and

12  initially obtained, a Preliminary Injunction providing Plaintiffs with this very relief. (*Id.*) However,

13  the very same day that the Preliminary Injunction Order was issued, NMS forged a PMA for one of

14  the Joint Venture Properties (La Cienega) and submitted that forgery, along with a forged copy of the

15  JVA, to the Court; the forged La Cienega PMA contained a 60-day no-cause termination provision

16  rather than the approved 30-day no-cause termination provision. (*Id.* ¶ 9; Zelenay Decl. Exh. A.)

17  The Court reconsidered and vacated its Preliminary Injunction Order, apparently relying, at least in

18  part, on the forged La Cienega PMA. Meanwhile, NMS Capital and other affiliates had filed suit

19  against the Investor Member in Department 71 based on the forged JVA. When an obvious anomaly

20  in the forged JVA (which is not relevant to this action) was pointed out, Judge Bruguera ordered

21  NMS to preserve all of its electronic devices and documents, as well as any originals and copies of

22  the forged JVA, the forged PMA, and yet another forgery, pending a further motion to compel a

23  forensic examination. (Zelenay Decl. Exh. B.) Judge Bruguera subsequently ordered that all such

24  devices and documents be presented for forensic examination, which was originally to take place in

25  October 2015. (*Id.*, Exh. C.) After a brief stay ordered by the Court of Appeal, the Court of Appeal

26  denied NMS' writ petition, thus permitting the examination to take place. (*Id.*, Exh. D.) NMS was

27  supposed to comply with Judge Bruguera's orders by early December, but the subsequent forensic

28  examination not only confirmed the forgery of the La Cienega PMA and the JVA, along with another

Gibson, Dunn &
Crutcher LLP

2

PLAINTIFFS' MOTION FOR TERMINATING AND OTHER SANCTIONS AGAINST DEFENDANTS
FOR SPOLIATION OF EVIDENCE AND LITIGATION MISCONDUCT

EXHIBIT D - PAGE 141

1  document, but it also revealed a wide-spread effort to destroy and hide electronic evidence and

2  devices, the likes of which this Court has probably never seen.  The destruction of so many electronic

3  devices and documents is the focus of this Motion, along with the related forgery and perjury.

4       There can be no genuine dispute that the La Cienega PMA submitted by NMS on June 25,

5  2015 attached to the sworn declaration of Neil Shekhter is fraudulent.  Not only is the 60-day

6  termination provision contained in the document incompatible with the parties' actual agreement and

7  the approved Form PMA for the property located at 375 N. La Cienega sent to NMS and lenders in

8  early 2012, but two different nationally recognized forensic experts have also confirmed that the

9  document and the forensic evidence prove that it is not authentic.  (Declaration of Samuel S. Rubin

10 ["Rubin Decl."] ¶¶ 5(c), 43-51; Declaration of Gerald M. LaPorte ["LaPorte Decl."], ¶¶ 27, 98-121,

11 128-129.)  The forensic evidence establishes that it was Neil Shekhter himself that created the

12 fraudulent document.  As set forth in the declaration of Samuel Rubin, Managing Director of Digital

13 Forensics at Stroz Friedberg, and as described in the Timeline attached hereto as <u>Exhibit A</u>, on the

14 morning of June 24, 2015, the same morning that the Court issued its original Preliminary Injunction

15 Order, Neil Shekhter received, by email, Word versions of older PMAs for two unrelated Joint

16 Venture properties (**1410 5th Street** and **Washington**), each of which contained the agreed-upon 30-

17 day no cause termination provisions.[3]  (Rubin Decl., ¶ 51(a).)  Mr. Shekhter then created a word

18 document called ***Property Management-375 ns.doc***, and shortly thereafter scanned the first known

19 copy of the forged La Cienega PMA on his home scanner.  (*Id.*, ¶ 51(b)-(c).)  The problem for NMS,

20 however, is that, while Mr. Shekhter makes a habit of forging documents, he is not very good at it.

21 As explained by the experts and reflected in <u>Exhibit B</u>, ***Mr. ·Shekhter forgot to change the cover***

22 ***page on the forgery before emailing his creation***, so the property owner identified on the cover page

23 he emailed that morning was ***1410 5th Street***, the same one he had received that very morning by

24 email containing the approved 30-day no cause termination provision.  (*Id.*, ¶ 51(d).)  Mr. Shekhter

25 realized his mistake just before midnight and scanned and emailed a new version of the PMA with a

---

27 [3]  Interestingly, the emails were sent from email accounts of two NMS employees who no longer
28 worked at the company by the time the emails were sent; thus, either Mr. Shekhter sent the emails
to himself or had someone else access these accounts.  (See Rubin Decl., ¶ 51.)

PLAINTIFFS' MOTION FOR TERMINATING AND OTHER SANCTIONS AGAINST DEFENDANTS
FOR SPOLIATION OF EVIDENCE AND LITIGATION MISCONDUCT

1  different cover page identifying the property as Luxe@375 and the property owned as Luxe La

2  Cienega. (*Id.*, ¶ 51(e).) NMS and Shekhter then hid or destroyed the evidence, as discussed below,

3  but the evidence of forgery remains overwhelming.[4]  (See generally *Id.*, ¶¶ 52-107.)

4  Likewise, NMS' intentional and widespread destruction of evidence during the pendency of

5  this case, in violation of multiple court orders, cannot be the basis of any genuine dispute. The

6  forensic evidence uncovered includes Google search terms by multiple NMS officers and employees

7  such as: *"secure wipe hard drive," "computer expert los angeles," "backdated secure wipe," "los*

8  *angele[s] anti-computer forensics,"* and *"How to avoid computer forensics."* (*Id.*, fig. 12.)

9  Similarly, *forensic evidence uncovered a text exchange between Neil Shekhter and his son, Alan,*

10  *an NMS employee*, after Judge Bruguera issued her forensic examination order, *in which Mr.*

11  *Shekhter and his son discussed removing the hard drive from Mr. Shekhter's computer, replacing*

12  *it with a new one that looks just like it, and then loading backdated files onto the new hard drive to*

13  *hide the fact that the exchange had taken place.* (*Id.*, ¶ 55, fig. 7.) A copy of that text message

14  exchange, *which Mr. Shekhter deleted*, is attached hereto as Exhibit C. The evidence conclusively

15  establishes that Mr. Shekhter and his son then did just that, and *subsequently hid or destroyed the*

16  *original hard drive, the Seagate hard drive on which they had backed up the original hard drive,*

17  *and at least 21 other electronic devices, as well as deleting numerous electronic documents,*

18  *including the Word document entitled "Property Management-375 ns.doc"* that Mr. Shekhter

19  created on June 24, 2015 just before he scanned the forged La Cienega PMA. (*Id.*, ¶¶ 6(c), 56-62,

20  68-76, 81-84, fig. 11.)  *__The evidence also shows that other NMS employees downloaded portable__*

21  *__eraser software and utilized it before turning over electronic files__*. (*Id.*, ¶¶ 101-106.) In sum, the

22  spoliation evidence in this case is both overwhelming and unprecedented.

23  For these reasons and those discussed below, the Court should issue terminating sanctions

24  against NMS, striking its Answer to the First Amended Complaint and ordering that judgment be

25

26

27  [4]  The evidence of NMS' forgery of the JVA and an alleged "cover letter" to the forged JVA is just
as compelling (see generally LaPorte Decl.; Rubin Decl.; Zelenay Decl. Exhs. L, M.), though

28  neither document is relevant to the termination of the PMAs by Plaintiffs.

Gibson, Dunn &
Crutcher LLP

4

PLAINTIFFS' MOTION FOR TERMINATING AND OTHER SANCTIONS AGAINST DEFENDANTS
FOR SPOLIATION OF EVIDENCE AND LITIGATION MISCONDUCT

EXHIBIT D - PAGE 143

1    entered in Plaintiffs' favor.[5]  Additionally, NMS and its counsel should be sanctioned in the amount

2    of $25,000, a small fraction of the attorneys' fees and costs incurred in bringing this Motion.

3    **II.      THE COURT HAS THE AUTHORITY TO ISSUE TERMINATING SANCTIONS**

4          Section 2023.030 of the Code of Civil Procedure provides that "the court, after notice to the

5    affected party, person, or attorney, and after opportunity for hearing, may impose the following

6    sanctions against anyone engaging in conduct that is a misuse of the discovery process: . . . (d)  The

7    court may impose a terminating sanction by one of the following orders:  (1) An order striking out the

8    pleadings or part of the pleadings of any party engaging in the misuse of the discovery process. . . .

9    (3) An order dismissing the action, or any part of the action, of that party.  (4) An order rendering a

10   judgment by default against that party."  (Code Civ. Proc., § 2023.030, subd. (d).)[6]

11         "Misuses of the discovery process" subject to terminating sanctions "include, but are not

12   limited to, . . . : . . . (f)  Making an evasive response to discovery  [or] (g) Disobeying a court order to

13   provide discovery."  (Code Civ. Proc., § 2023.010, subds. (c), (f), (g).)  "Misuses of the discovery

14   process" subject to terminating sanctions also include the willful, intentional alteration or destruction

15   of evidence.  (See, e.g., *Williams v. Russ* (2008) 167 Cal.App.4th 1215, 1223; *R.S. Creative, Inc. v.*

16   *Creative Cotton, Ltd.* (1999) 75 Cal.App.4th 486, 497.)

17         In *Williams*, for instance, Justice Rubin, writing for a unanimous panel of the Second District,

18   affirmed the trial court's awarding of terminating sanctions against a plaintiff on facts far less

19   egregious than those here:  the plaintiff failed to pay fees on a storage locker, resulting in the loss of

20   files in the locker.  (*Williams, supra,* 167 Cal.App.4th at p. 1224.)  As the court stated, the intentional

21   alteration or destruction of evidence "is a misuse of the discovery process that is subject to a broad

22   range of punishment, including . . . terminating sanctions."  (*Id.* at p. 1223.)  "Such conduct is

23   condemned because it can destroy fairness and justice, for it increases the risk of an erroneous

24   _____

25   [5]  Should the Court grant this relief, Plaintiffs would be willing to waive their request for monetary
     damages, and request only the non-monetary relief sought in their First Amended Complaint.

26
     [6]  Subdivision (a) also provides:  "The court may impose a monetary sanction ordering that one

27   engaging in the misuse of the discovery process, or any attorney advising that conduct, or both
     pay the reasonable expenses, including attorney's fees, incurred by anyone as a result of that

28   conduct. . . ."  (Code Civ. Proc., § 2023.030, subd. (a).)

Gibson, Dunn &
Crutcher LLP

5

PLAINTIFFS' MOTION FOR TERMINATING AND OTHER SANCTIONS AGAINST DEFENDANTS
FOR SPOLIATION OF EVIDENCE AND LITIGATION MISCONDUCT

EXHIBIT D - PAGE 144

1    decision on the merits of the underlying cause of action [and] . . . can increase the costs of litigation."

2    (*Ibid.*) As the *Williams* court stated, "[a] terminating sanction is appropriate in the first instance

3    without a violation of prior court orders in egregious cases of intentional spoliation of evidence"—

4    which the court found in the case before it. (*Ibid.*) The *Williams* court recognized: "The power to

5    impose discovery sanctions is a broad discretion subject to reversal only for arbitrary, capricious, or

6    whimsical action." (*Id.* at p. 1224.)

7         Likewise, in *R.S. Creative, Inc.*, Justice Epstein, writing for another unanimous panel of the

8    Second District, affirmed the trial court's ordering of terminating sanctions against a plaintiff under

9    section 2023.030 on facts again less egregious than those here: the plaintiff forged one document,

10   provided perjury about the authenticity of the document, and destroyed or altered files on just one

11   desktop and one laptop. (*R.S. Creative, supra,* 75 Cal.App.4th at pp. 488, 491, 497.) The court found

12   that these actions "illustrate a kind of discovery abuse that is intolerable in civil litigation." (*Id.* at p.

13   488.) The court, holding that "terminating and monetary sanctions are . . . fully justified" on the facts

14   before it, found: "This case presents a particularly egregious example of an effort at discovery games

15   by plaintiffs. Indeed, the efforts of [plaintiff's] principal and only officer and director went beyond

16   gamesmanship and intruded into the area of actual fraud." (*Id.* at p. 498.)

17        Similarly, in *Los Defensores v. Gomez*, Justice Manella, writing for a unanimous panel of the

18   Second District, affirmed yet another trial court ruling granting terminating sanctions against the

19   defendant under Section 2023.030, based on the defendant's failure to produce certain "call logs" and

20   other documents the defendant had testified to during deposition. (*Los Defensores v. Gomez* (2014)

21   223 Cal.App.4th 377, 391-392.) The court held that terminating sanctions were justified because

22   there "is sufficient evidence that [defendants] willfully failed to comply with the [court's orders]"

23   that relevant material be produced. (*Id.* at p. 391.)[7]

24        In addition to section 2023.030, the Court has inherent authority to issue terminating

25

26
_____

27   [7]  See also *Van Sickle v. Gilbert* (2011) 196 Cal.App.4th 1495, 1519 [Third District unanimously
     upholding trial court's striking of defendant's answer as discovery sanction]; *Electronic Funds
28   Solutions v. Murphy* (2005) 134 Cal.App.4th 1161, 1184 [Fourth District unanimously affirming
     terminating sanctions against defendant for violating court orders].

Gibson, Dunn &
Crutcher LLP

6

PLAINTIFFS' MOTION FOR TERMINATING AND OTHER SANCTIONS AGAINST DEFENDANTS
FOR SPOLIATION OF EVIDENCE AND LITIGATION MISCONDUCT

EXHIBIT D - PAGE 145

1    sanctions. The case of *Stephen Slesinger, Inc. v. Walt Disney Co.* (2007) 155 Cal.App.4th 736 is

2    instructive. There, Justice Willhite, writing for a unanimous panel of the Second District, affirmed

3    the trial court's decision issuing terminating sanctions against a plaintiff for litigation misconduct (the

4    plaintiff's investigator stole files from defendant and the files were then forged or altered by

5    plaintiff). "Courts cannot lack the power to defend their integrity against unscrupulous marauders; if

6    that were so, it would place at risk the very fundament of the judicial system." (*Id.* at p. 762.)

7       Indeed, even if there were any genuine factual disputes (and there are none), this Court has

8    the exclusive authority to resolve any such disputes. (*Tucker v. Pac. Bell Mobile Servs.* (2010) 186

9    Cal. App.4th 1548, 1562). Otherwise, it "would be to permit a plaintiff who is perpetrating a fraud

10    on the court to run roughshod over the court's integrity." (*Ceglia v. Zuckerberg* (W.D.N.Y. Mar. 26,

11    2013) 2013 WL 1208558, at \*11, 25-26, 36;[8] see also *REP MCR Realty, L.L.C. v. Lynch* (N.D. Ill.

12    2005) 363 F.Supp.2d 984, 1014-1015; *Peat, Marwick, Mitchell & Co. v. Superior Court* (1998) 200

13    Cal.App.3d 272, 282; *Victor Stanley, Inc. v. Creative Pipe, Inc.* (D. Md. 2010) 269 F.R.D. 497, 505)

14      **III.    TERMINATING SANCTIONS SHOULD BE AWARDED HERE**

15    **A.    NM Forged The "La Cienega PMA," Among Other Documents**

16       Forgery provides grounds for terminating sanctions. (*See, e.g., R.S. Creative, supra,* 75

17    Cal.App.4th at pp. 487-488 [awarding terminating sanctions based in part on the proffer of a forgery];

18    *Williams, supra,* 167 Cal.App.4th at p. 1223 ["Spoliation of evidence means the destruction or

19    significant alteration of evidence . . ."]; *Slesinger, supra,* 155 Cal.App.4th at p. 770 [issuing

20    terminating sanctions in part based upon plaintiff's alteration of documents]; *Ceglia, supra,* 2013 WL

21    1208558, at \*72-73 [granting terminating sanctions on account of plaintiff's relying upon a forged

22    document].) Plaintiffs have submitted with this Motion the declarations of Mr. Rubin of Stroz

23    Friedberg, and Gerald LaPorte, the Director of the Office of Investigative and Forensic Sciences at

24    the National Institute of Justice, a division of the United States Department of Justice, who is a

25    nationally recognized expert trained by the Secret Service. Both of these experts confirm that the La

26

27

28    [8]   For the Court's convenience, a true and correct copy of the opinion in the analogous case of *Ceglia v. Zuckerberg* is attached hereto as <u>Exhibit D</u>.

7

PLAINTIFFS' MOTION FOR TERMINATING AND OTHER SANCTIONS AGAINST DEFENDANTS FOR SPOLIATION OF EVIDENCE AND LITIGATION MISCONDUCT

1  Cienega PMA is a forgery, and that NMS also forged the JVA it submitted to this Court, as well as at

2  least one more document.  (Rubin Decl., ¶¶ 5, 15, 32, 43; LaPorte Decl., ¶¶ 122, 125, 128.)  As Mr.

3  Rubin, an expert in data collection and forensic analysis, unambiguously states:  "[The] Luxe La

4  Cienega PMA is a forgery."  (Rubin Decl., ¶ 43; see also LaPorte Decl., ¶ 128.)

5      The bevy of expert evidence confirming that the Luxe La Cienega PMA with the 60-day term

6  that NMS proffered to this Court is a forgery is overwhelming, but includes the following:

7  - The forensic timeline developed by Mr. Rubin based upon his inspection of NMS'
       computers, and summarized in Exhibit A, which shows that Mr. Shekhter created the
8      forgery on June 24, 2015, after receiving an adverse legal ruling from the Court, based
       upon PMAs for properties owned by 1410 5th Street that were emailed from closed email
9      accounts to him that morning.  Mr. Shekhter forged the La Cienega PMA from these other
       PMAs (changing the property name, date, and 30-day termination provision from the prior
10     PMAs), but botched the first attempt at the forgery by including a cover page on the "La
       Cienega PMA" with an owner for these other properties (an owner whose transactions had
11     closed *nearly two years before* the date listed on the botched forgery).  When Mr.
       Shekhter realized his mistake, he created yet another, new version with a corrected cover
12     page (same property name and date as the botched forgery, but with a different owner
       property name and owner whose transaction occurred nearly two years later) that night.
13     (Rubin Decl., ¶ 51(a)-(f).)

14 - As the expert declaration of Mr. LaPorte explains, the forged La Cienega PMA contains
       formatting, textual anomalies, and other characteristics that are found in the earlier PMAs
15     for the 1410 5th Street properties—which were also contained in the emails sent to Mr.
       Shekhter the morning of June 24, 2015.  Tellingly, these same anomalies, characteristics,
16     and formatting are *not* found in the drafts of the actual La Cienega PMA circulated among
       the parties in 2012 and provided to lenders at the time.  (LaPorte Decl., ¶ 27.)

17

18 - On the morning of June 24, 2015, three years after the La Cienega PMA was actually
       drafted, the forensic evidence shows that Mr. Shekhter *created* and *modified* a Word
19     document, entitled "Property Management-375 ns.doc".  "375" is the address of the La
       Cienega Property, and "ns" are the initials of Neil Shekhter.  (Rubin Decl., ¶ 51(b).)

20 - On October 15, 2015, immediately prior to forensic inspection, Mr. Shekhter and his son,
       Alan, engaged in the illegal hard drive "swap" discussed below, destroying the file
21     "Property Management-375 ns.doc", which has never been produced.  (*Id.*, ¶¶ 51(b), 71.)
       Mr. Shekhter's right hand man, Eddie Valentin, also sought out and destroyed a local copy
22     of the forged La Cienega PMA on his own computer immediately prior to the forensic
       inspection.  (*Id.*, ¶ 107.)

23

24 - *Every* PMA document on NMS' systems, including all executed versions and drafts
       (including drafts of the Luxe La Cienega PMA) and including everything found in NMS'
25     email correspondence, contains a 30-day no cause termination provision.  It was not until
       NMS proffered its forgery on June 24, 2015 of the Luxe La Cienega PMA (a document
26     allegedly finalized in 2012) that a 60-day provision appears for the first time on any NMS
       device.  (*Id.*, ¶ 45.)

27 - There is no Word version at all on any of NMS' systems or devices of the forged La
       Cienega PMA (which is altered and different from all other PMAs with its purported 60-
28     day term.  As Mr. Rubin states:  "If NMS' Luxe La Cienega PMA was authentic, I would

Gibson, Dunn &
Crutcher LLP

8

PLAINTIFFS' MOTION FOR TERMINATING AND OTHER SANCTIONS AGAINST DEFENDANTS
FOR SPOLIATION OF EVIDENCE AND LITIGATION MISCONDUCT

EXHIBIT D - PAGE 147

1   expect to find contemporaneously created drafts of the document circulated internally at
2   NMS and/or between the parties prior to the creation of the final version. Indeed, there
    are numerous Word versions of other PMAs sent back and forth between the parties;
3   however, across all of NMS' computer systems that I was provided, I did not identify a
    single copy of Plaintiffs' Luxe La Cienega PMA in Word format." (*Id.*, ¶ 46.)

4   • Mr. Shekhter also wholly deleted another clause in the forged "La Cienega PMA"
      (tellingly the one providing for circumstances of "immediate termination" of the Property
5     Manager). (*Id.* ¶¶ 50-51.) Because of this forgery, the Table of Contents in the document
      no longer matches up with the document itself. (LaPorte Decl., ¶ 110; see also Exhibit E.)
6     This is the only document amongst all of the PMAs circulated and provided by NMS for
      all of the properties where the Table of Contents does not match up with the document
7     itself. (Rubin Decl., *id.*)[9]

8   • The document metadata for the La Cienega PMA proffered by NMS also indisputably
      shows it was created on June 24, 2015 (more than three years after it was allegedly
9     finalized), and the day the forgery was submitted to the Court. (*Id.*, ¶¶ 47-49.)
      Meanwhile, the document metadata for the legitimate drafts of the La Cienega PMA with
10    a 30-day term show creation dates in early 2012, and all versions of the La Cienega PMA
      on NMS' systems have a 30-day term.[10] (See Rubin Decl., ¶ 45.)
11
12  • Although Mr. Shekhter claimed he "misfiled" the PMA in his office, the forensic evidence
      demonstrates that he created and scanned it from his home computer. (*Id.*, ¶ 51.) Prior to
      this point, Mr. Shekhter had sworn under penalty of perjury that he did not have the PMA
13    at all. (Zelenay Decl. Exh. F, at ¶ 25.1.)

14      The unmistakable expert conclusion from these facts, all of which are undisputed, is clear:

15  NMS forged the La Cienega PMA with the 60-day term proffered to this Court on June 25, 2015.

16  (Rubin Decl., ¶¶ 5, 15, 32, 43; LaPorte Decl., ¶¶ 122, 125, 128.)

17      Moreover, although not necessary to reach the conclusion of forgery, the contemporaneous

18  evidence unanimously confirms this conclusion. There is absolutely no evidence in the record at all,

19  other than Mr. Shekhter's wholly unsupported, perjured testimony, that anything but a 30-day

20  termination provision was ever considered by the parties, let alone agreed upon. The 30-day

21  provision is found explicitly in the JVA itself (whether considering the actual or forged version of the

22

23  [9] This is reminiscent of the error NMS made in forging what NMS refers to as "Version 2" of the
    JVA, where Mr. Shekhter's altering of "five (5) years" to "three (3) years" caused one letter in
24  one line to move beyond the right margin, making that one line the only one not right justified in
    78 pages of the document. (See Zelenay Decl., Exh. F, at § 12.1; Rubin Decl., ¶ 21; LaPorte
25  Decl., ¶ 74.)

26  [10] Additionally, in March 2012, Amber Peterson of NMS wrote internally that NMS did not have a
    final executed copy of the La Cienega PMA and this was confirmed internally at NMS in April
27  2012; yet, the "LA Cienega PMA" proffered by NMS to this Court following an adverse legal
    ruling is dated March 1, 2012—before Ms. Peterson's email stating NMS did not have an
28  executed copy. (Zelenay Decl., Exh. J.)

9

Gibson, Dunn &
Crutcher LLP

PLAINTIFFS' MOTION FOR TERMINATING AND OTHER SANCTIONS AGAINST DEFENDANTS
FOR SPOLIATION OF EVIDENCE AND LITIGATION MISCONDUCT

EXHIBIT D - PAGE 148

JVA) (Watson Decl., ¶¶ 10, 12 & Exh. A, at § 8.9 )[11]; it is also in the Form PMA that the parties
agreed to, and which was constantly circulated and referred to by the parties as the binding Form (*id.*
¶¶ 14-23; Chun Decl., ¶¶ 5, 31)[12]; and it is in every executed copy and draft of all PMAs (other than
the forged one proffered by NMS on June 25, 2015) (see generally, Watson Decl.; Chun Decl.). It
was even included in the draft La Cienega PMA that was circulated among the parties in early 2012,
to which NMS agreed and stated "This looks ok" (Chun Decl., ¶ 15 & Exh. G), and that was provided
to lenders at the time, (*id.*, ¶ 16 & Exh. H).

Nor did NMS ever argue or suggest at any point prior to June 25, 2015 that there was a
different PMA for the La Cienega property with a different 60-day term. (See Chun Decl., ¶ 31,
Watson Decl., ¶ 34; Samek Decl., ¶ 14.) Only Mr. Shekhter has ever made such a claim, and he
made it for the first time on June 25, 2015. (See Zelenay Decl., Exh. A.) Dino Ciarmoli, the former
CFO of NMS, however, recently testified in this case that he is not aware of ***any*** PMA with anything
other than a 30-day provision, and that all PMAs were based upon the original Form with the 30-day
provision. (*Id.*, Exh. E, at 62:24-63:4; 63:8-11; 69:25-70:9; 82:11-85:19; 92:18-24.)

In short, not one person or document—from NMS or otherwise—supports any conclusion
other than that the "La Cienega PMA" was a forgery.

**B.    NMS Has Engaged In A Campaign of Intentional Destruction of Evidence**

The intentional destruction of evidence by NMS alone provides sufficient grounds for
terminating sanctions. (*See, e.g., R.S. Creative, supra,* 75 Cal.App.4th at pp. 487-488; *Williams,
supra,* 167 Cal.App.4th at p. 1223; see also *Electronic Funds, supra,* 134 Cal.App.4th at p. 1184; *Los*

---

[11] The definition of "Property Management Agreement" in the JVA provides that any PMA would be "cancellable, without penalty or fee, upon ***thirty (30) days*** written notice." (Watson Decl., ¶ 10 & Exh. A.) And Section 8.9 of the JVA states that "the Investor Member shall have the sole and exclusive right: (i) . . . to cause the Company to cause each Subsidiary Company to exercise its right to terminate the Property Management Agreement without cause upon not less than ***thirty (30) days notice*** to the Property Manager." (*Id.* ¶ 12 & Exh. A [emphasis added].)

[12] The Form PMA states: "Owner may terminate this Agreement . . . without cause, by giving Manager at least *30 days* prior written notice." This Form PMA was agreed to at the time the JVA was being finalized. (See Watson Decl., ¶ 16 & Exh. B; *see also id.*, ¶ 21 & Exh. E; Chun Decl., ¶¶ 22-23 & Exh. K.) This Form was also referred to on numerous closing checklists for the various properties. (See, e.g., Watson Decl. Exh. L.)

Gibson, Dunn &
Crutcher LLP

10

PLAINTIFFS' MOTION FOR TERMINATING AND OTHER SANCTIONS AGAINST DEFENDANTS
FOR SPOLIATION OF EVIDENCE AND LITIGATION MISCONDUCT

EXHIBIT D - PAGE 149

*Defensores, supra,* 223 Cal.App.4th at pp. 387, 391; *Ceglia, supra,* 2013 WL 1208558, at \*72-73.)
The expert evidence has revealed unheard of actions of spoliation by NMS in violation of multiple
court orders, easily deserving of terminating sanctions.

> **1.**    **NMS Conspired To Destroy Evidence on Neil Shekhter's Computer, Including Evidence Relating To The Forgeries NMS Proffered To The Court**

On the morning of October 15, 2015, *while this case was pending* and the day before NMS'
computers were to be inspected *pursuant to court orders requiring that all evidence be preserved
and produced,* NMS principles took the following incredible actions. First, Mr. Shekhter's adult son,
Alan, an employee of NMS, ran a stunning series of Google searches for: "secure wipe hard drive,"
"backdated secure wipe," "los angele[s] anti-computer forensics," and "how to avoid computer
forensics." (Rubin Decl., ¶¶ 6(a) & fig. 12.) Then, after Alan ran these searches, Alan and Neil
Shekhter, NMS' CEO and principal, engaged in the text exchange (which Mr. Shekhter then
deleted—a sanctionable act on its own) that is found in Exhibit C. The text message is bone-chilling
and speaks for itself. It outlines an incredible criminal plan of spoliation that Alan and Neil Shekhter
then executed: *while this case was pending* and *while under court orders to preserve and produce
all evidence,* Neil Shekhter and his son Alan intentionally, knowingly, and surreptitiously (i)
*removed* the hard drive from Neil Shekhter's computer upon which the La Cienega PMA was forged
and that was to be subject to forensic inspection; (ii) *replaced* it with one that would look similar ("so
it looks like you upgraded"); (iii) manipulated and altered the computer by *artificially backdating* the
computer's clock; and then (iv) *flooded* the hard drive with more than 75,000 backdated files and
folders so that the swap would go undetected ("We could even put some data files from another one
of your computers which will show date created as before . . . As long as I change the date before.").
(Rubin Decl. fig. 7.) Neil Shekhter impressed on Alan the urgency of this illegal plan of evidence
alteration and destruction in light of the impending court-ordered forensic inspection: "Take it and
have it done today," and "pay them extra" to do it. (See *id.*)

Incredibly, Neil and Alan Shekhter, when caught, just lied again, claiming that, despite the
Court's orders, they took these actions and others, to hide "private pictures" of Neil Shekhter's wife.
(Zelenay Decl., Exh. H, at ¶ 151.) The forensic analysis demonstrates this is a complete fabrication:
Neil Shekhter and his son destroyed *over 800 files,* including dozens of Excel, Word, and PDF files

Gibson, Dunn &
Crutcher LLP

11

PLAINTIFFS' MOTION FOR TERMINATING AND OTHER SANCTIONS AGAINST DEFENDANTS
FOR SPOLIATION OF EVIDENCE AND LITIGATION MISCONDUCT

EXHIBIT D - PAGE 150

1    clearly related to the Joint Venture, among them the file "Property Management-375 ns. doc" created
2    and modified on Neil Shekhter's computer the very morning that the "La Cienega PMA" forgery was
3    created. Other files that NMS destroyed as part of this process include documents entitled "P6 LA
4    MF Holdings I LLC – fully executed (ver 1).pdf" and "2010 12 14 P6 LA MF Holdings I LLC – final
5    Ver 4.pdf," among many others (known and unknown). (Rubin Decl., fig. 10.) Obviously, none of
6    these files were photographs of anyone.

7            **2.      Other NMS Employees Also Conspired to Destroy Evidence**

8            Neil Shekhter and his son were not alone at NMS in their destruction of evidence. Instead,
9    this was a coordinated effort engaged in by numerous NMS employees in concert with Neil Shekhter
10   and each other. For example, on December 3, 2015, while this case was pending, and the day before
11   the forensic examination began, Eddie Valentin, who counsel for NMS has described as Mr.
12   Shekhter's assistant of "many years," sought out and intentionally destroyed a copy of the forged "La
13   Cienega PMA" from his desktop computer. (*Id.*, ¶ 107.)

14           Furthermore, on December 4, 2015, *the very day that the forensic examination took place,*
15   Enrique Sanchez, the Information Technology employee at NMS, searched for "*file deletion utility*
16   *windows 7*" and "*free SSD secure erase*", and *then downloaded a powerful computer data*
17   *destruction and wiping application called "Eraser Portable."* (*Id.*, ¶ 99, fig. 99.) This "data wiping"
18   software was copied to the NMS corporate file server. Both Enrique Sanchez and another NMS
19   employee, Brian Bowis (Vice President for Finance at NMS), *then used this "data wiping" software*
20   *the morning before their computers were to be imaged.* (*Id.*, ¶¶ 102-106.)

21           In advance of the court-ordered forensic inspection, Mr. Sanchez also sent Mr. Shekhter
22   another "data erasing" program (called "ExifTool") and ran alarming Google searches for "*wipe*
23   *multiple hard drives simultaneously,*" "*hard drive destruction service,*" and "*hard drive destruction*
24   *service los angeles.*" (*Id.*, ¶ 42(b), fig. 13.) He then ran a confirming search: "does eraser work on
25   ssd?" (Rubin Decl., fig. 13.)

26           Similarly, in November 2015, Mr. Sanchez also searched for "*Adobe Acrobat removal tool*",
27   and Adobe Acrobat was deleted sometime after October 2, 2015 from the computer of Adam
28   Shekhter, which had been the host of the JVA forgery proffered by NMS to this Court. (*Id..*)

Gibson, Dunn &
Crutcher LLP

12

PLAINTIFFS' MOTION FOR TERMINATING AND OTHER SANCTIONS AGAINST DEFENDANTS
FOR SPOLIATION OF EVIDENCE AND LITIGATION MISCONDUCT

EXHIBIT D - PAGE 151

### 3. NMS Also Engaged In A Wide Net Of Other Data and Document Destruction Actions

Among additional other actions outlined in Mr. Rubin's declaration:

- On December 2, 2015, two days before NMS' computers were to be imaged pursuant to a court order and while this case was pending, NMS installed a new Operating System on Neil Shekhter's computer. (*Id*, ¶¶ 6(e).) This was a manual installation, done by a manual upload or use of a Windows 10 DVD. The action resulted in thousands of changes to the file system metadata, making forensic examination more difficult. (*Id.*, ¶ 79.)

- On or after December 2, 2015, a folder on Neil Shekhter's computer called "AEW" was renamed to "W" to hide the folder from the forensic experts, and subfolders and files within the folder were also deleted. The deleted subfolders included ones named "AEW docs," "AEW Legal \ From AEW," and "AEW Legal\Neil Decl." They also included two subfolders related to the "cover letter" forgery called "AEW docs\From AEW\09 21 2010\AEW v 2 Letter" and "AEW docs\From AEW\09 21 2010." (*Id.*, ¶¶ 72-73.)

- Sometime between November 25, 2015 and December 4, 2015, Neil Shekhter also deleted a zip file emailed to him from Daniel Lennon—a disgruntled former employee of AEW Capital Management (which advises the Investor Member in the Joint Venture); the file was described as containing every AEW document that Mr. Lennon could locate. (*Id.*, ¶ 74.) Neil Shekhter admitted that he did this to hide the communication from Plaintiffs. (Zelenay Decl., Exh. H, at ¶ 155.)

- Between the period of October 4, 2015 and December 4, 2015, the computer clock on Neil Shekhter's computer was also manually changed and manipulated at least seventeen times, meaning someone manually altered the computer clock to attempt to backdate files. All told, these actions altered the data associated with over 800,000 files and folders in the process. (Rubin Decl., ¶¶ 63-67.)

- At least 21 storage devices that were connected to Neil Shekhter's computer between June 2015 and December 5, 2015 have never been produced. This includes the Seagate drive allegedly used to back up Neil Shekhter's computer prior to the illegal swap, the swapped out hard drive from Neil. Shekhter's computer on which the "La Cienega PMA" was forged, and a zip drive on which the forged JVA that Neil Shekhter proffered to this Court was created. (*Id.*, ¶¶ 81-84, fig. 11.)

- Neil Shekhter also testified that he simply "threw away" an older computer on which he had created forgeries and thus failed to produce that computer; however, the forensic evidence demonstrates the computer was still active long after his testimony and was connected to the network as late as the end of last year. This computer has never been produced, (*id.*, ¶¶ 6(b), 52-53.); and

- Although NMS claims it simply "discarded" the Seagate drive use to back-up Neil Shekhter's computer prior to the illegal "swap" and never produced the drive, the evidence shows it was still active and connected to NMS servers long after this swap. (*Id.*, ¶¶ 82-83.)

### C. The Prejudice to Plaintiffs From NMS' Actions Is Immeasurable

NMS' intentional, concerted actions go far beyond anything in any of the published cases where terminating sanctions have been issued. They far exceed the conduct of the plaintiff in

PLAINTIFFS' MOTION FOR TERMINATING AND OTHER SANCTIONS AGAINST DEFENDANTS FOR SPOLIATION OF EVIDENCE AND LITIGATION MISCONDUCT

1     *Williams* (involving the failure to pay fees on one storage locker, resulting in the loss of the files in

2     the locker); the conduct of the sanctioned party in *R.S. Creative* (involving one forged document, as

3     compared to at least three here, and the destruction of files on one desktop and laptop, as compared to

4     many here); or the actions of the defendant in *Los Defensores* (involving the failure to produce

5     documents identified in deposition.) Indeed, the only cases even approaching the level of misconduct

6     here are *Slesinger* (involving the breaking and entering of opposing party's offices) and *Ceglia*

7     (involving the forgery of a document and spoliation), but even those cases do not reach the level of

8     misconduct here and neither involved the intentional violation of multiple court orders (as is the case

9     here).[13] This is truly an action of unparalleled misconduct.

10       The prejudice to Plaintiffs from these actions of NMS is immeasurable. The documents that

11     NMS destroyed are relevant to this case for purposes of both liability and damages. (Rubin Decl., §

12     B.; Chun Decl.; Watson Decl. ¶ 13; Chun Decl. ¶ 5.) It would be manifestly unfair and inequitable to

13     allow NMS to proceed with its defenses in this case (of which there are none), given its rampant

14     document destruction, especially when it was responsible for executing and maintaining all of the

15     documents relating to the Properties. (See *id.*) Assuming that any trial were necessary (Plaintiffs

16     will seek summary judgment if this Motion is not granted), NMS should not be allowed to tell a jury

17     defenses that it claims are based on the absence of documents, when it has clearly engaged in massive

18     spoliation of such documents; nor should NMS be permitted to present forgeries to any jury. As

19     numerous courts have recognized, ***destruction of these files represents prejudice of the highest***

20     ***order to Plaintiffs***: "'[w]ithout knowing the content and weight of the spoliated evidence, it would

21     be impossible for the jury to meaningfully assess what role the missing evidence would have played

22     in the determination of the underlying action. The jury could only speculate . . . .'" (*Williams, supra,*

25     [13] The actions of NMS are egregious, so a violation of a prior court order is not required to issue
26     terminating sanctions. But the fact that court orders *were violated* only makes terminating
    sanctions more deserving. (See, e.g., Code Civ. Proc., § 2023.010, subd. (g) [violation of court
27     order, such as the court's preservation and production order, provides grounds for terminating
    sanctions]; *Williams, supra,* 167 Cal.App.4th at p. 1223 [stating terminating sanctions may be
28     ordered in the first instance, i.e., without a violation of a court order, in "egregious cases"].)

1   167 Cal.App.4th at p. 1227 [quoting *Cedars–Sinai Medical Center v. Superior Court* (1998) 18

2   Cal.4th 1, 14].)[14]

3          Nor can NMS claim that it is somehow insulated from the full scope of its misconduct

4   because it is allegedly impossible to know the full and complete extent of everything it has destroyed.

5   As one court has stated, that is akin to "the story of the children who murdered their parents and then

6   pled for sympathy as orphans." (*Peal v. Lee* (2010) 403 Ill.App.3d 197, 205.) NMS has engaged in

7   rampant, unprecedented document destruction, in plain violation of multiple court orders and

8   counsel's ethical obligations. In these circumstances, when the evidence is gone and destroyed and

9   there is no other remedy that will cure the prejudice suffered by Plaintiffs or protect the integrity of

10  the judicial system itself, terminating sanctions should be issued. (*See, e.g.*, *R.S. Creative*; *Williams,*

11  *supra,* 167 Cal.App.4th at p. 1227; *Van Sickle, supra,* 196 Cal.App.4th at p. 1518; *Los Defensores,*

12  *supra,* 223 Cal.App.4th at p. 391; *Ceglia, supra,* 2013 WL 1208558, at *11, 72-73.)

13                    **IV.    FEES AND COSTS ALSO SHOULD BE AWARDED**

14         The Code of Civil Procedure also authorizes an award of fees and costs, and demands it when

15  the opposing party's actions are not "substantially justified." (Code Civ. Proc., § 2023.030, subd.

16  (a).) Here, there is no justification for NMS' or its counsel's actions, and fees and costs should be

17  awarded. Attorneys' fees and costs, including the cost of the forensic experts, incurred to date far

18  exceed the amount of $25,000 in sanctions requested, and Defendant's counsel must be held jointly

19  and severally liable for these sanctions given their inability and/or unwillingness to explain their

20  knowledge and involvement in this conduct, all of which took place on their watch. (*Sinaiko*

21  *Healthcare Consulting, Inc. v. Pacific Healthcare Consultants* (2007) 148 Cal.App.4th 390, 401, 413

22  [counsel is subject to sanctions]; see, e.g., *Williamson v. Recovery Ltd. P'ship* (S.D. Ohio May 9,

23  2014) 2014 WL 1884401, at *10-13 [counsel cannot be "willfully blind to the truth . . . [or] the

24  judicial machinery itself has been subverted."].)

25

26  [14] NMS has admitted that the same devices that it destroyed and altered, making terminating

27  sanctions deserving in *Lincoln Studios*, are the same ones that would be relevant here. Indeed, for
    NMS, the two actions involved the same people, in the same building, with the same computers.

28  And NMS has responded to discovery in this case by referring to the discovery it produced (and
    failed to produce) in *Lincoln Studios*. (Zelenay Decl. ¶ 21.)

                                              15
PLAINTIFFS' MOTION FOR TERMINATING AND OTHER SANCTIONS AGAINST DEFENDANTS
FOR SPOLIATION OF EVIDENCE AND LITIGATION MISCONDUCT

# V. CONCLUSION

For all of the foregoing reasons, Plaintiffs respectfully request that terminating and monetary sanctions in the amount of $25,000 be issued.

DATED: June 3, 2016

GIBSON, DUNN & CRUTCHER LLP

By: _____
James P. Fogelman
Attorney for Plaintiffs

PLAINTIFFS' MOTION FOR TERMINATING AND OTHER SANCTIONS AGAINST DEFENDANTS
FOR SPOLIATION OF EVIDENCE AND LITIGATION MISCONDUCT

Gibson, Dunn &
Crutcher LLP

# Exhibit E

EXHIBIT E - REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

# CERTIFICATE OF SERVICE

*Aspen Specialty Insurance Company v. Miller Barondess, LLP, et al.*
*USDC Case No. 2:21-CV-04208*

**STATE OF CALIFORNIA, COUNTY OF LOS ANGELES**

   I am a citizen of the United States and employed in Los Angeles County, California.  I am over the age of eighteen years and not a party to the within-titled action.  My business address is **601 South Figueroa Street, Suite 2500, Los Angeles, California 90017.**

   On May 20, 2021, I served the **"COMPLAINT FOR DECLARATORY RELIEF AND REIMBURSEMENT"** on the counsel listed and by the methods indicated below:

   The following CM/ECF participants were served by electronic means through the Court's CM/ECF system on May 20, 2021.

| *SEE COURT'S SERVICE LIST* |
| --- |

   I declare under penalty of perjury that the foregoing is true and correct, and that I am employed in the office of a member of the bar of this Court at whose direction the service was made.  Executed on May 20, 2021, at Los Angeles, California.

<div align="right">

/s/ *Ermelita P. Gonzalez*
_____

Ermelita P. Gonzalez

</div>